IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| POLARIS ENGINEERING, INC., § § *Plaintiff*, § § v. § § TEXAS INTERNATIONAL § TERMINALS, LTD., § § *Defendant*. § | CIVIL ACTION NO. 4:20-cv-03389 |

**PLAINTIFF POLARIS ENGINEERING, INC.'S
<u>FIRST AMENDED COMPLAINT</u>**

Plaintiff Polaris Engineering, Inc. ("Polaris") files this First Amended Complaint against Texas International Terminals, Ltd. ("TXIT") and respectfully shows as follows:

**INTRODUCTION**

1. TXIT operates a fuel storage, loading and processing facility located in Galveston, Texas. Polaris agreed to engineer, design and construct certain facilities for TXIT under three separate contracts, each based on certain critical assumptions agreed to in advance by TXIT. Based on those critical assumptions, Polaris priced the work under each of the three contracts. When those critical assumptions turned out to be false or when TXIT requested a change, Polaris submitted Change Orders for TXIT's approval as provided for under the respective agreements. But TXIT refused to accept or reject the Change Orders, or engage in the dispute resolution procedures set forth in the Parties' contracts to resolve the Change Orders.

2. Polaris kept working, and completed 100% of the work to achieve Mechanical Completion under the ISBL Agreement for the launch of a crude processing facility. Polaris also completed more than 90% of the original scope of work provided for in the OSBL Agreement that could be completed without TXIT's response to pending Change Orders. Polaris invoiced TXIT

for a $6,292,120.25 milestone payment triggered at 90% completion of the work. TXIT refused to pay Polaris for work performed under the OSBL Agreement. Polaris invoked its contractual right to suspend performance of the OSBL Agreement. TXIT took the indefensible position that the work articulated in the Change Orders was part of the original scope of work. If true, which it is not, TXIT argued that Polaris did not met the 90% completion of the work necessary to trigger TXIT's milestone payment obligations under the OSBL contract without acknowledging its own failure to approve or reject the submitted Change Orders that rendered performance impossible.

3. To illustrate, an owner requests a contractor to build a road. In the middle of building the road, the owner asks the contractor to build a bridge in a certain segment of the road. The contractor submits a change order. The owner neither approves or rejects the change order. The contractor builds the road up to and beyond the section of the road where the bridge is to be built. But without the owner's approval or rejection of the change order, the contractor faces a dilemma: build the bridge with no assurance that the owner will pay for it, complete the road contrary to the owner's request for a bridge, or complete the agreed upon work while attempting to resolve and waiting for the owner to approve or reject the pending change order. Here, despite TXIT's failure to approve or reject the pending Change Orders, Polaris completed all agreed upon work, attempted to resolve the pending Change Orders, and waited for TXIT to approve or reject the Change Orders. TXIT refused to pay Polaris for the work completed, and falsely claims that Polaris did not meet 90% completion required to trigger the payment obligation without accounting for TXIT's own failure to approve or reject the pending Change Orders that left Polaris in an impossible position.

4. Under the ISBL Agreement, TXIT refused to accept or reject the Change Orders and the proposed changes to the original scope of work necessitated by critical assumptions now

2

determined to be false. The parties also dispute why the crude processing facility has not performed as designed. Polaris maintains that TXIT used crude that did not meet the required specifications stated in the ISBL Agreement during its attempts to start-up the facility. TXIT claims that the design is deficient. Rather than engage in the dispute resolution procedures required under the ISBL Agreement to resolve ongoing disputes over the Change Orders and performance of the facility, TXIT unilaterally attempted to revoke its Mechanical Completion certification, in an attempt to circumvent the warranty provisions in the ISBL Agreement, and wrongfully declared a default under the ISBL Agreement.

5.  Polaris files this declaratory judgment and breach of contract action to seeking, in part, a declaration that the submitted Change Orders are outside of the original scope of work, and to recover damages resulting from TXIT's breach of the parties' agreements.

## PARTIES

6.  Polaris is a corporation incorporated under the laws of the State of Louisiana with its principal place of business in Lake Charles, Louisiana.

7.  TXIT is a limited partnership incorporated under the laws of Texas with its principal place of business in Galveston, Texas. TXIT can be served through its registered agent for service in Texas, Todd P. Sullivan at 6702 Broadway, Galveston, TX 77554 pursuant to TEX. R. CIV. P. 21a.

## JURISDICTION

8.  Jurisdiction is proper pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

## VENUE

9.  The Parties contractually agreed to the nonexclusive jurisdiction of the courts of

Harris County, Texas and waived any defense of *forum non conveniens*.

