**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **POLARIS ENGINEERING, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:21-cv-00094** |
| | § | |
| **TEXAS INTERNATIONAL** | § | |
| **TERMINALS, LTD., DRL** | § | |
| **ENGINEERING, LLC, and DAVID R.** | § | |
| **LUETCHFORD,** | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF POLARIS ENGINEERING, INC.'S**
**FOURTH AMENDED COMPLAINT**

Plaintiff Polaris Engineering, Inc. ("Polaris") files this Fourth Amended Complaint against Texas International Terminals, Ltd. ("TXIT"), DRL Engineering, LLC ("DRL"), and David R. Luetchford and respectfully shows as follows:

**INTRODUCTION**

1.     TXIT operates a fuel storage, loading and processing facility located in Galveston, Texas. Polaris agreed to engineer, design and construct certain facilities for TXIT under four separate contracts: the ISBL, OSBL, OSBL Engineering, and Dock Agreements.  As Polaris completed or neared completion of the work under each of the contracts, TXIT refused to pay Polaris or honor the contract terms.

2.     The Agreements each had milestone indications which triggered a corresponding Progress Payment.  TXIT refused to pay Polaris Progress Payment No. 5 under the OSBL Engineering Agreement for engineering work completed by Polaris.  TXIT refused to timely and fully pay Progress Payments Nos. 4 and 5 under the Dock Agreement.

3. TXIT refused to pay Polaris Progress Payment No. 6 under the OSBL Agreement. Polaris completed more than 90% of the original scope of work provided for in the OSBL Agreement that could be completed without TXIT's response to pending Change Orders. At some point, without resolution of the disputed Change Order, if any additional work would have been performed, assuming TXIT ultimately albeit untimely accepted the Change Order, work would actually have to have been undone to proceed with work provided for in any untimely accepted Change Order. After receiving no payment for some time, Polaris invoked its contractual right to suspend performance of the OSBL Agreement on the basis that TXIT was in default. TXIT subsequently terminated the OSBL Agreement and did not pay Polaris for the work performed.

4. TXIT breached the ISBL Agreement by failing to abide by the terms of the parties' agreement. Pursuant to the ISBL Agreement, Polaris completed 100% of the work necessary to achieve Mechanical Completion. Following Mechanical Completion, TXIT then bore sole responsibility for conducting Start-Up and Commissioning of the ISBL Facility to achieve stable operations. Following Start-Up and Commissioning, TXIT had two options. TXIT could provide Polaris with: (a) Notification of Stable Operations; or (b) notice of an alleged Warranty Defect. Upon receipt of Notification of Stable Operations, Polaris would then have the option to accept or reject such Notification and proceed to Performance Testing for the purpose of demonstrating that the ISBL Facility met certain Performance Guarantees. Alternatively, upon receipt of a notice of an alleged Warranty Defect, Polaris had the obligation to investigate and correct any identified defect. TXIT did neither. Instead, TXIT circumvented the terms of the ISBL Agreement and declared a default based on TXIT's baseless assertion that ISBL Facility failed to meet certain Performance Guarantees during Start-Up and

Commissioning and prior to any Performance Testing, and unilaterally attempted to revoke its Mechanical Completion certification.   In so doing, TXIT not only obstructed Polaris' investigation of the alleged claim, but denied Polaris the opportunity to conduct Performance Testing to demonstrate the ISBL Facility can, in fact, perform as guaranteed.  TXIT unilaterally claimed the ISBL Facility as defective without ever giving Polaris the opportunity to verify the accuracy of any alleged claim.

5.      The ISBL Facility is not defective.  Any alleged failure in the performance of the ISBL Facility was the fault of TXIT.  When TXIT conducted Start-Up and Commissioning of the ISBL Facility, TXIT used crude that did not meet the required specifications stated in the ISBL Agreement during its unsuccessful attempts to start-up and commission the ISBL Facility.  This is akin to complaining that a gasoline engine is defective because it will not run correctly on diesel.   While TXIT claimed that the design was deficient, TXIT refused to permit Polaris to conduct Performance Testing pursuant to the terms of the ISBL Agreement as necessary to demonstrate that the ISBL Facility met the Performance Guarantees.

6.      Both the OSBL and ISBL Agreements were negotiated and agreed upon based on certain critical assumptions provided by TXIT and relied upon by Polaris.  Polaris did not have the opportunity to independently verify those assumptions.   Because TXIT wanted to immediately begin work on the project, TXIT inserted these assumptions into the parties' agreements and agreed that Polaris could rely on them.  Indeed, Polaris priced the work under each of the contracts based on those critical assumptions. When those critical assumptions turned out to be false or when TXIT requested a change to the original scope of work, Polaris submitted Change Orders for TXIT's approval as provided for under the respective agreements.  But TXIT

refused to accept or reject the Change Orders or engage in the dispute resolution procedures set forth in the Parties' contracts to resolve the disputed Change Orders.

7.      TXIT's refusal to accept, reject or resolve any disputed Change Orders under the OSBL Agreement frustrated completion of work under that agreement.  To illustrate, an owner requests a contractor to build a road.  In the middle of building the road, the owner asks the contractor to build a bridge in a certain segment of the road.  The contractor submits a change order. The owner neither approves nor rejects the change order.  The contractor builds the road up to and beyond the section of the road where the bridge is to be built.  Without the owner's approval or rejection of the change order, the contractor faces a dilemma: build the bridge with no assurance that the owner will pay for it, complete the road contrary to the owner's request for a bridge, or complete the agreed upon work while attempting to resolve and waiting for the owner to approve or reject the pending change order.  Here, because of TXIT's failure to approve or reject the pending Change Orders, Polaris completed more than 90% of all agreed upon work exclusive of pending Change Orders, attempted to resolve the pending Change Orders, and waited for TXIT to approve or reject the Change Orders.  TXIT did neither.  Likewise, under the ISBL Agreement, TXIT refused to accept or reject Change Orders necessitated by critical assumptions later determined to be false.

8.      Relatedly, DRL, and its member-manager David Luetchford, tortiously interfered with the agreements between Polaris and TXIT.  DRL is an engineering firm and competitor of Polaris.  DRL, through its principal Luetchford, presented itself to TXIT as an independent consultant willing to assist TXIT in evaluating the capabilities of the Facility.  However, DRL sought to step into the shoes of Polaris, overtake the construction project, and obtain the benefits of the agreements.  To achieve this, DRL submitted a report to TXIT containing numerous

inaccurate opinions about the Facility.  DRL further instructed TXIT to unlawfully breach its agreements with Polaris, including by refusing to pay substantial milestone payments, because DRL thought the plain terms of the contract were a "bad business deal" and would "allow Polaris to get too far ahead based on percentage of completion (despite the clear terms of the agreements).  DRL induced TXIT to unlawfully terminate its agreements, and ultimately took over construction of the project, receiving payments that should have and otherwise would have been made to Polaris.   As a result, DRL and Luetchford—each—tortiously interfered with the ISBL Agreement between Polaris and TXIT by willfully and intentionally inducing TXIT to breach the ISBL Agreement and intentionally hindering Polaris' performance under the ISBL Agreement.   DRL and Luetchford also tortiously interfered with the OSBL and Dock Agreements by advising TXIT to withhold payments from Polaris to create leverage over Polaris and inducing TXIT to unlawfully terminate the ISBL, OSBL and Dock Agreements. DRL ultimately stepped into Polaris' shoes to undertake the modification of the ISBL Facility.

