United States District Court
Southern District of Texas
**ENTERED**
August 23, 2023
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| POLARIS ENGINEERING, INC., | § | |
| Plaintiff. | § § § | |
| V. | § § | CIVIL ACTION NO. 3:21-cv-00094 |
| TEXAS INTERNATIONAL TERMINALS, LTD., *et al.*, | § § § § | |
| Defendants. | § § | |

## OPINION AND ORDER

Presently before me are three separate privilege disputes. Plaintiff Polaris Engineering, Inc. ("Polaris") has moved to compel: (1) communications between Defendant Texas International Terminals, Ltd. ("TXIT"), TXIT's counsel Andrews Myers, P.C. ("Andrews Myers"), and non-party GCC Supply & Trading, LLC ("GCC"); and (2) three documents between TXIT, Andrews Myers, and TXIT's former employee Jereme Crouthamel ("Crouthamel"). *See* Dkts. 377, 469. Separately, TXIT challenges Polaris's claw back of various documents generated during the course of a "Lessoned Learned" or "Opportunity for Improvement" ("OFI") exercise that Polaris claims was conducted at the direction and guidance of its general counsel Joseph Pousson. *See* Dkt. 414.

## BACKGROUND

This case concerns a contractual dispute between Polaris and TXIT. In 2018, TXIT contracted with GCC "to seek out and negotiate a contract with a contractor that could timely build a profitable crude processing facility." Dkt. 199 at 19. In 2019, TXIT contracted with Polaris to design, engineer, and construct a crude oil processing plant in Galveston, Texas (the "Facility"). In 2020, a dispute arose concerning the project, and Polaris ultimately sued TXIT in Texas state court on September 25, 2020. In October 2020, TXIT removed the case to federal district court and counterclaimed.

There have been numerous amendments to the parties' pleadings in the nearly three years that this litigation has been underway. The operative pleadings are Polaris's Fourth Amended Complaint (Dkt. 197) and TXIT's Fifth Amended Answer, Counterclaim, and Third-Party Complaint (Dkt. 199), which purports to assert claims against Polaris that GCC assigned to TXIT. On January 13, 2022—more than a year after this litigation was initiated—GCC assigned to TXIT "any and all claims it has against Polaris and its officers which relate to or arise of the Facility and Polaris's representations regarding the timing and performance capabilities of the same." Dkt. 199 at 31. Thus, although GCC is not a party to this litigation, it is nevertheless a critical player.

Another critical player is Crouthamel, who was employed by TXIT for approximately four years and worked as Terminal Operations Manager for TXIT until his termination in May 2021. In his last six months of employment with TXIT, Crouthamel worked with TXIT and its litigation team in support of TXIT's defense against Polaris's suit. Shortly after TXIT terminated Crouthamel's employment, he accepted an offer of employment with Polaris. Like GCC, Crouthamel is a crucial non-litigating third party.

With these background relationships in mind, I turn to the parties' privilege assertions.

## LEGAL STANDARDS

"In diversity cases such as this, state law applies to claims of attorney–client privilege, while federal law governs whether the items are immune from discovery under the work product doctrine." *Homeland Ins. Co. of N.Y. v. Clinical Pathology Labs., Inc.*, No. 1-20-CV-783-RP, 2022 WL 17255798, at *2 (W.D. Tex. Nov. 28, 2022); *see* FED. R. EVID. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."). Thus, Texas law governs the application or waiver of the attorney–client privilege, while federal common law governs the work product privilege. *See In re Avantel, S.A.*, 343 F.3d 311, 323 (5th Cir. 2003); *United Coal Cos. v. Powell Constr. Co.*, 839 F.2d 958, 966

(3d Cir. 1988) ("Unlike the attorney client privilege, the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed. R. Civ. P. 26(b)(3).").

**A.  ATTORNEY–CLIENT PRIVILEGE**

The attorney–client privilege exists to facilitate free and open communication between attorneys and their clients. *See Paxton v. City of Dallas*, 509 S.W.3d 247, 259–60 (Tex. 2017). In Texas, the attorney–client privilege is governed by Texas Rule of Evidence 503, which states, in relevant part:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made to facilitate the rendition of professional legal services to the client:
>
> (A) between the client or the client's representative and the client's lawyer or the lawyer's representative;
>
> (B) between the client's lawyer and the lawyer's representative;
>
> (C) by the client, the client's representative, the client's lawyer, or the lawyer's representative to a lawyer representing another party in a pending action or that lawyer's representative, if the communications concern a matter of common interest in the pending action;
>
> (D) between the client's representatives or between the client and the client's representative; or
>
> (E) among lawyers and their representatives representing the same client.