## RULE 47 CLAIM FOR RELIEF

10. Polaris seeks monetary relief over $1,000,000 and non-monetary relief, including in the form of a declaratory judgment. The damages sought are within the jurisdictional limits of the Court.

## STATEMENT OF FACTS

11. TXIT entered three contracts with Polaris to complete three separate projects at its fuel terminal facility located in Galveston, Texas. First, the parties entered into an Engineering, Procurement and Construction Agreement of the Green Marine Fuel Processing Facility dated March 16, 2019 (the "ISBL Agreement) to design, engineer, and construct a 50,000 barrel per day crude oil processing facility and commenced the "Work" as defined in the Agreement. Second, the parties entered into a separate Procurement and Construction Agreement of the Green Marine Fuel OSBL Facilities dated July 15, 2019 (the "OSBL Agreement"),[1] and commenced the "Work" set forth in Appendix A to the ISBL and OSBL Agreements. Third, the parties entered into a separate Engineering, Procurement and Construction Agreement of the Green Marine Fuel Dock Facilities dated December 9, 2019 (the "Dock Agreement") for work on the Green Marine Fuel Dock Facilities.

**A. TXIT breaches the ISBL Agreement by failing to adhere to the dispute resolution procedures set forth in the ISBL Agreement to resolve submitted Change Orders or an alleged Default.**

12. TXIT had a strong desire to begin the ISBL project right away, without waiting for additional information to be developed for the formation of a precise project price and schedule. For example, a geotechnical survey needed to be performed on the premises to determine the

---

[1] ISBL stands for "Inside Battery Limits," and OSBL stands for "Outside Battery Limits". The ISBL and OSBL contain substantially the same terms and conditions with respect to each project.

4

conditions below the surface of this facility on the shores of Galveston. The survey would have determined with increased precision how deep piles had to be driven and how thick slabs had to be, among other things. But the survey would have taken months to complete. Without the survey there could be no "exact" price or schedule. TXIT declined to conduct the survey to avoid delay. To allow the project to commence without delay, as insisted upon by TXIT, the parties agreed to certain Critical Assumptions and a change order process in the event any Critical Assumptions proved to be wrong. Appendix A of the ISBL Agreement articulates the Critical Assumptions that form the basis for the Contract Price and Schedule included in the ISBL Agreement. In the event any Critical Assumption proves to be incorrect, then the Contract Price and Schedule is adjusted through a Change Order process. During the course of construction, it became evident that some of the Critical Assumptions were incorrect and necessitated Change Orders to both price and schedule to facilitate the continued construction of the facility. To date, TXIT has refused to approve or reject the ISBL Change Orders related to additional Work performed and expenses incurred due to geotechnical data which was subsequently acquired, and rendered the Critical Assumptions which formed the basis of the parties' contractual agreement incorrect. TXIT refused to fully engage in the dispute resolution process set forth in the ISBL Agreement to resolve the outstanding Change Orders.

   13. The ISBL Agreement expressly provides that any disputes arising from or related to the Agreement shall be resolved as provided for in Article XIX. "Dispute" "means any claim, dispute or controversy arising out of or relating to this Agreement." ISBL Agreement at 9. Article XIX provides:

> "In the event of a Dispute between the Parties, within five (5) days of receipt of Notice of Dispute, or such time as is mutually agreed, the executive management of both Parties will meet and undertake to resolve the Dispute between themselves. If the Dispute remains unresolved after twenty (20) days, and as a specific condition precedent to litigation, the Parties will participate, in good faith, in mediation in

> Houston, Texas, before one neutral mediator …. If the Parties are unable to resolve their Dispute through good faith mediation within 30 days after initiating such mediation, either Party may seek resolution through the court system as agreed in this Article."

ISBL Agreement at 56, § 19.1.

14. Polaris presented TXIT with a Mechanical Completion Certificate dated May 21, 2020, which represented that the Work was "…mechanically completed in accordance with this Agreement and in accordance with Appendix A." Appendix A of the ISBL Agreement describes the Facility as a "Crude Processing Unit designed to process 50,000 BPD of crude oil meeting the properties set forth in Appendix F and produce products meeting the properties set forth in Appendix G." Appendix F includes Table 1, Design Composite Crude Feed Properties, the specifications required for any crude oil to be processed, and Table 2 the Performance Guarantee, the expected yield of various crude products after processing.