9.      Polaris files this declaratory judgment and breach of contract action seeking, in part, declaratory relief as to the parties' rights and obligations under their Agreements, and to recover damages resulting from TXIT's breach of the parties' agreements.

## PARTIES

10.      Polaris is a corporation incorporated under the laws of the State of Louisiana with its principal place of business in Lake Charles, Louisiana.

11.      TXIT has made an appearance in the above-styled lawsuit.

12.      DRL is a limited liability company organized under the laws of the State of Texas with its principal place of business in Houston, Texas.  DRL can be served through its registered agent for service in Texas, David Luetchford, 16225 Park Ten Pl., Suite 519, Houston, Texas

77084.  David Luetchford is the Managing Member DRL. Luetchford is an individual domiciled in Texas.

13.     Upon information and belief, David Luetchford is an individual residing in Houston, Texas.

14.     Westchester Fire Insurance Company has made an appearance in the above-styled lawsuit.

## JURISDICTION

15.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

## VENUE

16.     Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391 which states that all lawsuits shall be brought in the judicial district in which the defendant resides or all or a substantial part of the events or omissions giving rise to the claim occurred.

17.     TXIT and Polaris contractually agreed to the jurisdiction of the courts of Harris County, Texas and waived any defense of *forum non conveniens*.

## STATEMENT OF FACTS

18.     TXIT entered four contracts with Polaris to complete three separate projects at its fuel terminal facility located in Galveston, Texas.  First, the parties entered into an Engineering, Procurement and Construction Agreement of the Green Marine Fuel Processing Facility dated March 16, 2019 (the "ISBL Agreement) to design, engineer, and construct a 50,000 barrel per day crude oil processing facility and commenced the "Work" as defined in the Agreement. Second, the parties entered into an agreement for the Detailed Engineering and Design of the Facilities on or about June 3, 2019 (the "OSBL Engineering Agreement").  Third, the parties

entered into a separate Procurement and Construction Agreement of the Green Marine Fuel OSBL Facilities dated July 15, 2019 (the "OSBL Agreement"),[1] and commenced the "Work" set forth in Appendix A to the ISBL and OSBL Agreements.  Fourth, the parties entered into a separate Engineering, Procurement and Construction Agreement of the Green Marine Fuel Dock Facilities dated December 9, 2019 (the "Dock Agreement") for work on the Green Marine Fuel Dock Facilities.

## A.    TXIT breaches the ISBL Agreement.

19.    TXIT had a strong desire to begin the ISBL project right away, without waiting for additional information to be developed for the formation of a precise project price and schedule.  For example, a geotechnical survey needed to be performed on the premises to determine the conditions below the surface of this facility on the shores of Galveston.  The survey would have determined with precision how deep piles had to be driven and how thick slabs had to be, among other things.  Without the geotechnical survey one could only guess, but the survey would have taken months to complete.  Without the survey there could be no "exact" price or schedule.  To avoid such a delay, TXIT declined to conduct the survey in advance of the contract price or schedule being developed with exactitude.  Instead, the parties agreed to certain Critical Assumptions and a change order process so that in the event any Critical Assumptions proved to be wrong, the price and schedule could be adjusted "on the fly."  TXIT agreed that Polaris' obligations and the negotiated price of the project were dependent on these Critical Assumptions.

20.    Appendix A of the ISBL Agreement articulates the Critical Assumptions that form the basis for the Contract Price and Schedule included in the ISBL Agreement.  In the event

---

[1] ISBL stands for "Inside Battery Limits," and OSBL stands for "Outside Battery Limits".  The ISBL and OSBL contain substantially the same terms and conditions with respect to each project.

any Critical Assumption proves to be incorrect, then the Contract Price and Schedule is adjusted through a Change Order process.  During the course of construction, it became evident that some of the Critical Assumptions were incorrect and necessitated Change Orders to both price and schedule to facilitate the continued construction of the facility.  To date, TXIT breached the ISBL Agreement by refusing to approve or reject the ISBL Change Orders related to additional Work performed, expenses incurred and schedule extensions due to geotechnical data which was subsequently acquired, and which rendered the Critical Assumptions incorrect.  To further exacerbate the situation, TXIT refused to engage in the dispute resolution process in the manner set forth in the ISBL Agreement to resolve the outstanding Change Orders.

21.     The ISBL Agreement expressly provides that any disputes arising from or related to the Agreement shall be resolved as provided for in Article XIX.  "Dispute" "means any claim, dispute or controversy arising out of or relating to this Agreement."  ISBL Agreement at 9. Article XIX provides:

> "In the event of a Dispute between the Parties, within five (5) days of receipt of Notice of Dispute, or such time as is mutually agreed, the executive management of both Parties will meet and undertake to resolve the Dispute between themselves.  If the Dispute remains unresolved after twenty (20) days, and as a specific condition precedent to litigation, the Parties will participate, in good faith, in mediation in Houston, Texas, before one neutral mediator …. If the Parties are unable to resolve their Dispute through good faith mediation within 30 days after initiating such mediation, either Party may seek resolution through the court system as agreed in this Article."

ISBL Agreement at 56, § 19.1.

22.     Polaris presented TXIT with a Mechanical Completion Certificate dated May 21, 2020, which represented that the Work was "…mechanically completed in accordance with this Agreement and in accordance with Appendix A."  Appendix A of the ISBL Agreement describes the Facility as a "Crude Processing Unit designed to process 50,000 BPD of crude oil meeting the properties set forth in Appendix F and produce products meeting the properties set forth in

Appendix G."  Appendix F includes Table 1, the Design Composite Crude Feed Properties, which are the specifications required for any crude oil to be processed in order for the Performance Guarantee to be met.  If nonconforming crude is processed, the Facility will still function, just not at the guaranteed rate.  Appendix F also includes Table 2, which reflects the Performance Guarantee of 50,000 barrels per day and the Facility's volume throughout capabilities and limitations for each of the different products generated.

23.    TXIT, after more than ten days spent verifying the achievement of Mechanical Completion, countersigned the Notice of Mechanical Completion on or about June 2, 2020 pursuant to § 10.1(c).  Upon TXIT's approval of the Notice of Mechanical Completion, Polaris turned over the Facility,[2] including its care custody and control, to TXIT for commissioning and start-up.  TXIT began the start-up process and introduced crude oil into the facility.[3]  Because TXIT failed to use crude oil that conformed with the specifications in Appendix F, and because TXIT improperly operated the facility without qualified operators or know-how, the ISBL Facility allegedly did not process the desired 50,000 barrels a day.