TEX. R. EVID. 503(b)(1).

The Supreme Court of Texas has recently summarized the parameters of the attorney–client privilege under Texas law:

> A communication is "confidential" if it is not intended to be disclosed to third persons other than (1) those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or (2) those reasonably necessary for the transmission of the communication. TEX. R. EVID. 503(a). The presence of third persons during the communication will destroy confidentiality, and communications intended to be disclosed to third parties are not generally privileged. *See id.* Further, the person who holds the privilege—the client—waives it if "the person . . . while holder of the privilege, voluntarily discloses or consents to disclosure of any

3

significant part of the privileged matter unless such disclosure itself is privileged." TEX. R. EVID. 511(a)(1).

> At the core of the privilege is the notion that the communications are "made for the purpose of facilitating the rendition of professional legal services." *Huie v. DeShazo*, 922 S.W.2d 920, 922 (Tex. 1996). . . . However, the mere copying of legal counsel, in and of itself, does not transform an otherwise nonlegal communication into one made for a legal purpose. *See* Tex. Att'y Gen. Op. No. JC–0233, at 6 (2000).

*Univ. of Tex. Sys. v. Franklin Ctr. for Gov't & Pub. Integrity*, No. 21-0534, 2023 WL 4278243, at *3 (Tex. June 30, 2023).

"The party who seeks to limit discovery by asserting a privilege has the burden of proof." *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004). "The documents themselves may constitute sufficient evidence to make a prima facie showing of attorney-client . . . privilege." *Id.* But "[t]here is no presumption that documents are privileged, and there is no presumption that a party listed on the privilege log is an authorized person under the rule governing the privilege." *Id.* at 225. "The party asserting a privilege in opposition to a discovery request must establish ***by testimony or affidavit*** a prima facie case for the privilege, although the party need produce only the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 804 (Tex. 2017) (emphasis added) (cleaned up).

## B. ATTORNEY WORK PRODUCT DOCTRINE

The work product doctrine first appeared in the United States Supreme Court's decision in *Hickman v. Taylor*, 329 U.S. 495 (1947). *Hickman* served as the authority for work product protection until 1970 when the work product doctrine was codified in Federal Rule of Civil Procedure 26(b)(3). Today, the rule provides: "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." FED. R. CIV. P. 26(b)(3)(A).

4

> To assert work product protection, the party resisting discovery must show:
>
> (1) the materials sought are documents or tangible things; (2) the materials sought were prepared in anticipation of litigation or for trial; (3) the materials were prepared by or for a party's representative; [and] (4) if the party seeks to show that the material is opinion work product, that party must show that the material contains the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party.

*SEC v. Brady*, 238 F.R.D. 429, 441 (N.D. Tex. 2006). As with assertions of attorney–client privilege, the burden is on the party who seeks work product protection to show that its representative prepared the materials at issue in anticipation of litigation or for trial. *See Hodges, Grant & Kaufman v. U.S. Gov't, Dep't of the Treasury, I.R.S.*, 768 F.2d 719, 721 (5th Cir. 1985). "In contrast to the attorney-client privilege, the work product privilege belongs to both the client *and the attorney*, either one of whom may assert it." *Malik v. U.S. Dep't of Homeland Sec.*, No. 22-10772, 2023 WL 5211651, at *5 (5th Cir. Aug. 15, 2023) (quotation omitted).

The Fifth Circuit has said that the privilege can apply where litigation is not imminent "as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation." *United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982) (quotation omitted). "[D]etermining whether a document is prepared in anticipation of litigation is a slippery task." *Id.* "It is admittedly difficult to reduce to a neat general formula the relationship between preparation of a document and possible litigation necessary to trigger the protection of the work product doctrine." *United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. Unit A Feb. 1981). Nevertheless, "[i]f the document would have been created without regard to whether litigation was expected to ensue, it was made in the ordinary course of business and not in anticipation of litigation." *Jolivet v. Compass Grp. USA, Inc.*, 340 F.R.D. 7, 18 (N.D. Tex. 2021); *see also El Paso Co.*, 682 F.2d at 542 ("The work product doctrine is not an umbrella that shades all materials prepared by a lawyer, however. . . . Excluded from work product

5

materials . . . are '(m)aterials assembled in the ordinary course of business.'" (quoting FED. R. CIV. P. 26(b)(3) advisory comm. note to 1970 amendment)).