15. TXIT countersigned the Notice of Mechanical Completion on or about June 2, 2020 pursuant to § 10.1(c). Upon TXIT's approval of the Notice of Mechanical Completion, Polaris turned over the Facility,[2] including its care custody and control, to TXIT for commissioning and start-up. TXIT began the start-up process and introduced crude oil into the facility.[3] Because TXIT failed to use crude oil that conformed with the specifications in Appendix F, and because defendant improperly operated the facility, the Facility did not process the desired 50,000 barrels a day.

16. The failure of the Facility to process 50,000 barrels a day was caused, in part, by the non-conforming crude oil used by TXIT during the start-up process, and in part by defendant's refusal to engage qualified operators to operate this complex facility. Appendix F allowed a

---

[2] "Facility" is defined as "the facility to be designed, engineered, procured, installed, constructed, and tested by Contractor on the Facility Site pursuant to the terms of this Agreement, consisting of all the components, systems, sub-systems, equipment, materials and items of Work to be incorporated, all as described in Appendix A." ISBL Agreement at 10.

[3] Prior to the approval of the Notice of Mechanical Completion, TXIT actually initiated start-up procedures despite the facility being in Polaris' care, custody and control at that time in breach of the ISBL Agreement.

maximum of 18.8% naphtha in the crude oil; TXIT used crude oil that contained 30% naphtha. The facility, simply put, is not designed to process that amount of naphtha. Running crude with an excess of naphtha through the Facility is like pouring an excess of liquid into a funnel—only so much liquid can run through a funnel during any given period of time. Because the non-conforming crude oil contained an excess of naphtha, the Facility was only able to allegedly process approximately 35,000 barrels a day rather than 50,000 barrels a day for which the Facility was designed to process with conforming crude.

17. The Agreement provides for a Warranty Period following Mechanical Completion. Corrective work could be accomplished during the Warranty Period pursuant to §13.3 of the ISBL Agreement:

> If Owner provides notice to Contractor within the Warranty Period regarding an alleged Defect and any Work or component thereof is found to be Defective, Contractor shall, at its sole cost and expense, promptly correct (whether by repair, replacement or otherwise) such Defective Work, including all obligations in connection with such correction, such as in and out costs, storage, labor, Taxes, transportation and expediting costs and any other costs necessary to Complete the necessary Corrective Work… .

ISBL Agreement at 44, § 13.3(a).

> If it is determined that there exists no defect covered by such warranty, Owner shall reimburse Contractor the actual and documented reasonable costs and expenses of Contractor for any work performed, including all costs for conducting the investigation of the alleged defect plus 15%.

*Id*. at § 13.8.

18. On or about July 8, 2020, TXIT sent Polaris a letter regarding alleged ongoing and potential delays in completion of the project and disputes related to various Change Orders. Pursuant to the terms of the Agreement, Polaris immediately arranged for the management of both companies to meet to resolve the disputed Change Orders on or about July 24, 2020. After the meeting, TXIT requested a written response and represented it would take the issues discussed

during the meeting under advisement. Polaris provided a detailed response to each issue raised by TXIT in the July 8, 2020 letter and the subsequent meeting. Thereafter, TXIT engaged in no further discussion of the disputed matters.

19. On September 11, 2020, having received no response from TXIT, Polaris sent TXIT a letter requesting mediation on the issues discussed during the July 24, 2020 meeting and addressed in Polaris' written response to the July 8, 2020 letter. Polaris also provided a proper Notice of Dispute regarding additional issues and Change Orders defendant refused to discuss or respond to, and requested a second meeting of the management executives pursuant to the dispute resolution provisions of the ISBL Agreement to resolve the additional issues articulated in the September 11 Notice of Dispute.

20. All of the Change Orders submitted to TXIT involved changes requested by TXIT outside the original scope of work and were required to progress the Work. TXIT has neither accepted nor rejected the following Change Orders, and its failure to do so has resulted in additional scheduling delays (Owner Caused Delays) and increased expenses for Polaris. The list below does not include additional Change Orders to be submitted to TXIT related to Force Majeure events, Scheduling Extensions as a matter of right based on defendant's failure to pay timely, or COVID-19 (Force Majeure (expense and schedule)):

| FCO No. | Contract | Description | Justification for Submission of Change Order |
|---|---|---|---|
| 2*[4] | ISBL | Additional Pile & Foundation Work @ FinFan Rack (Design Phase) | The geotechnical data at the selected Facility site did not match the geotechnical data used in the preliminary design. As a result, changes to the foundation designs were required based on the geotechnical data of the selected Facility site. |

---

[4] An asterisk (*) indicates that the Change Order was discussed during the management meeting on July 24, 2020. Those entries without an asterisk have not yet been the subject of a management meeting as required by the dispute resolution procedures in both the ISBL and OSBL Agreements.