24.    Any failure of the Facility to process 50,000 barrels a day, however, was caused, in part, by the non-conforming crude oil used by TXIT during the start-up process, and in part by TXIT's refusal to engage qualified operators to operate this complex facility.  Appendix F, Table 1 sets forth the specific set of properties for conforming crude oil, each and every one of which had to be satisfied for the Facility to achieve the 50,000 barrels per day Performance Guarantee. TXIT used crude oil that did not satisfy Appendix F, Table 1, which the parties had

---

[2] "Facility" is defined as "the facility to be designed, engineered, procured, installed, constructed, and tested by Contractor on the Facility Site pursuant to the terms of this Agreement, consisting of all the components, systems, sub-systems, equipment, materials and items of Work to be incorporated, all as described in Appendix A."  ISBL Agreement at 10.
[3] Prior to the approval of the Notice of Mechanical Completion, TXIT actually initiated start-up procedures despite the facility being in Polaris' care, custody and control at that time in breach of the ISBL Agreement.

acknowledged in their contract would change the performance of the Facility.  Moreover, after achieving stable operations, TXIT refused to provide conforming crude and permit Polaris to conduct performance testing, including making any necessary adjustments to the Facility's operating settings so that it would consistently process at the performance guarantee rate.

25.     The ISBL Agreement placed the obligation to achieve stable operations squarely on TXIT following Mechanical Completion.

> Owner will Commission, Start Up and achieve stable operation of the Facility within twenty-one (21) calendar days of the Mechanical Completion Date.

Upon achievement of stable operations, TXIT was obligated to provide Polaris a Notification of Stable Operations to allow Polaris the opportunity to approve or reject the same.  Upon agreement by the parties that TXIT had achieved stable operations, Polaris would then begin performance testing for the sole purpose of demonstrating that the ISBL Facility met the Performance Guarantees provided for in Appendix F:

> Contractor shall perform the initial Performance Tests and if the results of such Performance Tests fail to satisfy the Performance Guarantees, then Contractor shall be allowed to re-run the Performance Tests.

The ISBL Agreement expressly provides that TXIT shall provide crude feedstock for the testing that conforms to the specifications in Appendix F and in quantities adequate for the duration of the Performance Test.  The procedures for the Performance Test are set forth in Appendix G. Appendix G also requires TXIT to provide Crude in compliance with Table 1 of Appendix F at a sustainable rate of 50,000 BPD for up to three (3) consecutive days or until the Performance Guarantees are met, and allows Polaris to retest until Performance Guarantees are demonstrated. Appendix G also gives TXIT the right, but not the obligation to elect to run the Performance Test at 25,000 BPD instead of 50,000 BPD.  TXIT never provided Polaris Notification of Stable

Operations, and consequently, TXIT intentionally deprived Polaris of the opportunity to conduct

the Performance Testing necessary to demonstrate compliance with the Performance Guarantees.

26.     Absent stable operations, the ISBL Agreement also provides for a Warranty
Period following Mechanical Completion.  Corrective work could be accomplished during the
Warranty Period pursuant to §13.3 of the ISBL Agreement:

> If Owner provides notice to Contractor within the Warranty Period regarding an
> alleged Defect and any Work or component thereof is found to be Defective,
> Contractor shall, at its sole cost and expense, promptly correct (whether by repair,
> replacement or otherwise) such Defective Work, including all obligations in
> connection with such correction, such as in and out costs, storage, labor, Taxes,
> transportation and expediting costs and any other costs necessary to Complete the
> necessary Corrective Work… .

ISBL Agreement at 44, § 13.3(a).

> If it is determined that there exists no defect covered by such warranty, Owner
> shall reimburse Contractor the actual and documented reasonable costs and
> expenses of Contractor for any work performed, including all costs for conducting
> the investigation of the alleged defect plus 15%.

*Id*. at § 13.8.  TXIT never provided notice to Polaris of any Warranty claim or alleged Defect in

any Work.  Accordingly, TXIT denied Polaris the opportunity to investigate and, if needed,

correct any allegedly Defective Work.  Rather than provide Polaris Notification of Stable

Operations or Notice of any alleged Defect or Work pursuant to the Warranty provisions of the

ISBL Agreement, TXIT took an end-run around the terms of the ISBL Agreement and

unilaterally declared a default before engaging in the dispute resolution procedure set forth in the

ISBL Agreement.  When Polaris notified TXIT that it disagreed that there was any default under

the ISBL Agreement and further attempted to abide by the terms of the dispute resolution

procedures, TXIT disregarded those requests.

27.     Upon information and belief, TXIT engaged DRL to confirm TXIT's false

assertion that Polaris was at fault for TXIT's failure to achieve stable operations.  As part of the

engagement, DRL reviewed and was fully aware of the terms of the ISBL Agreement, OSBL

Agreement, and Dock Agreement between TXIT and Polaris.  DRL knew the interest that Polaris had in these agreements, including Polaris's right to the milestone payments for work already performed.  Indeed, DRL orally communicated to Polaris that it thought TXIT should not pay the required payments because it thought the payment schedule (already set out in the contracts) was not favorable to TXIT.

28.   DRL prepared a report that purported to outline the ISBL Facility's alleged deficiencies (the "DRL Report").  The DRL Report was subsequently used as "proof" of an alleged default by Polaris under the ISBL Agreement and sent to the surety along with a written notice of default.  DRL intentionally induced TXIT to breach the ISBL Agreement. Following TXIT's unlawful termination of the ISBL, OSBL and Dock Agreements and upon information and belief, DRL was hired by TXIT to modify the ISBL Facility—modifications on which TXIT claims to be spending tens of millions of dollars.    Upon information and belief, DRL interfered with the payment due to Polaris under the OSBL Agreement and advised TXIT to declare a default and wrongfully terminate the Agreement.  Upon information and belief, DRL interfered with the Dock Agreement by convincing TXIT to, without any contractual basis, refuse to make payments due to Polaris under that agreement.  DRL specifically did this by advising TXIT to withhold payment from Polaris that was due under the Dock Agreement to create leverage for the return of equipment.

29.   Upon information and belief, DRL acted in its own self-interest when it interfered with the ISBL, OSBL and Dock Agreements and induced TXIT to breach the same.  DRL knew that TXIT wanted out of the parties' Agreements and seized on the opportunity by persuading TXIT to unlawfully refuse payment, terminate the Agreements, and then hire DRL to replace Polaris on the project.  DRL prepared the brief and unsubstantiated DRL Report, which lacked

detail concerning several critical facts and assumptions concerning the Facility's capacity, operation, and performance. When Polaris challenged the DRL Report's conclusions, DRL and TXIT refused to provide the necessary information. This was in an effort to conceal their true purposes—unlawfully terminating the Agreements with Polaris.