## ANALYSIS

**A.   WHETHER COMMUNICATIONS BETWEEN TXIT, ANDREWS MYERS, AND GCC ARE PROTECTED BY THE ATTORNEY–CLIENT PRIVILEGE**

Polaris seeks "all communications exchanged between non-party GCC, TXIT, and [Andrews Myers] as it relates to Polaris, the Facility, and this lawsuit since 2018." Dkt. 377 at 2. TXIT has refused to produce these documents, arguing that they are protected by both the attorney–client privilege and the work product doctrine because "(i) GCC employees served as corporate representatives of TXIT in seeking and facilitating legal advice concerning Polaris and the Facility; and (ii) GCC is a joint client of TXIT's litigation counsel."[1] Dkt. 402 at 3. I will address these arguments in reverse order. But first, I want to describe the evidence that TXIT has offered in support of its burden to establish a prima facie claim of privilege over communications between GCC, TXIT, and Andrews Myers.

### 1.   *TXIT's Evidence in Support of Its Prima Facie Burden*

#### a.   **The Mafrige Affidavit**

First, TXIT offers an affidavit by GCC's Managing Director, John Mafrige ("Mafrige"). *See* Dkt. 402-3. Mafrige states:

> 3.   On September 18, 2020, I attended a meeting with Todd Sullivan[2] and Scott Mixon[3] with Tim Ross and Hunter Barrow of Andrew Myers, P.C. I understood the meeting to pertain to obtaining

---

[1] If TXIT cannot establish that GCC was its representative and/or joint client, then GCC's inclusion on the communications at issue waives TXIT's privilege. *See In re XL Specialty Ins. Co.*, 373 S.W.3d 46, 50 (Tex. 2012) ("[T]he privilege is waived if the lawyer or client voluntarily discloses privileged communications to a third party."); *see also* TEX. R. EVID. 511(a)(1) ("A person upon whom these rules confer a privilege against disclosure waives the privilege if . . . the person or a predecessor of the person while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter unless such disclosure itself is privileged.").

[2] Mafrige fails to identify Todd Sullivan ("Sullivan") beyond his name. Polaris states that Sullivan is TXIT's owner. *See* Dkt. 468 at 4.

[3] Scott Mixon ("Mixon") is GCC's in-house attorney.

> legal advice and discussing legal strategy, including with respect to potential litigation, involving [Polaris's] failure to engineer, procure, and construct [the Facility]. I understood my role in that meeting to serve as a representative and/or agent of GCC for purposes of it seeking legal advice, as well as a representative or agent of [TXIT] in seeking legal advice concerning the Facility. After that meeting, GCC, including myself, understood that Andrews Myers was serving as GCC's outside legal counsel, as well as TXIT's outside legal counsel, as it pertained to Polaris and the Facility.
>
> 4. In November 2020, Mark VandeVoorde[4] and I met with Tim Ross and Andy Clark of Andrews Myers at GCC's offices in Houston. During that meeting, we discussed GCC's potential claims against Polaris related to the Facility and sought legal advice on those potential claims from Andrews Myers.
>
> 5. As I testified in my deposition in March 2023, GCC did not formally execute an engagement letter with Andrews Myers. In that respect, I could not say that GCC "hired" Andrews Myers. However, beginning at least in early October 2020, myself and others with GCC sought legal advice from Andrews Myers in connection with the lawsuit against Polaris and with respect to claims GCC might have against Polaris. GCC understood that Andrews Myers was its legal counsel and conducted itself accordingly in meetings, phone calls, and email communications. In all respects, Andrews Myers agreed—as it provided legal advice, met with GCC regarding litigation strategy, collected documents, responded to subpoena requests, and otherwise—that it represented GCC in connection with the lawsuit.

*Id.* at 2–3.

Polaris argues that Mafrige's affidavit is a sham that "attempt[s] to change GCC's prior testimony," as offered by Mafrige during his deposition as GCC's corporate representative. Dkt. 404 at 2. "[T]he 'sham-affidavit doctrine' is an exception to th[e] general rule by which [a] court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 477 (5th Cir. 2022) (quotation omitted). I will assume without deciding that the doctrine has applicability outside of the summary judgment context. Even so,

---

[4] Again, neither Mafrige nor TXIT bothers to identify the relevant players mentioned in this affidavit beyond stating their names.