| | | | |
|---|---|---|---|
| 5* | ISBL | Additional Pile & Foundation Work @ FinFan Rack (Construction Phase) | Subsoil conditions in the area of the FinFan Rack were not clear of obstructions that affect the budget or schedule.  Unmarked existing piles were discovered during construction phase, requiring additional design, fabrication and construction to mitigate. |
| 8* | ISBL | Additional Foundation & Piles (Existing foundations inside unit unsuitable, and additional piles required) | The geotechnical data at the selected Facility site did not match the geotechnical data used in the preliminary design.  As a result, changes to the foundation designs were required based on the geotechnical data of the selected Facility site.  Subsoil conditions were not clear of conditions that affect the budget or schedule (i.e. subsoil conditions required foundation).  TXIT requested that some equipment change physical locations in the field, requiring a change in foundation design. TXIT client requested that the design of equipment be changed, requiring a change in foundation design. |
| 11 | ISBL | Force Majeure Event due to Tropical Storm Imelda | Polaris incurred schedule delays and additional costs associated with the Force Majeure event, TS Imelda.  The ISBL Contract entitles the Contractor to additional costs and expenses or delays derived from an event of Force Majeure. |
| 14* | ISBL | Changes to Pipe Rack 4 (PR4) and Pipe Rack 6 (PR6) from (Front End Loading Phase 2) FEL 2 to detailed design | TXIT requested that the pipe rack routing be modified to a different routing that increased the number of steel components. TXIT communicated to Polaris that the soils underneath the pipe racks in the Tank Farm would be cement stabilized 8' dia x 36' deep with 4' thick table top stabilized to 4500 psf.  After the execution of both ISBL and OSBL Agreements, the client chose not to stabilize the soil and install helical piles instead.  Polaris incurred schedule delays while waiting on TXIT to complete the installation of the helical piles.  TXIT's request required PR4 and PR6 steel design changes to accommodate helical piles. TXIT requested that PR4 and PR6 design be modified to hold more piping, thus requiring additional design and materials. |
| 15* | ISBL | Natural Gas Piping (Underground Obstructions) (Construction) | Subsoil conditions in the area of the underground Natural Gas Piping boring were not clear of obstructions that affect the budget or schedule.  Unmarked ethanol lines were discovered during construction phase, requiring additional labor and construction costs and schedule delays. |
| 17* | ISBL | Unavailability of ISBL Power Supply | The ISBL Agreement provided for existence of available local utility to support the Facility electrical load. Local utility power was not available to support the ISBL Facility electrical load at the time required.  Additional costs and schedule delays resulted. |
| 31* | ISBL | Incorporate Helical Piles into 710 Series Pump Foundations | The geotechnical data at the selected Facility site did not match the geotechnical data used in the preliminary design.  As a result, changes to the foundation designs were required based on the actual geotechnical data of the selected Facility site. |
| 75 | ISBL | Change in Crude Slate | After the ISBL Agreement was executed, TXIT requested that the Crude Slate basis be modified. |

9

| 10 | ISBL/OSBL | Delays due to Helical Pile Installations (Construction) ISBL & OSBL | TXIT communicated to Polaris that the soils underneath the pipe racks in the Tank Farm would be cement stabilized 8' dia x 36' deep with 4' thick table top stabilized to 4500 psf. After the execution of both ISBL and OSBL Agreements, the client chose not to stabilize the soil and install helical piles instead. Polaris incurred schedule delays while waiting on TXIT to complete the installation of the helical piles. |
|---|---|---|---|
| 32 | ISBL/OSBL | Compliant Expansion Joints for Connecting Pipe to Tanks | Polaris' ISBL EPC and OSBL P&C Bid Basis applied API650's typical tank settlement of 2" to the selection of expansion joints in the Bid. After execution of both Agreements, TXIT's geotechnical subcontractor assessed and confirmed that the tanks TXIT built on the soils that TXIT stabilized will settle up to 10". Polaris was then required to specify and purchase more sophisticated and expensive expansion joints. |
| 52 | ISBL/OSBL | Potential new change order to cover triad EWO | Polaris received many change orders for additional Instrument/Electrical (I/E) scope for work from the I/E Construction Contractor, Triad. After reviewing, there were many scope items that Triad completed at the direction of TXIT, that were not part of the ISBL or OSBL Agreement scope of work. |
| 46 | ISBL | Contract Changes - Builders Risk | TXIT started operating the unit before signing the Mechanical Completion Certificate. Per the Agreement, Care, Custody and Control transfers to TXIT when TXIT signed off on Mechanical Completion. This change order amended the Agreement language to state that Care, Custody, and Control transferred on the date TXIT started operating the unit. |

21. Rather than submit any remaining disputed Change Orders to mediation or agreeing to a second meeting of the executives on the additional issues as required by the unambiguous terms of the ISBL Agreement, TXIT wrongfully issued a Notice of Default on September 3, 2020[5] to Polaris and its surety and thereby attempted to circumvent the agreed dispute resolution procedures in the ISBL and OSBL Agreements.