30.     TXIT did in fact hire DRL to perform modifications to the Facility. These modifications were aimed at altering the fundamental nature of the Facility because, upon information and belief, TXIT had determined it wanted to process a different type of crude than originally intended. These modifications would otherwise have been Polaris's right to perform under the Agreements (pursuant to change orders) and Polaris should have benefitted from the same, in addition to receiving payment for all work performed to date. Polaris suffered extensive damages as a result of DRL's interference with the ISBL, OSBL and Dock Agreements.

31.     David Luetchford is the managing member of DRL and was the primary agent acting on its behalf with respect to DRL's relationship with TXIT and DRL's interference with TXIT's agreements with Polaris. Upon information and belief, Mr. Luetchford personally reviewed the ISBL, OSBL, and Dock Agreements and was personally aware of their terms. He personally advised TXIT to breach these agreements, terminate these agreements, and hire DRL to perform work on the project, all to his and DRL's personal benefit and to Polaris's damage.

32.     On or about July 8, 2020, TXIT sent Polaris a letter regarding alleged ongoing and potential delays in completion of the project and disputes related to various Change Orders. Pursuant to the terms of the Agreement, Polaris immediately arranged for the management of both companies to meet to resolve the disputed Change Orders on or about July 24, 2020. After the meeting, TXIT requested a written response and represented it would take the issues discussed during the meeting under advisement. Polaris provided a detailed response to each

issue raised by TXIT in the July 8, 2020 letter and the subsequent meeting.  Thereafter, TXIT engaged in no further discussion of the disputed matters.

33.     On September 11, 2020, having received no response from TXIT, Polaris sent TXIT a letter requesting mediation on the issues discussed during the July 24, 2020 meeting and addressed in Polaris' written response to the July 8, 2020 letter.  Polaris also provided a proper Notice of Dispute regarding numerous additional issues and Change Orders defendant refused to discuss or respond to, and requested a second meeting of the management executives pursuant to the dispute resolution provisions of the ISBL Agreement to resolve the additional issues articulated in the September 11 Notice of Dispute.

34.     All of the Change Orders submitted to TXIT involved changes requested by TXIT outside the original scope of work and which were required to progress the Work.  TXIT has neither accepted nor rejected the following Change Orders, and its failure to do so has resulted in additional scheduling delays (Owner Caused Delays for which the schedule is extended) and increased expenses for Polaris and costs for TXIT.  The list below does not include additional Change Orders related to Force Majeure events, Scheduling Extensions as a matter of right based on defendant's failure to pay timely and additional Owner Caused Delays, or COVID-19 (Force Majeure (expense and schedule)):

| FCO No. | Contract | Description | Justification for Submission of Change Order |
|---|---|---|---|
| 2*[4] | ISBL | Additional Pile & Foundation Work @ FinFan Rack (Design Phase) | The geotechnical data at the selected Facility site did not match the geotechnical data used in the preliminary design.  As a result, changes to the foundation designs were required based on the geotechnical data of the selected Facility site. |

[4] An asterisk (*) indicates that the Change Order was discussed during the management meeting on July 24, 2020. Those entries without an asterisk have not yet been the subject of a management meeting as required by the dispute resolution procedures in both the ISBL and OSBL Agreements.

| FCO No. | Contract | Description | Justification for Submission of Change Order |
|---|---|---|---|
| 5* | ISBL | Additional Pile & Foundation Work @ FinFan Rack (Construction Phase) | Subsoil conditions in the area of the FinFan Rack were not clear of obstructions that affect the budget or schedule.  Unmarked existing piles were discovered during construction phase, requiring additional design, fabrication and construction to mitigate. |
| 8* | ISBL | Additional Foundation & Piles (Existing foundations inside unit unsuitable, and additional piles required) | The geotechnical data at the selected Facility site did not match the geotechnical data used in the preliminary design.  As a result, changes to the foundation designs were required based on the geotechnical data of the selected Facility site.  Subsoil conditions were not clear of conditions that affect the budget or schedule (i.e. subsoil conditions required foundation).  TXIT requested that some equipment change physical locations in the field, requiring a change in foundation design. TXIT client requested that the design of equipment be changed, requiring a change in foundation design. |
| 11 | ISBL | Force Majeure Event due to Tropical Storm Imelda | Polaris incurred schedule delays and additional costs associated with the Force Majeure event, TS Imelda. The ISBL Contract entitles the Contractor to additional costs and expenses or delays derived from an event of Force Majeure. |
| 14* | ISBL | Changes to Pipe Rack 4 (PR4) and Pipe Rack 6 (PR6) from (Front End Loading Phase 2) FEL 2 to detailed design | TXIT requested that the pipe rack routing be modified to a different routing that increased the number of steel components. TXIT communicated to Polaris that the soils underneath the pipe racks in the Tank Farm would be cement stabilized 8' dia x 36' deep with 4' thick table top stabilized to 4500 psf.  After the execution of both ISBL and OSBL Agreements, the client chose not to stabilize the soil and install helical piles instead.  Polaris incurred schedule delays while waiting on TXIT to complete the installation of the helical piles.  TXIT's request required PR4 and PR6 steel design changes to accommodate helical piles. TXIT requested that PR4 and PR6 design be modified to hold more piping, thus requiring additional design and materials. |
| 15* | ISBL | Natural Gas Piping (Underground Obstructions) (Construction) | Subsoil conditions in the area of the underground Natural Gas Piping boring were not clear of obstructions that affect the budget or schedule. Unmarked ethanol lines were discovered during construction phase, requiring additional labor and construction costs and schedule delays. |
| 17* | ISBL | Unavailability of ISBL Power Supply | The ISBL Agreement provided for existence of available local utility to support the Facility electrical load. Local utility power was not available to support the ISBL Facility electrical load at the time required. Additional costs and schedule delays resulted. |