7

Mafrige's affidavit—while vague and unhelpful—is not quite a sham.[5] As the Fifth Circuit has explained, "not every discrepancy in an affidavit justifies disregarding it," and "the bar for applying the doctrine is a high one, typically requiring affidavit testimony that is 'inherently inconsistent' with prior testimony." *Id.*

Mafrige's affidavit clarifies that because GCC did not execute an engagement letter with Andrews Myers, he could not testify that GCC "hired" Andrews Myers. This is not so markedly inconsistent with Mafrige's testimony that GCC did not hire outside counsel as to be a sham. Words matter, and "hired" is sufficiently distinct from "engaged" or "consulted" to explain the discrepancy between Mafrige's testimony and his affidavit. Additionally, Mafrige's testimony that GCC's in-house counsel represented GCC in negotiating the assignment of GCC's claims against Polaris to TXIT is not entirely inconsistent with the proposition that Andrews Myers could otherwise (theoretically) represent GCC in this litigation.

On that note, I am unmoved by Polaris's arguments regarding any conflicts created by Andrews Myers's purported representation of TXIT and GCC given their adversity to each other. *See* Dkt. 377 at 9–10 (TXIT testified that GCC put TXIT in default of their Tolling Agreement). Such a conflict may very well exist. Indeed, TXIT makes little attempt to refute such a conflict. In the face of such a conflict, Andrews Myers would certainly have failed in its ethical obligations if it did not secure a conflict waiver from both parties before undertaking any purported representation of GCC. *See* TEX. DISC. R. PROF'L CONDUCT 1.06(c)(2). Yet, Polaris points me to no authority stating that violating the rule against representing clients with adverse interests destroys the attorney–client privilege. To the contrary, punishing innocent clients—by disregarding their privilege—for an attorney's

---

[5] As I explain below, the majority of Mafrige's affidavit is not *so* inconsistent with his deposition testimony as to make it a sham affidavit. That said, Mafrige's testimony that he did not "know of" "any attorney from Andrews Myers [who was] GCC's counsel, ***outside of depositions***," Dkt. 377-3 at 28, is incredibly difficult to reconcile with his affidavit. Alas, I have generously considered Mafrige's affidavit anyway. Even so, it fails to move the needle in establishing a prima facie claim of attorney–client privilege.

8

breach of the ethical rules would be anathema to clients' "reasonable expectation that information relating to the client will not be voluntarily disclosed and that disclosure of such information may be judicially compelled only in accordance with recognized exceptions to the attorney-client and work product privileges." *Id.* Preamble: Scope ¶ 16. The proper remedy for such a situation is the withdrawal or disqualification of the conflicted attorney. *See id.* R. 1.06(e). Accordingly, Polaris is incorrect to suggest that adversity between GCC and TXIT would operate to destroy the attorney–client privilege (assuming there is an attorney–client relationship to give rise to the privilege in the first place).

Finally, contrary to Polaris's assertion otherwise, Mafrige never gave "unequivocal testimony that no [attorney–client] relationship existed" between GCC and Andrews Myers. Dkt. 404 at 4. Literally, Mafrige never said those words. Thus, I will not disregard Mafrige's affidavit as a sham.

### b. The Harrison-Alcorta Email

TXIT's second piece of "evidence" in support of its burden to establish a prima facie claim of attorney–client privilege is an October 29, 2020 email from GCC employee Ben Harrison ("Harrison") to Robert Alcorta ("Alcorta") stating that Tim Ross ("Ross") of Andrews Myers "is our primary outside council [sic]." Dkt. 402-4 at 2. TXIT does not offer an affidavit that establishes (1) Harrison's and Alcorta's roles or relationships (or the roles or relationships of other individuals copied on the email); (2) explains who "our" refers to; (3) explains why this email demonstrates that GCC is a co-client of Andrews Myers with TXIT; or (4) explains how this email shows that GCC had the authority to obtain legal services for TXIT, or to act for TXIT on legal advice rendered.

### c. PRIV_000087

On July 28, 2023, I held another hearing on Polaris's motion to compel. During that hearing, Ross, TXIT's counsel, directed my attention to a particular entry on TXIT and GCC's privilege log that he argued demonstrates the attorney–client relationship between Andrews Myers and GCC. Ross described this

9

document, subsequently provided to me for *in camera* review, as an October 2, 2020 email exchange between himself and Mixon, in-house counsel for GCC. The email is titled "RE: Surety Call – Confidential and Privileged." Copied on the email are Sullivan, Bill Bevers ("Bevers"), Mafrige, and attorneys Andrew Clark and Hunter Barrow of Andrews Myers. TXIT has not provided an affidavit explaining the roles and relationships of the folks copied on this email, though Polaris has stated that Sullivan is TXIT's owner. Ross informed me at the July 28, 2023 hearing that Bevers is with TXIT, though I am still unclear as to his role.