22. In the Notice of Default, TXIT claimed Breach of Warranty and Material Breach as the basis for the alleged default. TXIT also purported to revoke TXIT's acceptance of Polaris' Mechanical Completion Certificate. At no time did TXIT invoke the Warranty procedures unambiguously set forth in Section 13 of the ISBL Agreement.

---

[5] Hurricane Laura made landfall as a Category 4 Hurricane on August 27, 2020 and tore through Lake Charles destroying homes and businesses and had significant impact on Polaris' principal offices.

23. Polaris responded to the purported Notice of Default by letter on September 16, 2020, disputing that the Notice was appropriate for Default, as opposed to a Warranty issue, and demanded another management level meeting to resolve the dispute as to whether the issue was one of Default, and reiterated TXIT's failure to use crude oil that conformed to the specifications articulated in Appendix F to the ISBL Agreement. In response, TXIT expressly rejected Polaris' request for an additional executive level meeting on the Default issue, and took the position that the proper process for "addressing the noted deficiencies is for Polaris to develop a corrective action plan and present it to TXIT."

24. Despite the unambiguous terms of the Parties' ISBL Agreement, TXIT stated "Polaris' attempted reliance upon the dispute resolution procedure of Article XIX is misplaced and TXIT rejects the request for an additional executive level meeting to discuss the default present in our September 3, 2020 correspondence." TXIT refused to engage in the dispute resolution process for any of the multiple disputes, including those for which no management meeting had ever taken place to try and resolve, and more often than not would not even respond to Polaris' requests to do so. TXIT has not responded to Polaris' request for mediation or additional executive meetings pursuant to the dispute resolution procedures on which the parties agreed.

25. TXIT's response or abject lack thereof renders any resolution through the parties' agreed dispute resolution process futile. Pending resolution of any remaining disputed Change Orders, TXIT is obliged to continue to pay Polaris in accordance with the terms of the ISBL Agreement. *See* ISBL Agreement at 27, § 3.1(b). TXIT has not continued to pay Polaris during the pending resolution of the disputed Change Orders. Accordingly, Polaris seeks declaratory relief and damages caused by TXIT's breach of contract.

26. Polaris expressly disputes the alleged bases for TXIT's Notice of Default. TXIT's

Notice of Default is based on an alleged Breach of Warranty and Breach of Contract related to the perceived inability of the Facility to process 50,000 barrels per day. Polaris at all times has maintained that TXIT's failure to use crude oil that meets the specifications in Appendix F is the reason that the Facility processes less than 50,000 barrels per day. TXIT also alleges a Breach of Contract based on the timeliness of the project without accounting for schedule changes attributable to Force Majeure events, Change Orders, late payment of invoices and other delays provided for in the ISBL and OSBL Agreements. Tabulating the schedule changes attributable to delays expressly provided for the ISBL and OSBL Agreements renders the project timely.

27. Appendix P to the ISBL Agreement requires Polaris to obtain, at TXIT's expense, a builder's risk "all risk" insurance policy. Polaris acquired the policy, and TXIT reimbursed Polaris for the cost of the requisite policy. When the policy came up for renewal, in blatant breach of the Agreement, TXIT refused to reimburse Polaris for the renewed builder's risk policy. TXIT's purported reason for refusal was because the project was allegedly behind schedule, which even if true, such refusal is certainly not provided for in the Agreement. Todd Sullivan of TXIT sent an email to Polaris unilaterally declaring that this is a "closed issue." There is no contractual basis for TXIT to avoid its obligation to pay for the requisite builder's risk policy based on any alleged scheduling issue, or otherwise. Appendix P to the OSBL Agreement also requires Polaris to obtain, at TXIT's expense, a builder's risk "all risk" insurance policy. Despite the agreement, TXIT has steadfastly refused, without basis, to reimburse Polaris for the cost of the builder's risk policy under both the ISBL and OSBL Agreements.