| FCO No. | Contract | Description | Justification for Submission of Change Order |
|---|---|---|---|
| 31* | ISBL | Incorporate Helical Piles into 710 Series Pump Foundations | The geotechnical data at the selected Facility site did not match the geotechnical data used in the preliminary design. As a result, changes to the foundation designs were required based on the actual geotechnical data of the selected Facility site. |
| 75 | ISBL | Change in Crude Slate | After the ISBL Agreement was executed, TXIT requested that the Crude Slate basis be modified. |
| 10 | ISBL/OSBL | Delays due to Helical Pile Installations (Construction) ISBL & OSBL | TXIT communicated to Polaris that the soils underneath the pipe racks in the Tank Farm would be cement stabilized 8' dia x 36' deep with 4' thick table top stabilized to 4500 psf. After the execution of both ISBL and OSBL Agreements, the client chose not to stabilize the soil and install helical piles instead. Polaris incurred schedule delays while waiting on TXIT to complete the installation of the helical piles. |
| 32 | ISBL/OSBL | Compliant Expansion Joints for Connecting Pipe to Tanks | Polaris' ISBL EPC and OSBL P&C Bid Basis applied API650's typical tank settlement of 2" to the selection of expansion joints in the Bid. After execution of both Agreements, TXIT's geotechnical subcontractor assessed and confirmed that the tanks TXIT built on the soils that TXIT stabilized will settle up to 10". Polaris was then required to specify and purchase more sophisticated and expensive expansion joints. |
| 52 | ISBL/OSBL | Potential new change order to cover triad EWO | Polaris received many change orders for additional Instrument/Electrical (I/E) scope for work from the I/E Construction Contractor, Triad. After reviewing, there were many scope items that Triad completed at the direction of TXIT, that were not part of the ISBL or OSBL Agreement scope of work. |
| 46 | ISBL | Contract Changes - Builders Risk | TXIT started operating the unit before signing the Mechanical Completion Certificate. Per the Agreement, Care, Custody and Control transfers to TXIT when TXIT signed off on Mechanical Completion. This change order amended the Agreement language to state that Care, Custody, and Control transferred on the date TXIT started operating the unit. |

35.     Rather than submit any remaining disputed Change Orders to mediation or agreeing to a second meeting of the executives on the additional issues as required by the unambiguous terms of the ISBL Agreement, TXIT wrongfully issued a Notice of Default on

September 3, 2020[5] to Polaris and its surety and thereby attempted to circumvent the agreed dispute resolution procedures in the ISBL and OSBL Agreements.

36.     In the Notice of Default, TXIT claimed Breach of Warranty and Material Breach as the basis for the alleged default.  TXIT also purported to revoke TXIT's acceptance of the Mechanical Completion Certificate.  At no time did TXIT invoke the Warranty procedures unambiguously set forth in Section 13 of the ISBL Agreement or provide Polaris a Notification of Stable Operations to allow Polaris to conduct Performance Testing for the purpose of demonstrating compliance with the Performance Guarantees.

37.     Polaris responded to the purported Notice of Default by letter on September 16, 2020, disputing that the Notice was appropriate for Default, as opposed to a Warranty issue, and demanded another management level meeting to resolve the dispute as to whether the issue was one of Default, and reiterated TXIT's failure to use crude oil feedstock that conformed to the specifications articulated in Appendix F to the ISBL Agreement.  In response, TXIT expressly rejected Polaris' request for an additional executive level meeting on the Default issue, and took the position that the proper process for "addressing the noted deficiencies is for Polaris to develop a corrective action plan and present it to TXIT."

38.     Despite the unambiguous terms of the Parties' ISBL Agreement, TXIT stated "Polaris' attempted reliance upon the dispute resolution procedure of Article XIX is misplaced and TXIT rejects the request for an additional executive level meeting to discuss the default present in our September 3, 2020 correspondence."  TXIT refused to engage in the dispute resolution process for any of the multiple disputes, including those for which no management meeting had ever taken place to try and resolve, and more often than not would not even respond

---

[5] Hurricane Laura made landfall as a Category 4 Hurricane on August 27, 2020 and tore through Lake Charles destroying homes and businesses and had significant impact on Polaris' principal offices.

to Polaris' requests to do so.  TXIT has not responded to Polaris' request for additional executive meetings pursuant to the dispute resolution procedures on which the parties agreed.

39.     TXIT's response or abject lack thereof renders any resolution through the parties' agreed dispute resolution process futile.  Pending resolution of any remaining disputed Change Orders, TXIT is obliged to continue to pay Polaris in accordance with the terms of the ISBL Agreement.  *See* ISBL Agreement at 27, § 3.1(b).  TXIT has not continued to pay Polaris during the pending resolution of the disputed Change Orders.  Accordingly, Polaris seeks declaratory relief and damages caused by TXIT's breach of contract.

40.     Polaris expressly disputes the alleged bases for TXIT's Notice of Default. TXIT's Notice of Default is based on an alleged Breach of Warranty and Breach of Contract related to the perceived inability of the Facility to process 50,000 barrels per day.  Polaris at all times has maintained TXIT's failure to use crude oil feedstock that meets the specifications in Appendix F, in addition to TXIT's failure to properly operate the ISBL Facility during Start-Up and Commissioning are the reasons that the Facility allegedly processes less than 50,000 barrels per day.

41.     TXIT also alleges a Breach of Contract based on the timeliness of the project without accounting for schedule changes attributable to Force Majeure events, Change Orders, late payment of invoices and other delays caused by TXIT and provided for in the ISBL and OSBL Agreements.  Tabulating the schedule changes attributable to delays expressly provided for the ISBL, OSBL and Dock Agreements render the projects unquestionably timely.

42.     Appendix P to the ISBL Agreement requires Polaris to obtain, at TXIT's expense, a builder's risk "all risk" insurance policy.  Polaris acquired the policy, and TXIT reimbursed Polaris for the cost of the requisite policy.  When it was time to renew the policy, in blatant

breach of the Agreement, TXIT refused to reimburse Polaris for the renewed builder's risk policy. TXIT's purported reason for refusal was because the project was allegedly behind schedule, which even if true, would not justify such refusal under the Agreement. Todd Sullivan of TXIT sent an email to Polaris unilaterally declaring that this is a "closed issue." There is no contractual basis for TXIT to avoid its obligation to pay for the requisite builder's risk policy based on any alleged scheduling issue, or otherwise. Appendix P to the OSBL Agreement also requires Polaris to obtain, at TXIT's expense, a builder's risk "all risk" insurance policy. Despite the agreement, TXIT has steadfastly refused, without basis, to reimburse Polaris for even the initial cost of the builder's risk policy or for any renewals under ISBL and OSBL Agreements.

**B.      TXIT breaches the OSBL Agreement by failing to pay Polaris.**

43.     TXIT requested changes under the OSBL Agreement beyond the original scope of work, in addition to those listed above under the ISBL Agreement. TXIT again sat in silence and refused to accept or reject the following submitted Change Orders:

| FCO No. | Contract | Description | Justification for Submission of Change Order |
|---|---|---|---|
| 10 | ISBL/OSBL | Delays due to Helical Pile Installations (Construction) ISBL & OSBL | TXIT communicated to Polaris that the soils underneath the pipe racks in the Tank Farm would be cement stabilized 8' dia x 36' deep with 4' thick table top stabilized to 4500 psf. After the execution of both ISBL and OSBL Agreements, the client chose not to stabilize the soil and install helical piles instead. Polaris incurred schedule delays while waiting on TXIT to complete the installation of the helical piles. |
| 32 | ISBL/OSBL | Compliant Expansion Joints for Connecting Pipe to Tanks | Polaris' ISBL EPC and OSBL P&C Bid Basis applied API650's typical tank settlement of 2" to the selection of expansion joints in the Bid. After execution of both Agreements, TXIT's geotechnical subcontractor assessed and confirmed that the tanks TXIT built on the soils that TXIT stabilized will settle up to 10". Polaris was then required to specify and purchase more sophisticated and expensive expansion joints. |