\* \* \*

I will now analyze whether these three pieces of evidence are sufficient to carry TXIT's burden to establish a prima facie claim of privilege.

### 2. *Whether GCC Is a Joint or Co-Client of Andrews Myers*

"The joint client or co-client doctrine applies when the same attorney simultaneously represents two or more clients on the same matter." *In re XL Specialty Ins. Co.*, 373 S.W.at 50 (cleaned up). "Where an attorney acts as counsel for two parties, communications made to the attorney for the purpose of facilitating the rendition of legal services to the clients are privileged, except in a controversy between the clients." *Id.*; *see also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 75(1) ("If two or more persons are jointly represented by the same lawyer in a matter, a communication of either co-client that otherwise qualifies as privileged under §§ 68–72 and relates to matters of common interest is privileged as against third persons, and any co-client may invoke the privilege, unless it has been waived by the client who made the communication.").

Establishing "[w]hether a client–lawyer relationship exists between each client and the common lawyer" is a prerequisite to any purported co-client situation. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 75 cmt. c. Whether an attorney–client relationship exists in the first place is a fact-intensive inquiry. "[T]he parties must explicitly or by their conduct manifest an intention to create it. To determine whether there was a meeting of the minds, [courts] use an

objective standard examining what the parties said and did and do not look at their subjective states of mind." *Sutton v. Est. of McCormick*, 47 S.W.3d 179, 182 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.). A putative client's failure to pay a fee, though not dispositive, is one of many factors that may be considered in determining whether an attorney–client relationship exists. *See Border Demolition & Env't, Inc. v. Pineda*, 535 S.W.3d 140, 154 (Tex. App.—El Paso 2017, no pet.) (collecting cases that considered a lack of paid attorney's fees in finding no evidence of an attorney–client relationship).

As Polaris points out, GCC never executed an engagement agreement with GCC; GCC admitted that it did not "hire" Andrews Myers; and there is no evidence that GCC has paid Andrews Myers any legal fees. Mafrige's affidavit is unhelpful to the extent it references Mafrige's "subjective state[] of mind,"[6] which is entirely irrelevant. *Maersk Tankers MR K/S v. M/T Swift Winchester*, No. 3:22-CV-00390, 2023 WL 1824832, at *3 (S.D. Tex. Feb. 8, 2023) (quoting *Sutton*, 47 S.W.3d at 182). Mafrige's affidavit is also internally inconsistent. For example, Mafrige states that he and GCC's Mark VandeVoorde met with Andrews Myers attorneys in November 2020 to "discuss[] GCC's potential claims against Polaris related to the Facility and sought legal advice on those potential claims." Dkt. 402-3 at 3. Yet he later states that GCC's in-house counsel—not Andrews Myers— "evaluated whether to assert claims against TXIT" and "whether to independently pursue claims against Polaris or assign its claims to TXIT." *Id*.

Mafrige's affidavit is also heavy on conclusory statements but light on details. Mafrige states that he "and others with GCC sought legal advice from Andrews Myers in connection with the lawsuit against Polaris and with respect to claims GCC might have against Polaris." *Id*. But Mafrige does not elaborate as to **who** these "others" are, **why** "GCC understood that Andrews Myers was its legal counsel," or **what** it means for GCC to have "conducted itself accordingly in

---

[6] "I understood" and "GCC understood" are subjective statements. Dkt. 402-3 at 2–3.

11

meetings, phone calls, and email communications." *Id*. Lastly and most importantly, Mafrige's affidavit fails to address the documents that are at issue here, to identify the people listed on the privilege log, or to even reference the privilege log. *See DuPont*, 136 S.W.3d at 224 ("[A]n affidavit is of no probative value if it merely presents global allegations that documents come within the asserted privilege."). Thus, Mafrige's affidavit is not prima facie evidence that GCC had an attorney–client relationship with Andrews Myers, or that any of the documents on the privilege log are privileged.

Nor does the Harrison-Alcorta email, offered without an affidavit or context, give rise to a rational inference that GCC had an attorney–client relationship with Andrews Myers, or that any of the documents on the privilege log are privileged.