**B. TXIT breaches the OSBL Agreement by failing to pay Polaris.**

28. TXIT requested changes under the OSBL Agreement beyond the original scope of work, in addition to those listed above under the ISBL Agreement. TXIT again sat in silence and

refused to accept or reject the following submitted Change Orders:

| | | | |
|---|---|---|---|
| 10 | ISBL/OSBL | Delays due to Helical Pile Installations (Construction) ISBL & OSBL | TXIT communicated to Polaris that the soils underneath the pipe racks in the Tank Farm would be cement stabilized 8' dia x 36' deep with 4' thick table top stabilized to 4500 psf. After the execution of both ISBL and OSBL Agreements, the client chose not to stabilize the soil and install helical piles instead. Polaris incurred schedule delays while waiting on TXIT to complete the installation of the helical piles. |
| 32 | ISBL/OSBL | Compliant Expansion Joints for Connecting Pipe to Tanks | Polaris' ISBL EPC and OSBL P&C Bid Basis applied API650's typical tank settlement of 2" to the selection of expansion joints in the Bid. After execution of both Agreements, TXIT's geotechnical subcontractor assessed and confirmed that the tanks TXIT built on the soils that TXIT stabilized will settle up to 10". Polaris was then required to specify and purchase more sophisticated and expensive expansion joints. |
| 52 | ISBL/OSBL | Potential new change order to cover Triad EWO | Polaris received many change orders for additional Instrument/Electrical (I/E) scope for work from the I/E Construction Contractor, Triad. After reviewing, there were many scope items that Triad completed at the direction of TXIT, that were not part of the ISBL or OSBL Agreement scope of work. |
| 18* | OSBL | Electrical Recovery Plan | Local utility power was not available to support the OSBL Facility at the time required. The OSBL requires that local utility power is available to support the OSBL Facilities' electrical load. Additional costs for rental generator and electrical gear and fuel were incurred to provide temporary power. |
| 19 | OSBL | Pipe Rack #6 Bridge | The original scope of work required a Pipe Rack 6 Bridge over the railroad to accommodate a 6" line and cable tray only. After the OSBL Agreement was executed, TXIT requested that the design be changed to hold and support four additional 24" lines. This required Polaris to redesign a much larger Pipe Rack 6 Bridge. |
| 20 | OSBL | Provide Double Isolation Valves on Tank Nozzles | Double isolation valves were not included in the basis of the OSBL P&C Agreement. After the execution of the Agreement, TXIT requested that double isolation valves be added on Tank Nozzles. |
| 24* | OSBL | Unavailability of OSBL Power Supply | Local utility power was not available to support the OSBL Facility at the time required. The OSBL requires that local utility power is available to support the OSBL Facilities' electrical load. Additional costs for rental generator and electrical gear and fuel were incurred to provide temporary power.<br><br>Polaris cannot complete their EPC scope of work until the utility feeder is installed and energized. As such, Polaris incurred additional costs and schedule delays. The utility feeder was not installed and energized until 8/20/20. |

13

| | | | |
|---|---|---|---|
| 25 | OSBL | Add Recycle Lines, Valves, Fittings... to Pumps | Recycle Lines, and related valves and fittings were not included in the basis of the OSBL P&C Agreement. After the execution of the Agreement, TXIT requested that the recycle lines and related valves and fittings be added. Polaris incurred additional costs and schedule delays. |
| 34* | OSBL | Changes to PR 3 and 7 due to Helical Piles vs drilled slurry shafts | TXIT requested that the pipe rack routing be modified to a different routing that increased the number of steel components. TXIT communicated to Polaris that the soils underneath the pipe racks in the Tank Farm would be cement stabilized 8' dia x 36' deep with 4' thick table top stabilized to 4500 psf. After the execution of both ISBL and OSBL Agreements, the client chose not to stabilize the soil and install helical piles instead. |
| 41 | OSBL | Change to PR 5 to add north bridge (Truck Bridge) | The basis for the OSBL P&C Bid did not include a truck crossing at the north end of PR 5. After execution of the Agreement, the client requested that a truck crossing bridge be added. |
| 43* | OSBL | Motor Control Center (MCC) Transformer Platform Addition | The basis for the OSBL P&C Bid did not include access platforms for the OSBL MCC Transformers. After the execution of the OSBL Agreement, the client requested that access platforms be added. |
| 44 | OSBL | Relocation of OSBL MCC | The location of the OSBL MCC was defined and communicated by TXIT to Polaris prior to executing the OSBL P&C Agreement. After the Agreement was executed, the client requested that the location of the MCC be moved on two separate occasions. |
| 47 | OSBL | Contract Changes - Insurance | The Agreement stated that Contractor must maintain all insurance through Substantial Completion. This change order amended the language specific to the duration through which insurance must be maintained. |
| 51* | OSBL | Changed to PR 5 foundation/bent design, routing, and location basis | The routing and foundation basis was defined when the OSBL Engineering Only Agreement (OEOA) was executed. After the execution of the OSBL P&C Agreement, the routing of the PR 5 was changed, the basis of foundation was changed, and the specific coordinate location was changed by the client on more than one occasion. |
| 64 | OSBL | Isolation valves at the Abutment | Isolation valves at the Abutment were not included in the basis of the OSBL P&C Agreement nor in the Dock EPC Agreement. After the execution of both Agreements, the client requested that isolation valves be added to all lines going to/from Dock. |
| 74 | OSBL | PR 3 Vehicle Access Bridge | Vehicle crossing was not included in the basis of the OSBL P&C Agreement. After the execution of the Agreement, TIT requested that vehicle access be provided through PR 3 into the 300 tank area. |