| FCO No. | Contract | Description | Justification for Submission of Change Order |
|---|---|---|---|
| 52 | ISBL/OSBL | Potential new change order to cover Triad EWO | Polaris received many change orders for additional Instrument/Electrical (I/E) scope for work from the I/E Construction Contractor, Triad. After reviewing, there were many scope items that Triad completed at the direction of TXIT, that were not part of the ISBL or OSBL Agreement scope of work. |
| 18* | OSBL | Electrical Recovery Plan | Local utility power was not available to support the OSBL Facility at the time required. The OSBL requires that local utility power is available to support the OSBL Facilities' electrical load. Additional costs for rental generator and electrical gear and fuel were incurred to provide temporary power. |
| 19 | OSBL | Pipe Rack #6 Bridge | The original scope of work required a Pipe Rack 6 Bridge over the railroad to accommodate a 6" line and cable tray only. After the OSBL Agreement was executed, TXIT requested that the design be changed to hold and support four additional 24" lines. This required Polaris to redesign a much larger Pipe Rack 6 Bridge. |
| 20 | OSBL | Provide Double Isolation Valves on Tank Nozzles | Double isolation valves were not included in the basis of the OSBL P&C Agreement. After the execution of the Agreement, TXIT requested that double isolation valves be added on Tank Nozzles. |
| 24* | OSBL | Unavailability of OSBL Power Supply | Local utility power was not available to support the OSBL Facility at the time required. The OSBL requires that local utility power is available to support the OSBL Facilities' electrical load. Additional costs for rental generator and electrical gear and fuel were incurred to provide temporary power.<br><br>Polaris cannot complete their EPC scope of work until the utility feeder is installed and energized. As such, Polaris incurred additional costs and schedule delays. The utility feeder was not installed and energized until 8/20/20. |
| 25 | OSBL | Add Recycle Lines, Valves, Fittings... to Pumps | Recycle Lines, and related valves and fittings were not included in the basis of the OSBL P&C Agreement. After the execution of the Agreement, TXIT requested that the recycle lines and related valves and fittings be added. Polaris incurred additional costs |

| FCO No. | Contract | Description | Justification for Submission of Change Order |
|---|---|---|---|
| | | | and schedule delays. |
| 34* | OSBL | Changes to PR 3 and 7 due to Helical Piles vs drilled slurry shafts | TXIT requested that the pipe rack routing be modified to a different routing that increased the number of steel components. TXIT communicated to Polaris that the soils underneath the pipe racks in the Tank Farm would be cement stabilized 8' dia x 36' deep with 4' thick table top stabilized to 4500 psf. After the execution of both ISBL and OSBL Agreements, the client chose not to stabilize the soil and install helical piles instead. |
| 41 | OSBL | Change to PR 5 to add north bridge (Truck Bridge) | The basis for the OSBL P&C Bid did not include a truck crossing at the north end of PR 5. After execution of the Agreement, the client requested that a truck crossing bridge be added. |
| 43* | OSBL | Motor Control Center (MCC) Transformer Platform Addition | The basis for the OSBL P&C Bid did not include access platforms for the OSBL MCC Transformers. After the execution of the OSBL Agreement, the client requested that access platforms be added. |
| 44 | OSBL | Relocation of OSBL MCC | The location of the OSBL MCC was defined and communicated by TXIT to Polaris prior to executing the OSBL P&C Agreement. After the Agreement was executed, the client requested that the location of the MCC be moved on two separate occasions. |
| 47 | OSBL | Contract Changes - Insurance | The Agreement stated that Contractor must maintain all insurance through Substantial Completion. This change order amended the language specific to the duration through which insurance must be maintained. |
| 51* | OSBL | Changed to PR 5 foundation/bent design, routing, and location basis | The routing and foundation basis was defined when the OSBL Engineering Only Agreement (OEOA) was executed. After the execution of the OSBL P&C Agreement, the routing of the PR 5 was changed, the basis of foundation was changed, and the specific coordinate location was changed by the client on more than one occasion. |
| 64 | OSBL | Isolation valves at the Abutment | Isolation valves at the Abutment were not included in the basis of the OSBL P&C Agreement nor in the Dock EPC Agreement. After the execution of both Agreements, the client requested that isolation valves be |

| FCO No. | Contract | Description | Justification for Submission of Change Order |
|---------|----------|-------------|----------------------------------------------|
|         |          |             | added to all lines going to/from Dock. |
| 74      | OSBL     | PR 3 Vehicle Access Bridge | Vehicle crossing was not included in the basis of the OSBL P&C Agreement.  After the execution of the Agreement, TIT requested that vehicle access be provided through PR 3 into the 300 tank area. |

44.    Appendix B of the OSBL Agreement provides for a Progress Payment Schedule. TXIT was required to pay Progress Payment No. 6 upon 90% completion of Work.  Polaris completed more than 90% of the scope of work without TXIT making of decision one way or the other in response to the submitted Change Orders.  Accordingly, on or about September 25, 2020, Polaris sent TXIT an invoice for Project Payment No. 6 in the amount of $6,292,120.25 which included a schedule detailing 93.55% completion of the work exclusive of the work detailed in the disputed Change Orders.  Pursuant to the OSBL Agreement, Article VIII, Section 8.1(c):

> Contractor's Representative and Owner's Representative will meet to verify and confirm satisfaction of Milestone Indications covered by each Progress Payment. Upon verification and approval of each pro forma Invoice, Owner shall pay each Invoice to a bank account designated by Contractor no later than 5 Days after receipt and approval of such Invoice.

Subsequently, the parties' representatives met on or before October 2, 2020 and agreed that 90% of the work was completed, but TXIT refused to timely pay the invoice. TXIT's refusal to pay the invoice constitutes a default under the OSBL Agreement. Polaris, accordingly, exercised its right to suspend performance under the OSBL Agreement. TXIT, in retaliation, subsequently terminated the OSBL Agreement on November 4, 2020.

**C.      TXIT breaches the OSBL Engineering Agreement by refusing to pay Polaris.**

45.      On or about June 4, 2019, TXIT agreed to Polaris' proposal to provide detailed design engineering for a total cost of $2,687,320. Polaris submitted invoices pursuant to a Progress Payment Schedule. Payment was due within five (5) days of TXIT's receipt of the invoices. Invoices that remained unpaid beyond five (5) days of the Invoice date were subject to an interest charge of 1.5% interest per month. Under the contract, TXIT is also responsible and liable for Polaris' attorneys' fees in the event that Polaris is required to retain attorneys for the collection of overdue, uncontested payment. (Attachment B to the OSBL Engineering Agreement set forth the Progress Payment Schedule.) On or about July 13, 2020, Polaris submitted the invoice for Progress Payment No. 5 in the amount of $537,464.00. TXIT never remitted payment of the invoice. The contract provides that only upon payment of all amounts due and owing under the OSBL Engineering Agreement would TXIT own and hold all right, title and interest in and to all work product generated thereunder. Because of TXIT's failure to pay, it did not obtain right, title and interest in and to any work product.