PRIV_000087 is an email exchange between GCC's in-house counsel, Mixon, and TXIT's outside counsel, Ross. Although marked "Confidential and Privileged," this document does not show Mixon seeking legal advice from Ross for GCC, or Ross providing legal advice to Mixon for GCC's benefit. Rather, the email is an exchange of factual information regarding events related to Polaris's suit. At most, this document shows coordination between GCC's in-house counsel (Mixon) and TXIT's outside litigation counsel (Ross)—not Andrews Myers's representation of GCC.[7] Thus, TXIT fails to establish that GCC is a joint client of Andrews Myers.

### 3. *Whether GCC Is TXIT's "Client's Representative"*

TXIT has hedged its privilege bet, asserting that even if GCC is not a joint client, GCC is TXIT's "corporate representative." Dkt. 402 at 4. What matters

---

[7] Coordination can potentially indicate a common interest. "Unlike the joint client rule, the joint defense and common interest rules apply when there has been sharing of information between or among separately represented parties." *In re XL Specialty Ins. Co.*, 373 S.W.3d at 50 (citing RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 75 cmt. c). But TXIT has not articulated its mutual interest with GCC or even claimed application of the common interest rule. In fact, TXIT's insistence that GCC is its client's representative and/or that GCC is its co-client of Andrews Myers precludes application of the common interest rule, which applies only to "separately represented parties." *Id*.

though is whether GCC is TXIT's "client's representative" as defined by the Texas Rules of Evidence:

> (2) A "client's representative" is:
>
>> (A) a person who has authority to obtain professional legal services for the client or to act for the client on the legal advice rendered; or
>>
>> (B) any other person who, to facilitate the rendition of professional legal services to the client, makes or receives a confidential communication while acting in the scope of employment for the client.

TEX. R. EVID. 503(a)(2).

GCC was not an employee of TXIT, so by its plain language, Rule 503(a)(2)(B) is inapplicable. As for Rule 503(a)(2)(A), TXIT offers no evidence that GCC and/or Mafrige had "authority to obtain professional legal services *for [TXIT]* or to act *for [TXIT]* on the legal advice rendered." *Id.* (emphasis added). Neither the Harrison-Alcorta email nor PRIV_000087 can be read to establish GCC's authority to act *for TXIT*. And TXIT offers no "testimony or affidavit" from anyone at TXIT who could have bestowed such authority upon GCC to establish that GCC was, in fact, TXIT's representative. *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d at 804.

Mafrige's statement that he "understood" his role at the September 18, 2020 meeting to including acting "as a representative or agent of [TXIT] in seeking legal advice concerning the Facility" is conclusory. Dkt. 402-3 at 2–3. Mafrige does not offer any details as to *why* that was his understanding. Moreover, that conclusory statement, which simply parrots the standard for who is a "client's representative," is undercut by the fact that Mafrige attended the September 18, 2020 meeting *with TXIT's owner*, Sullivan. Yet Mafrige fails to explain why *he* needed to act as TXIT's representative in seeking legal advice when TXIT's owner was at the same meeting. Regardless, Mafrige's affidavit does not mention Mafrige's purported authority to act for TXIT *beyond* that isolated meeting on September 18, 2020. More importantly, Polaris has created an enormous hurdle for TXIT by

13

pointing to the Terminal Services Agreement, which explicitly states: "Neither [TXIT] nor [GCC] is authorized to take any action in any way whatsoever for or on behalf of the other." Dkt. 404 at 8. Similarly, the Tolling Agreement states that "no action taken by [TXIT and GCC] . . . shall constitute . . . either Party as the agent of the other Party for any purpose." *Id.* TXIT fails to respond to this argument in its supplemental brief, so I am left to presume that it has conceded this point. Thus, TXIT fails to show that GCC is TXIT's representative under Rule 503.

* * *

For the reasons stated above, I find that TXIT has not carried its burden to establish a prima facie claim of attorney–client privilege over documents exchanged between itself, GCC, and Andrews Myers. Specifically, TXIT fails to establish that GCC was a joint or co-client of Andrews Myers. TXIT also fails to establish that GCC was TXIT's client's representative as defined by Rule 503. Accordingly, TXIT has waived whatever attorney–client privilege it may have had concerning any document on which GCC personnel were included. *See Univ. of Tex. Sys.*, 2023 WL 4278243, at *3 (inclusion of third parties to otherwise privileged communications operates as waiver).