29.     Appendix B of the OSBL Agreement provides for a Progress Payment Schedule. TXIT was required to pay Project Payment No. 6 upon 90% completion of Work. Polaris

14

completed more than 90% of the scope of work without TXIT making of a decision one way or the other in response to the submitted Change Orders. Accordingly, on or about September 25, 2020, Polaris sent TXIT an invoice for Project Payment No. 6 in the amount of $6,292,120.25 which included a schedule detailing 93.55% completion. Pursuant to the OSBL Agreement, Article VIII, Section 8.1(c):

> Contractor's Representative and Owner's Representative will meet to verify and confirm satisfaction of Milestone Indications covered by each Progress Payment. Upon verification and approval of each pro forma Invoice, Owner shall pay each Invoice to a bank account designated by Contractor no later than 5 Days after receipt and approval of such Invoice.

Subsequently, the parties' representatives met on or before October 2, 2020 and agreed that 90% of the work was completed, but TXIT refused to timely pay the invoice. TXIT's refusal to pay the invoice constitutes a default under the OSBL Agreement. Polaris, accordingly, exercised its right to suspend performance under the OSBL Agreement. TXIT subsequently terminated the OSBL Agreement on November 4, 2020.

## CAUSES OF ACTION

### DECLARATORY JUDGMENT ACTION

30. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

31. Pursuant to Section 37.001, *et seq,* of the Texas Civil Practice and Remedies Code Polaris seeks a declaration of rights under the ISBL and the OSBL Agreements. TXIT claims that the agreed dispute resolution procedures do not apply to the dispute arising from and related to TXIT's issuance of a Notice of Default based on an alleged Breach of Warranty and Breach of Contract. Polaris claims that the agreed dispute resolution procedures do apply to any dispute arising from or relating to the ISBL and OSBL Agreements including TXIT's allegation that Polaris is in default. This is a live and ongoing controversy that impacts the ability of the parties to resolve their disputes and progress completion of the projects that arise from and relate to the

ISBL and OSBL Agreements. Polaris therefore requests that the Court declare the dispute resolution provisions applicable to all disputes arising from and related to the ISBL and OSBL Agreements including TXIT's allegation of default.

32. Polaris seeks a further declaration of rights under the ISBL and OSBL Agreements that TXIT is required to assert a Warranty Claim under the ISBL and OSBL Agreements as to any alleged defect prior to alleging an Event of Default and invoking the Default provisions of the Agreements based on any "False Representation or Warranty" under Section 16.1(d) of Article XVI. Section 13 of the Agreements specifically sets forth the proper procedure for a party to assert a Warranty claim. TXIT attempts to circumvent the parties' specific agreement as to Warranty claims including the cost-shifting provision by ignoring the Warranty provisions and skipping straight to the Default provisions based on an alleged "Breach of Warranty," and not a "False Representation or Warranty" as referenced in Section 16.1(d). Accordingly, Polaris seeks a declaration as to whether TXIT is required to assert a Warranty Claim prior to issuing an alleged Notice of Default based on any "False Representation or Warranty."

33. Polaris also seeks a declaration that there is no basis in the ISBL Agreement that allows TXIT to unilaterally revoke its acceptance of the Certificate of Mechanical Completion which TXIT executed and issued to Polaris on June 2, 2020.

34. Polaris seeks a declaration that TXIT is required to reimburse Polaris for the builder's risk insurance policy under both the ISBL and OSBL Agreement. Polaris continues to maintain the requisite policy for the ISBL Agreement and continued to maintain the requisite policy under the OSBL Agreement until TXIT's termination the OSBL Agreement at its own substantial expense despite TXIT's refusal to reimburse Polaris.