**D.      TXIT breached the Dock Agreement by Failure to Timely Pay Polaris.**

46.      Like the other agreements, the Dock Agreement provided that upon the achievement of certain milestones, TXIT had an obligation to pay certain invoices received from Polaris within five (5) days of receipt.

47.     On or about November 6, 2020, Polaris submitted an invoice for Progress Payment No. 4 in the amount of $6,047,599.65. Polaris used the identical methodology in calculating the percent complete for Progress Payment No. 4 as it had for all prior invoices submitted to and paid by TXIT under all of the parties' Agreements. TXIT refused to timely pay Progress Payment No. 4.

48.     On or about November 30, 2020, Polaris submitted an invoice for Progress Payment No. 5 in the amount of $6,249,186.31 upon completion of 75% of the work.  Polaris again used the identical methodology in calculating the percent complete for Progress Payment No. 5 as it had for all prior invoices submitted to and paid by TXIT.  TXIT again refused to timely pay Progress Payment No. 5.

49.     TXIT's failure to pay Progress Payment No. 5 under the OSBL Engineering Agreement, Progress Payment No. 6 under the OSBL Agreement, and to timely pay Progress Payments Nos. 4 and 5 under the Dock Agreement rendered it impossible for Polaris to timely pay subcontractors.  Under the express terms of the ISBL, OSBL and Dock Agreements, Polaris' failure to pay subcontractors does not constitute a default when attributable to TXIT's failure to pay Polaris.

**E.     TXIT failed to pay Polaris for work performed under the ISBL, OSBL and Dock Agreements**.

50.     TXIT terminated the OSBL Agreement on or about November 4, 2020.  TXIT terminated the ISBL and Dock Agreements on or about January 4, 2021.   Given the circumstances, TXIT did not have a right to terminate the agreements for Contractor Default.  Regardless, under the Agreements whether termination is for Contractor Default or for Convenience, pursuant to the contract, TXIT had the obligation to pay Polaris for Work performed up to and including the termination date.  TXIT again ignored its promise to pay

Polaris for Work performed prior to termination or all amounts due for the Progress Payments earned as of the date of such termination.

## CAUSES OF ACTION

## DECLARATORY JUDGMENT

51.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

52.     Pursuant to Section 37.001, *et seq,* of the Texas Civil Practice and Remedies Code Polaris seeks a declaration of rights under the ISBL and the OSBL Agreements. TXIT claims that the agreed dispute resolution procedures do not apply to the dispute arising from and related to TXIT's issuance of a Notice of Default based on an alleged Breach of Warranty and Breach of Contract.  Polaris claims that the agreed dispute resolution procedures do apply to any dispute arising from or relating to the ISBL and OSBL Agreements including TXIT's allegation that Polaris is in default. This is a live and ongoing controversy that impacts the ability of the parties to resolve their disputes that arise from and relate to the ISBL and OSBL Agreements.  Polaris therefore requests that the Court declare the dispute resolution provisions applicable to all disputes arising from and related to the ISBL and OSBL Agreements including TXIT's allegation of default.

53.     Polaris seeks a further declaration of rights under the ISBL and OSBL Agreements that TXIT is required to assert a Warranty Claim under the ISBL and OSBL Agreements as to any alleged defect prior to alleging an Event of Default and invoking the Default provisions of the Agreements based on any "False Representation or Warranty" under Section 16.1(d) of Article XVI.  Section 13 of the Agreements specifically sets forth the proper procedure for a party to assert a Warranty claim.  TXIT attempts to circumvent the parties' specific agreement as to Warranty claims including the cost-shifting provision by ignoring the

Warranty provisions and skipping straight to the Default provisions based on an alleged "Breach of Warranty," and not a "False Representation or Warranty" as referenced in Section 16.1(d). Accordingly, Polaris seeks a declaration as to whether TXIT is required to assert a Warranty Claim prior to issuing an alleged Notice of Default based on any "False Representation or Warranty."

54.     Polaris also seeks a declaration that there is no basis in the ISBL Agreement that allows TXIT to unilaterally revoke its acceptance of the Certificate of Mechanical Completion which TXIT executed and issued to Polaris on June 2, 2020.

55.     Polaris seeks a declaration that TXIT is required to reimburse Polaris for the builder's risk insurance policies under both the ISBL and OSBL Agreements.  Polaris continued to maintain the requisite policies for the ISBL and OSBL Agreement until TXIT's termination of the ISBL and OSBL Agreements at its own substantial expense despite TXIT's refusal to reimburse Polaris.

56.     Polaris seeks a declaration that the OSBL and ISBL Change Orders identified in the foregoing paragraphs are beyond the original scope of work provided for in the respective contracts.

57.     Polaris further requests a declaration as to the scheduling changes, costs, and additional time for completion provided for in the ISBL and OSBL Agreements attributable to Force Majeure events, Change Orders, and late payments of invoices by TXIT.  TXIT claims that the scheduling delays constitute a Breach of Contract without acknowledging and accounting for the scheduling changes and additional time for completion provided for in the ISBL and OSBL Agreements.

58.     Polaris seeks a declaration that TXIT was solely responsible for Start Up and Commissioning for the purpose of achieving stable operations of the ISBL Facility.

59.     Polaris seeks a declaration that under the terms of the ISBL Agreement, Polaris had the sole right to conduct Performance Testing to demonstrate that the ISBL Facility met Performance Guarantees, and that absent the requisite Performance Testing there is no contractual basis to assert that such Performance Guarantees were not met.

**BREACH OF CONTRACT**

60.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

61.     Polaris and TXIT are parties to the ISBL, OSBL Engineering, OSBL and Dock Agreements that are all valid enforceable contracts.  Polaris is a proper party to bring suit for breach of the contract.  Polaris performed its obligations under the ISBL, OSBL Engineering, OSBL and Dock Agreements.

62.     TXIT breached the ISBL and OSBL Agreements by not paying for, nor accepting or rejecting, Change Orders related to incorrect Critical Assumptions that formed the basis of the parties' Agreement or any other Change Orders.

63.     TXIT breached the ISBL and OSBL Agreements by failing to reimburse Polaris for the builder's risk insurance policies under both the ISBL and OSBL.

64.     TXIT breached the ISBL and OSBL Agreements by refusing to engage in the requisite dispute resolution procedures articulated in § 19.1 of the ISBL, OSBL and Dock Agreements.