**B.     WHETHER COMMUNICATIONS BETWEEN TXIT, ANDREWS MYERS, AND GCC ARE PROTECTED BY THE WORK PRODUCT DOCTRINE**

In its reply, Polaris argues that "any work product protection (to the extent this ever existed) belonging to any material TXIT or its counsel shared with GCC has been waived" because GCC and TXIT were adverse. Dkt. 404 at 13. There is ample case law to support the proposition that a party who "discloses work product to an adversary" or who "disclos[es work product] to a *potential* adversary may waive work product protection." *In re Sanchez Energy Corp.*, No. 19-34508, 2022 WL 17586713, at *6 (Bankr. S.D. Tex. Dec. 12, 2022) (collecting cases). TXIT does not dispute this legal proposition, or seriously dispute that TXIT and GCC were

adverse.[8] TXIT's conclusory assertion that "TXIT and GCC are 100% aligned" is betrayed by the very next sentence, which states that "to the extent there was the possibility of any deviation from that alignment . . . , GCC sought advice from additional counsel." Dkt. 470 at 3. TXIT mistakenly directs this argument to whether a potential conflict prevents forming an attorney–client relationship. TXIT is correct that "a potential conflict does not prevent the attorney–client relationship from forming." *Id.* at 4. But I found that no attorney–client relationship existed between Andrews Myers and GCC. Thus, if TXIT and GCC were potentially adverse, then the disclosure of TXIT's work product to GCC operated as a waiver of work product protection.

Polaris has provided convincing evidence that, even if they are 100 percent aligned now, GCC was adverse or potentially adverse to TXIT for years. Specifically, TXIT's owner and corporate representative Todd Sullivan testified that "TXIT is in default of its agreement with GCC for not being able to reach these performance requirements" and that "TXIT is liable to GCC for . . . GCC losses." Dkt. 377-1 at 105, 151. At no point does TXIT even attempt to explain why this is not clear adversity between TXIT and GCC. Thus, I find that communications between GCC, TXIT, and Andrews Myers are not protected work product.[9]

---

[8] In its response to Polaris's Motion to Compel, TXIT states without explanation that "TXIT and GCC have never been adverse parties in this lawsuit or any other litigation concerning the Facility." Dkt. 402 at 6 n.16. In support, TXIT cites to "Motion at 9, 19" but fails to specify to which of the motions in the **400** preceding docket entries it is referring. "Judges are not like pigs, hunting for truffles buried in the record." *United States v. del Carpio Frescas*, 932 F.3d 324, 331 (5th Cir. 2019) (quotation omitted).

[9] Polaris's Motion to Compel concerns only "communications between . . . TXIT, its counsel, and [GCC]." Dkt. 377 at 1. Thus, my ruling today does not reach documents on TXIT's privilege log that do not fall into this category.

### C. WHETHER TXIT'S CROUTHAMEL DOCUMENTS ARE PRIVILEGED

Polaris challenges only three documents between Crouthamel, TXIT, and Andrews Myers as not privileged. I have reviewed all three documents: PRIV_006380, PRIV_006379, and PRIV_006267.

PRIV_006380 is an April 26, 2021 email from Cameron Ellis ("Ellis") to Crouthamel. In all its briefing, TXIT never bothers to identify Ellis. I can deduce from Ellis's signature block that Ellis is *likely* an attorney, but for whom I do not know. Ellis's email address uses the same domain as Mixon (@sullbros.com). Thus, for all I know, Ellis is a GCC attorney, not a TXIT attorney. Without an affidavit to explain *why* this document is privileged, I cannot say that it is. PRIV_006380 must be produced.

PRIV_006379 is an April 26, 2021 email from Ellis to Mixon. If Ellis is a TXIT attorney (assuming, again, that Ellis is an attorney at all), then this email is not privileged because I have already held that TXIT has failed to establish a prima facie claim of privilege over TXIT–GCC communications. If Ellis is a GCC attorney, then the privilege is GCC's to claim, not TXIT's. Either way, because TXIT has not provided an affidavit explaining Ellis's role or why documents to or from Ellis are privileged, TXIT has failed to carry its burden to establish a prima facie claim of privilege over this document. PRIV_006379 must be produced.

PRIV_006267 is an April 23, 2021 email from Crouthamel to Ellis. For all the reasons stated above, TXIT has not carried its burden to establish a prima facie claim of privilege over this document. But even if it had, I would still find that this document must be produced because it is nothing more than a forward—without any context or explanation—of an underlying email to which I am certain all parties in this litigation already have access (because employees from both parties are included on the underlying email). PRIV_006267 must be produced.