35. Polaris seeks a declaration that the OSBL and ISBL Change Orders identified in

the foregoing paragraphs are beyond the original scope of work provided for in the respective contracts. TXIT asserts that the work identified in the submitted Change Orders is part of the original scope of work under both the OSBL and ISBL Agreements.

36. Polaris further requests a declaration as to the scheduling changes and additional time for completion provided for in the ISBL and OSBL Agreements attributable to Force Majeure events, Change Orders, and late payments of invoices by TXIT. TXIT claims that the scheduling delays constitute a Breach of Contract without acknowledging and accounting for the scheduling changes and additional time for completion provided for in the ISBL and OSBL Agreements.

## BREACH OF CONTRACT

37. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

38. Polaris and TXIT are parties to the ISBL and OSBL Agreements that are all valid enforceable contracts. Polaris is a proper party to bring suit for breach of the contract. Polaris performed its obligations under the ISBL and OSBL Agreements.

39. TXIT breached the ISBL and OSBL Agreements by not paying for, nor accepting or rejecting, Change Orders related to incorrect Critical Assumptions that formed the basis of the parties' Agreement or any other Change Orders.

40. TXIT breached the ISBL and OSBL Agreements by failing to reimburse Polaris for the builder's risk insurance policies under both the ISBL and OSBL Agreements.

41. TXIT breached the ISBL and OSBL Agreements by refusing to engage in the requisite dispute resolution procedures articulated in § 19.1 of the ISBL and OSBL Agreements.

42. TXIT breached the ISBL Agreement by circumventing the requirements of Article XIII related to any alleged defects, and instead, wrongfully issuing a Notice of Default.

43. TXIT breached the ISBL Agreement by failing to use crude oil that conformed with

the specifications set forth in Appendix F.

44. TXIT breached the ISBL Agreement by wrongfully issuing a Notice of Default based on alleged scheduling delays without accounting for scheduling changes and additional time for completion allowed under the ISBL Agreement for Force Majeure events, Change Orders and TXIT's late payment of invoices.

45. TXIT breached the ISBL Agreement by attempting to unilaterally revoke its acceptance of Polaris' Notice of Mechanical Completion.

46. TXIT breached the OSBL Agreement by failing to pay Polaris Progress Payment No. 6 in the amount of $6,292,120.25.

47. TXIT breached the OSBL Agreement by wrongfully terminating the OSBL Agreement.

48. TXIT's breaches of the ISBL and OSBL Agreements caused Polaris to suffer substantial damages.

## CONDITIONS PRECEDENT

49. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

50. All conditions precedent have been met.[6]

## ATTORNEY'S FEES AND COSTS

51. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

52. Polaris seeks to recover attorney's fees pursuant to TEX. CIV. PRAC. & REM. CODE § 37.009.

53. Polaris seeks recovery of attorney's fees pursuant to TEX. CIV. PRAC. & REM. CODE

---

[6] Polaris attempted to engage TXIT in the dispute resolution procedures set forth in the Parties' ISBL and OSBL Agreements on more than one occasion. TXIT has expressly denied the application of those procedures. Consequently, completion of those requirements has been rendered futile by TXIT, and accordingly conditions precedent have been met.

§ 38.001.

## JURY DEMAND AND JURY FEE

54. Polaris demands a jury trial on all triable issues, and has deposited with the Clerk of Court the required jury fee.

## PRAYER FOR RELIEF

For the foregoing reasons, Polaris respectfully requests that the Court enter judgment against TXIT for all damages Polaris has incurred as a result TXIT's breaches of the ISBL and OSBL Agreements, pre- and post-judgment interest, attorney's fees, costs of court, and declare the rights of the parties under the ISBL and OSBL Agreements together with any other relief to which Polaris has shown itself to be entitled.

Date: November 8, 2020

Respectfully submitted,
**WOMBLE BOND DICKINSON (US), LLP**

*/s/ Anthony M. Guerino II*
Anthony M. Guerino II
Texas State Bar No. 00792552
Elizabeth E. Klingensmith
Texas State Bar No. 24046496
811 Main St., Suite 3130
Houston, Texas 77002
Telephone: 346-998-7858
Facsimile: 346-998-5901
Tony.guerino@wbd-us.com
Liz.klingensmith@wbd-us.com

**ATTORNEYS FOR PLAINTIFF POLARIS ENGINEERING, INC.**

## CERTIFICATE OF SERVICE

      I hereby certify that on this the 8th day of November 2020, I electronically submitted the foregoing document for filing using the Court's CM/ECF system.

                                      */s/ Liz Klingensmith*
                                      Liz Klingensmith