65.     TXIT breached the ISBL Agreement by ignoring the requirements of Article XIII related to any alleged defects, and instead, wrongfully issuing a Notice of Default.

66.     TXIT breached the ISBL Agreement by refusing to use crude oil that conformed with the specifications set forth in Appendix F.

67.     TXIT breached the ISBL Agreement by breaching its obligation to provide Polaris with a Notification of Stable Operation or alternatively, notice of any alleged defect under the Warranty provisions of the ISBL Agreement.

68.     TXIT breached the ISBL Agreement by wrongfully issuing a Notice of Default based on alleged scheduling delays without accounting for scheduling changes and additional time for completion allowed under the ISBL Agreement for Force Majeure events, Owner Caused Delays, Change Orders and TXIT's late payment of invoices.

69.     TXIT breached the ISBL Agreement by attempting to unilaterally revoke its acceptance of Polaris' Notice of Mechanical Completion.

70.     TXIT breached the OSBL Agreement by refusing to pay Polaris Progress Payment No. 6 in the amount of $6,292,120.25.

71.     TXIT breached the OSBL Agreement by wrongfully terminating the OSBL Agreement.

72.     TXIT breached the OSBL Engineering Agreement by refusing to timely pay Progress Payment No. 5.

73.     TXIT breached the Dock Agreement by refusing to timely pay Progress Payments Nos. 4 and 5.

74.     TXIT's breaches of the ISBL, OSBL Engineering, OSBL and Dock Agreements caused, and is continuing to cause, Polaris to suffer substantial damages.

75.     TXIT's breaches of each of the above-referenced agreements has also caused Polaris to suffer special damages in the form of delay damages, loss of bonding capacity, loss of

reputation, and loss of credit.  More specifically, TXIT's intentional and bad faith refusal to timely approve change orders, coordinate with Polaris on project management, and make payments due caused substantial delays in the project.  This in turn caused Polaris to pay the costs of carrying idle workers and equipment and wasted overhead in dealing with the delays and futile negotiations with TXIT.

76.     TXIT's conduct has also jeopardized Polaris's ability to obtain performance and payment bonds on other projects.  Sureties evaluating potential projects have had concerns over the dispute with TXIT.  Because of TXIT's breaches, including its failure to pay Polaris, certain subcontractors filed claims against Polaris and liens against TXIT.  In addition, TXIT itself sought payment from Polaris's existing surety without a good faith basis.  These actions by TXIT stemming from its intentional and bad faith breaches have caused sureties to be reluctant to extend performance and payment bonds to Polaris on other projects until a resolution can be reached determining that Polaris was not at fault with respect to the claims at issue in this lawsuit.  This has resulted in delays (and/or more unfavorable terms) in Polaris's ability to obtain the coverage (including insurance) needed to win bids on other projects.

## QUANTUM MERUIT

77.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

78.     Polaris provided valuable services and materials.

79.     Such services and materials were provided to TXIT.

80.     TXIT accepted such services and materials.

81.     TXIT had reasonable notice that Polaris expected compensation for the services or materials.

82.     TXIT never compensated Polaris for the services or materials.

83.     Polaris suffered damages as a result of TXIT's failure to pay for the services or materials.

## TORTIOUS INTERFERENCE WITH EXISTING CONTRACT

84.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

85.     Polaris had valid contracts with TXIT. DRL knew these contracts existed and was fully aware of their terms, including Polaris's rights and benefits to be obtained under the contracts.   DRL willfully and intentionally interfered with the contracts.   DRL had no justification for doing so, but instead wrongfully sought to drive a wedge between TXIT and Polaris.  Indeed, DRL wrongfully benefitted from its interference.  DRL's interference with the contracts proximately caused Polaris' injury.  Polaris suffered actual damages and loss, including the consequential damages described herein, such as delay damages, loss of reputation, loss of credit, and loss of bonding capacity.  Polaris also seeks exemplary damages given the nature of DRL's conduct.

86.     Similarly, David Luetchford, managing member of DRL, personally reviewed the contracts at issue and was aware of their terms, including Polaris's rights and benefits to be obtained under the contracts.   Mr. Luetchford willfully and intentionally interfered with the contracts.  Mr. Luetchford had no justification for doing so.  Indeed, Mr. Luetchford, through DRL, personally and wrongfully benefitted from his interference.  Mr. Luetchford's interference with the contracts proximately caused Polaris's injury.  Polaris suffered actual damages and loss. Although he acted on behalf of DRL when interacting with TXIT, he remains personally liable for his tortious acts, including his tortious interference with contract.

## CONDITIONS PRECEDENT

87.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

88.     All conditions precedent have been met.[6]

## ATTORNEY'S FEES AND COSTS

89.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

90.     Polaris seeks to recover attorney's fees pursuant to TEX. CIV. PRAC. & REM. CODE § 37.009.

91.     Polaris seeks recovery of attorney's fees pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001.

92.     Polaris seeks recovery of attorney's fees pursuant to the terms of the parties' agreements including but not limited to the OSBL Engineering Agreement.

## JURY DEMAND AND JURY FEE

93.     Polaris demands a jury trial on all triable issues and has deposited with the Clerk of Court the required jury fee.

## PRAYER FOR RELIEF

For the foregoing reasons, Polaris respectfully requests that the Court enter judgment against TXIT for all damages Polaris has incurred as a result TXIT's breaches of the ISBL, OSBL, OSBL Engineering, and Dock Agreements, pre- and post-judgment interest, attorney's

---

[6] Polaris attempted to engage TXIT in the dispute resolution procedures set forth in the Parties' Agreements on more than one occasion.  TXIT has expressly denied the application of those procedures.  Consequently, completion of those requirements has been rendered futile by TXIT, and accordingly conditions precedent have been met.

fees, costs of court, and declare the rights of the parties under the ISBL, OSBL, OSBL Engineering, and Dock Agreements together with any other relief to which Polaris has shown itself to be entitled at law or in equity.

Respectfully submitted,

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Tony Guerino*
Tony Guerino
Texas State Bar No. 00792552
Elizabeth E. Klingensmith
Texas State Bar No. 24046496
Jonathan T. Sink
Texas State Bar No. 24099968
R. Yona Starosta
Texas State Bar No. 24120668
909 Fannin St., Suite 2000
Houston, Texas 77010
Telephone: 713-276-7695
Facsimile: 713-276-7673
Tony.guerino@pillsburylaw.com
Liz.klingensmith@pillsburylaw.com
Jonathan.Sink@pillsburylaw.com
Yona.Starosta@pillsburylaw.com

**ATTORNEYS FOR PLAINTIFF POLARIS ENGINEERING, INC.**

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the above and foregoing has been electronically filed in the Court's CM/ECF system on June 21, 2022, which caused a copy of same to be served upon all counsel of record.

*/s/ Tony Guerino*
Tony Guerino

32

4853-3201-2068.v1