### D. WHETHER POLARIS'S LESSONS LEARNED DOCUMENTS ARE PRIVILEGED

In May 2022, Polaris produced 76 "Lessons Learned" documents. Approximately eight months later, Polaris clawed these documents back. Polaris

asserts that all of these documents are protected by the attorney–client privilege. Polaris also claims that one of the 76 documents at issue is entitled to work product protection. TXIT, having already seen and reviewed the documents, disagrees.

Interestingly, none of the documents at issue involve an attorney. Thus, the only way these communications could be privileged under Rule 503 is if they are between the "client's representatives." TEX. R. EVID. 503(b)(1)(D). Yet Polaris does not identify the senders, recipients, or creators of the communications/documents on its log, much less to articulate why each of those individuals qualifies as its representative under Rule 503(b)(1)(D). Thus, Polaris cannot make a prima facie claim of attorney–client privilege for any of these documents.

Polaris's failure to claim work product protection for all 76 documents is also odd because the work product doctrine is "distinct from and broader than the attorney-client privilege." *United States v. Nobles*, 422 U.S. 225, 238 n.11 (1975). Polaris's assertion that these documents were created "at the direction and guidance of Polaris'[s] attorney . . . only after Polaris anticipated litigation" is the (conclusory) definition of work product. Dkt. 414 at 2. Thus, I will generously assume that Polaris meant to claim work product protection for all of the Lessons Learned documents and not just one. Even so, none of these documents are protected by the work product doctrine.

Polaris's only evidence that the primary motivating purpose of creating the Lessons Learned documents was to aid in possible future litigation is the declaration of its general counsel, Joseph Pousson ("Pousson"). As with Mafrige's affidavit, Pousson's affidavit is heavy on conclusory statements and light on details. For example, Pousson declares that "Polaris personnel were encouraged to communicate openly and frankly regarding the project because of the expectation that the communications and work generated at my direction would be privileged attorney client communications." Dkt. 463 at 4. But Pousson fails to provide the who, what, when, or how. Who did he direct to undertake this exercise? When did he give this direction? How was this direction conveyed? Was it an email? A virtual

17

meeting? Why is there no record of it? Such a record could easily have been submitted to the Court for *in camera* review. Pousson omits all of these details from his affidavit. This is not enough. *See Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-P, 2014 WL 884742, at *2 (N.D. Tex. Feb. 27, 2014) ("The proponent must provide sufficient facts by way of detailed affidavits or other evidence to enable the court to determine whether the documents constitute work product.").

The documents themselves are of no help either. Again, no lawyer is included on the documents; there is no reference to a lawyer or a lawyer's request; and nothing is marked privileged or confidential. "Although [Polaris] has the burden of establishing that a document is protected by the work-product privilege, it is noteworthy that only [TXIT] present[s] me with any evidence concerning how the [Lessons Learned documents] are created." *Env't Packaging Techs., Ltd. v. Arch Ins. Co.*, No. 4:18-CV-00240, 2020 WL 1046822, at *2 (S.D. Tex. Mar. 4, 2020). That evidence is the deposition testimony of Polaris employee Lanty Wylie. Wylie testified that Lessons Learned were discussions about "activities or shortcuts we should have took that would have been better and more cost effective," and that he "discussed items like this **after every project**," not just the TXIT project. Dkt. 414-1 at 6 (emphasis added). "This strongly suggests that the [Lessons Learned documents] would have been created even if there was no lawsuit." *Env't Packaging Techs., Ltd.*, 2020 WL 1046822, at *2; *see also Jolivet*, 340 F.R.D. at 18 ("If the document would have been created without regard to whether litigation was expected to ensue, it was made in the ordinary course of business and not in anticipation of litigation."). Because Polaris fails to satisfy its burden to show that the Lessons Learned documents were created in anticipation of litigation, I find that the work product doctrine does not protect them from disclosure.

## CONCLUSION

For the reasons stated above, I **GRANT** Polaris's Motion to Compel (Dkt. 377). With regard to the parties' dispute over the Lessons Learned documents (Dkt. 414), I find that neither the attorney–client privilege nor the work product doctrine

protect any of the Lessons Learned documents. If TXIT destroyed these documents, Polaris must reproduce them; if the documents were sequestered, TXIT is free to use them.

SIGNED this 23rd day of August 2023.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE