UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| POLARIS ENGINEERING, INC. | § | |
| | § | |
| vs. | § | 3:21-cv-94 |
| | § | |
| TEXAS INTERNATIONAL | § | |
| TERMINALS, LTD. | § | |

**TXIT'S AND GCC'S RESPONSE TO POLARIS' AND WFIC'S MOTION FOR JUDGMENT DOC 715, TXIT AND GCC'S MOTION FOR JUDGMENT AND REQUEST FOR ORAL HEARING**

Without waiving its right to renew its previous Rule 50(a) Motion (Doc 707) or its right to request a New Trial, Texas International Terminals, Ltd., ("**TXIT**") and GCC Supply & Trading LLC ("**GCC**") file this objection and response to the proposed judgment submitted by Polaris Engineering, Inc. ("**Polaris**") and Westchester Fire Insurance Company ("**WFIC**"). TXIT and GCC also move for judgment in their favor. Due to the importance of this issue TXIT and GCC also request that this Court grant an oral hearing on this matter. TXIT and GCC will show as follows:

**SUMMARY**

1.     Polaris did not secure the necessary findings on the affirmative defense of prior material breach. Specifically, Polaris did not secure **any** finding on timing of a material breach that would enable the Court to

1

determine that **all** of the damages in Question 11 flowed from breaches of obligations that arose after a material breach by TXIT. Rather, those damages in Question 11, if they are recoverable, naturally flowed from Polaris' failure to design and timely deliver a Facility that met the required specifications.

2.    TXIT is entitled to recover its ISBL Agreement damages (Question 12). Those damages flowed from Polaris' breaches of its obligations such as delays, design defects, and failure to deliver a facility that conformed to the required specifications ("**Facility**"). Because TXIT's claims are for failed performance and Polaris' claims are all for non-payment, it is easy to conclude that Polaris' material breaches existed well before any material breach by TXIT. Under Texas law, a material breach does not "discharge an obligation of the non-breaching party that arose before the alleged breach." *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 437 (Tex. 2017).

3.    The record makes TXIT's view on performance of the ISBL Agreement clear. Specifically, that after the Facility's defects became apparent (by August 21, 2020), that TXIT was still "… hoping that Polaris would help figure out the issues with the ISBL facility." Transcript, Day 15, Page 116, Lines 4 – 6. Even if Polaris had secured a finding on timing of

TXIT's material breach, and its damages, it was undisputed and conclusively proven that Polaris continued to seek benefits under the ISBL Agreement up through January 6, 2021, when Polaris and WFIC were still requesting further Performance Testing. Transcript, Day 16, Page 106, Lines 9 – 16. This demand for further Performance Testing deprived Polaris and WFIC of any excuse for non-performance up to that point.

4.      Simply put, neither Polaris nor WFIC are entitled to their requested judgment.  The claimed prior material breach is no savior for Polaris and a take nothing judgment for Polaris against TXIT is the correct result.  Among other things, Polaris not only lost on the Performance Guarantee question (Question 5) but was determined by the Jury to have otherwise further found in breach of the ISBL Agreement (Question 6).  A take nothing judgement is also appropriate because, upon termination of the ISBL Agreement, TXIT's much larger affirmative recovery bars the ability of Polaris to claim any award under the contractually-required netting provisions.

5.      Polaris failed to prove that it satisfied the conditions precedent to recover on the Change Orders, leaving $9,215,845.06 in Change Orders on the cutting room floor.  Specifically, and as described in detail below, Polaris did not timely submit Change Orders in accordance with the ISBL

3

Agreement, the OSBL Agreement and the Dock Agreement. Further, Polaris did not issue a notice of default and opportunity to cure to TXIT, both of which are expressly required under the operative Agreements.

6.    Lastly, the amount of any Judgment -- even one potentially in favor of Polaris -- cannot be finally determined because TXIT and GCC reserve the right to recover their attorneys' fees and costs under Federal Rule 54, and those fees must first be decided before an offset amount can be finalized.    Because Polaris failed to segregate its damages so that a calculation could be made, and due to the lack of a final disposition of which party is owed anything, the adjudication of pre- and post-judgment interest on Polaris' behalf is, at the very least, premature.

## **ARGUMENT**

7.    The prior material breach questions (Questions 7 and 27), and especially Question 7, do not appear to relate to a liability finding adverse to TXIT[1].  Questions 7 and 27 must nevertheless be disregarded because Polaris and WFIC conclusively proved that they continued to insist on performance by TXIT after the breach had already occurred.  At that time, Polaris and WFIC claimed they still wanted to run the Facility.  According to WFIC, "[i]f

---

[1]    Question 7 compares a "Yes" on Question 5 (Polaris) and a "Yes" on Question 6 (Polaris) both of which were Polaris failures.  Quite differently, Question 27 compares a "Yes" on Question 25 (TXIT) to a "Yes" on Question 26 (Polaris).

4

there was an issue out there that needed to be addressed, from what was being relayed to Westchester, we thought that given the opportunity that Polaris would resolve any issues that exist." Transcript, Day 16, Page 9, Lines 11 – 15.

8.     With both TXIT and Polaris still insisting on contractual performance the prior material breach issue evaporates rendering the defense of prior material breach immaterial. See, e.g., *Bartush-Schnitzius*, 518 S.W.3d at 437.  The Southern District of Texas is consistent with the holding in *Bartush*.  See also, *Kiewit Offshore Services v. Dresser-Rand Global Services, Inc.* 2016 WL 4564472 (SDTX – Houston, 2016).  A prior material breach only excuses future performance and not breaches of obligations that have already arisen.  A survey of the dates of the Change Orders visually underscores the prior material breach dilemma; namely, how could a non-payment breach for payment of an untimely January 2021 Change Order excuse Polaris and WFIC from performance in the summer of 2020? Clearly, it cannot.

9.     In the *Kiewit* case, Kiewit Offshore Services was hired to design and build two 1220-ton litoral compression modules to be installed on an offshore platform owned by Dresser-Rand's client, PEMEX.   The modules failed to perform correctly, and Dresser-Rand made warranty claims for the

non-performance and stopped paying bills.  Dresser-Rand did not pay change order  Change Order DR-07 dealing with supplying a different lift rigging system for the modules.  Dresser-Rand claimed that it disputed the charges because "the method used to compute the invoice value is not in compliance with the milestone payment process described in Appendix "A".

10.     Notably, the Court pointed out that Dresser-Rand did not dispute that the work on that particular invoice was compliant.  The Court posed the question in *Kiewit* as follows:

> *Whether Dresser-Rand may rely on Kiewits's previous alleged breaches of the Contract to excuse its obligation to pay for the subsequent, unrelated work reflected in invoice DR-07?*

Judge Gray Miller ruled that:

> *"Dresser-Rand clearly **waived any excuse** for its non-payment of Invoice DR-07. Despite Kiewit's multiple alleged breaches of the Contract, Dresser-Rand not only elected to treat the Contract as continuing but actively requested additional work from Kiewit pursuant to Change Order No. 22. By demanding additional performance from Kiewit, Dresser-Rand continued to seek benefits under the Contract and therefore made the "conclusive choice depriving [itself] of an excuse for [its] own non-performance." Henry, 333 S.W.3d at 841."*

11.     Numerous courts have applied these principles and denied the non-breaching party its excuse for non-performance where it has treated the contract as ongoing; or demanded continued performance from the breaching party.  Similarly, in this case, the evidence proved, after breach,

that the parties spent months trying to operate this Facility—which the Jury correctly concluded failed to meet Polaris' Performance Guarantee (Question 5). Other cases support this same proposition:

- *Henry v. Masson, 333 S*.W.3d 825 at 841–42 (Tex. App. – Houston [1ˢᵗ Dist.] 2010)(holding that the plaintiff's decision to treat a settlement agreement as ongoing after the defendant's breach by accepting the benefit of the defendant's performance deprived the plaintiff of any excuse to avoid its own performance);

- *Long Trs. v. Griffin*, 222 S.W.3d 412, 415–16 (Tex. 2006) (holding that, where the parties agreed to share the costs of litigation against a third party, the non-breaching party was required to pay its share of the costs because it accepted its share of the lawsuit recovery, thereby receiving the benefit of the bargain and waiving its excuse for non-performance);

- *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982) (holding that, where the non-breaching party treated a contract for sale of a business as ongoing by retaining all assets of the business and continuing its operation, the non-breaching party waived its right not to perform based on the other party's breach of the covenant not to compete); and

- *Gupta v. E. Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 757–58 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (explaining that, because the non-breaching party continued to demand the breaching party's performance under joint venture agreement, the non-breaching party was obligated to perform under the agreement).

12.     The affirmative defense of prior material breach really comes to an end with the absence of any notice of breach from Polaris. See, TXIT Ex. 1, Section 16.3 and the Trial record. The **only** notice of default under the

ISBL Agreement against which a breach can be measured (TXIT Ex. 1) was issued by TXIT on September 3, 2020. See, TXIT Ex. 600.  By the time Ex. 600 was sent by TXIT this dispute already revolved around a central theme; namely, whether the refinery (the "**Facility**") that had been designed and constructed by Polaris, and that was bonded by WFIC, failed to meet its contractual performance standards.  The notice of default primed the pump for all parties to examine where they were at that moment and neither Polaris, nor WFIC, pursued any effort to address the extensively outlined deficiencies. Transcript, Day 15, Page 116, Lines 8 – 11.

13.    In the interim, between September 3, 2020, and the filing of this lawsuit on September 25, 2020, there was no notice of default from Polaris to TXIT for any sort of payment, nor did one follow thereafter.  This lawsuit was unexpected to TXIT because "... at the time that Polaris sued TXIT on September 25th of 2020, ... TXIT [had] paid all invoiced amounts from invoices that Polaris had submitted."  Transcript, Day 13, Page 138, Lines 4 – 6.  There was no breach by TXIT, and no notice of breach or other claim of breach by Polaris.  In addition, across all contracts, there were only a small handful of invoiced Change Orders even in existence at that time:

- ISBL FCO 2 dated June 13, 2019 (Ex. 1267) in the amount of $97,129.20;

- ISBL FCO 45 dated August 13, 2020 (Ex. 1299) in the amount of $15,169.88;

- OSBL FCO 54 dated May 20, 2020 (Ex. 1306) in the amount of $140,597.00; and

- ISBL FCO 59 dated August 13, 2020 (Ex. 1311) in the amount of $29,382.84.

14.    Nothing in this Lawsuit changed the ISBL Agreement's requirements, including Polaris' Performance Guarantee, that the Facility was required to operate at 50,000 barrels per day, and make three on-spec product cuts at the contractually required yields and qualities.    Although they were contractually required to fix the Facility's defects, neither Polaris nor WFIC ever cured the defaults or began efforts towards curing the defaults— let alone within the 10-day period required by the ISBL Agreement.    See, TXIT Ex. 1, Section 16.1.    To this date, and even after a major repair effort undertaken by TXIT to mitigate its damages, the Facility still does not meet the full specifications promised by Polaris in the Performance Guarantee and TXIT was, and remains, harmed as a result.

15.    If the breaches outlined in TXIT Ex. 600 were somehow not curable in 10 days both Polaris and WFIC were contractually obligated to begin moving in the direction of a cure. The ISBL Agreement specified that,

9

within 10 days, Polaris and WFIC were required to, at least, commence a good faith effort directed toward a cure. See, TXIT Ex 1., Section 16.1(g)("… if contractor has not commenced within that period").  Rather than comply with this negotiated duty, and with knowledge the Facility never made and never would make 50,000 barrels, or three on-spec product cuts at the contractually required yields, both Polaris and WFIC ignored their contractual cure obligations and let the broken Facility languish.

16.    Polaris' and WFIC's failure to pursue a cure simultaneously conveyed a self-help right to TXIT. See, TXIT Ex. 1, Section 16.2 ("Owner shall have the right to … (1), (2), or (3)") and Section 13.2 ("Owners Right to Perform Corrective Work").  Before Polaris began hurling Change Orders, and by September 13, 2020 (10 days after TXIT's notice of default to Polaris and WFIC), TXIT was legally and contractually entitled to avail itself of the full menu of remedies provided in Section 16.2, including the right to "… take such steps as are reasonably necessary to overcome the Contractor Default, in which case Contractor shall be liable to Owner for any and all reasonable costs and expenses incurred by Owner in connection therewith."

17.    By the time of trial, Polaris and WFIC tried to rewrite the ISBL Agreement, hide from their cure requirements, and fabricate a narrative that they were "blocked" from the already conducted Performance Testing.

According to Polaris that fallacy, *ipse dixit*, somehow converted their expired cure rights into perpetual cure rights. The PowerPoint brick wall that Polaris and WFIC continuously used to distract the Jury had its sole basis in an attorney letter sent in December 2020 – prose that was drafted long after the September default notice that should have spurred Polaris and WFIC to action around Labor Day and not Christmas.

18.    While making this creative argument, and perhaps obstructed by the brick wall, Polaris ignored the unambiguous 10-day window within which it needed to commence a cure. For certain, Polaris failed to comply with the ISBL Agreement, and the Jury agreed. See, Questions 5 and 6. While intentionally abandoning their cure obligations, both Polaris and WFIC watched the ISBL from afar to see whether TXIT would (1) suspend the ISBL Agreement; (2) try to repair the Facility; or (3) terminate the ISBL Agreement altogether. See, TXIT Ex 1, Section 16.2. The steps taken by TXIT to mitigate its damages, and the leadership to implement that fix, was explained, in great detail, to this Jury.

19.    The clock continued to tick, and four months passed with no real action from Polaris or WFIC other than lip service. By January 4, 2021, when the formal termination letter was sent by TXIT, Polaris gave no push back because they had already, weeks earlier, abandoned the OSBL Agreement

11

and the Dock Agreement thereby leaving the completion of all of three Agreements solely in the hands of TXIT. See, Transcript, Day 14, Page 21, Line 22 – Page 22, Line 6.  And, while this four-month period passed, Polaris never made any sort of payment demand -- substantively reconfirming that nothing was owed.  In fact, all Polaris seemed to be doing during this period was spending its time issuing invalid Change Orders for claims that were nearly a year old (e.g., COVID).

20.    At trial, Polaris' first attempt to obfuscate liability was to try and convince the Jury that Performance Testing never could have happened because there was a failure to provide notice of Stable Operations[2], and that such failure was material.  With a negative answer to Question 1 – that TXIT's failure to provide a notification of stable operations was immaterial – TXIT obviously convinced the Jury that the Performance Testing stage had been reached.  This stage was automatic and changed the status. See, TXIT Ex. 1, Section 10.4(a)("Performance Testing will be performed by Contractor and shall commence as soon as achievement of Stable Operations is certified").  The ISBL Agreement unambiguously dictates that Performance Testing had thereafter commenced automatically and TXIT began supplying test crude.

---

[2]    Nothing in this statement is intended to suggest that written notice of Stable Operations was required because the ISBL Agreement does not require it.

21.     Returning to the evidentiary record, Polaris ignored that TXIT had already supplied more than enough MEH crude to meet its Performance Test obligations to demonstrate that the Facility did not, and could not, meet the Performance Guarantee.  Armed with this undeniable evidence, and a horribly polluting, fire-prone, and wholly unsafe facility, TXIT advised Polaris that Polaris still had a lot of work to accomplish.  Polaris knew it because they were standing in the control room watching the terrible results.  It was on this record that the Jury concluded that the Facility failed to meet the agreed upon Performance Guarantee.

22.     As part of their avoidance strategy, Polaris and WFIC attempted to transform TXIT's Appendix G obligation to provide MEH Crude for Performance Testing from "up to three days," into "as long as it takes." Obviously, Performance Testing was never intended to be perpetual – there has to be an end.  By contract, TXIT had mitigated its exposure by agreeing to provide up to 150,000 barrels to avoid the situation where Polaris offers nothing more than hope that the broken Facility might one day, miraculously, work.  Polaris never proposed a viable repair plan.  Even all these years later, at trial, their expert opined (incorrectly) that an increase in pressure in the tower would, presto, fix it all.  Transcript, Day 5, Page 19, Lines 2 -3.

23.    The limitations on TXIT's obligations with regard to Performance Testing were **clearly** expressed in the ISBL Agreement. Appendix G specified that TXIT was only obligated to provide up to three consecutive days of crude (or less if the Performance Guarantee was met sooner than three days) at a rate of 50,000 barrels per day.   Any interpretation of Appendix G that would require TXIT to provide *more* than three days' of crude would make the three-day reference expressed in Appendix G meaningless.  The case of *Wagner v. Apache Corp.*, 627 S.W.3d 277, 285 (Tex. 2021) stands for the proposition that this Court must harmonize the entire contract and give effect to all provisions when ascertaining the meaning of one provision.  The subject provision, often seen in this Court, appears below:



24.    The answer to Question No. 5 conclusively proves that Polaris failed to comply with the Performance Guarantee when the Facility did not, and could not, produce the promised 50,000 barrels per day, making three product cuts, at the contractually required yields and quality specifications. The Jury certainly disagreed with the volumetric position that Polaris promoted during trial as evidenced by their answer.

25.    The result found in Question 5 proved that this failure was harmful to TXIT, and because neither Polaris nor WFIC cured the defects of which they were given notice, TXIT had no choice but to mitigate, had a legal obligation to mitigate[3], and eventually spent at least $65,000,000 in repairs in that mitigation effort.  While the Jury improperly decided not to award all of the damages that TXIT requested[4] it did award $17,837,838.10 to complete the Facility together with $960,000 in delay damages – a bitter pill for TXIT to swallow but, critically important for this Motion, a clear recognition by the Jury that the Facility was defective.

26.    At great effort, during summary judgment motions, and as part of its Performance Testing juggernaut, Polaris proposed to the Court that the Performance Guarantee was ambiguous.  The Jury correctly resolved any

---

[3]    TXIT Ex. 1, Section 13.2(b)(Owner's Right to Perform Corrective Work).  The Contractor had five (5) days to commence Corrective Work, however, if the Defect shut down the Project then Owner can commence Corrective Work immediately.
[4]    TXIT will address those in its separate 50(b) Motion and Motion for New Trial.

ambiguity in the Appendix F Performance Guarantee when it properly concluded, in Question 5, that TXIT was correct in its interpretation of the Performance Guarantee. Indicating how clearly the Jury agreed with TXIT, the Jury also eliminated all of Polaris' preferred excuses by finding no mistake on the required, but undelivered, yields[5] and no impracticability of performance[6]. This Jury resolved that Polaris failed in providing its threshold deliverable[7] and that explains, in part, why Polaris should take nothing on any of its damages. See, Questions 9 and 10 where the tunes of Polaris' excuses that were so often hummed during the trial were eliminated by the Jury.

27. There was also a structural problem with the jury charge. TXIT contends that the answers to Questions 2 and 3 must be disregarded because no related damages were connected with these standalone questions. Digging deeper, Question 2 merely asks about a testing "opportunity" but considering that the Jury had enough information to conclude that the Performance Guarantee was breached (Question 5) the immateriality and

---

[5]   Clearly the Jury did not believe that this was a guaranty of hydraulic minimums in the Facility but, rather, was a guaranty of the maximum yield of Naphtha.

[6]   The Jury was not fooled by Polaris' coin sorter analogy because it understood that the promises Polaris made were achievable --- Polaris just had no interest in achieving them.

[7]   While Mr. Nodier testified repeatedly that if Polaris could have determined if it failed the Performance Test, then it would have fixed the Facility -- the answer to Question 5 proves that they did not. That is, the Jury concluded the Facility did not work and that it needed to be fixed – Mr. Nodier's excuse was dismissed.

16

inconsistency of the "opportunity" answer to Question 2 is self-evident.[8]  To be clear this Jury agreed that there was still enough of a testing "opportunity" to know that the Facility did not work – that was the whole point of the more specific Question 5.

28.    The overly broad Question 3, examining if TXIT breached "… in any way other," raises as many questions as it does answers.  As the Court will recall, the often cited "other" by Polaris was the failure to designate a company representative.  But nothing in that catchall category, given the chosen granulation of Questions 1 and 2, directly establishes liability for Change Orders, additional work or, for that matter, reimbursement for the cost of builder's risk insurance.  And a "yes" to Question 3, by its own text, means that the answer has to be something other than Questions 1[9] and 2[10] so it necessarily cannot have anything to do with "stable operations" or "Performance Testing".

29.    There is a spreadsheet attached to Polaris' Motion for Judgment that undoubtedly has its genesis in the days after the verdict was reached – it is no evidence of what this Jury did.  Indeed, the spreadsheet is a document that backs into calculations hoping to imply findings the Jury simply didn't

---

[8]       If it is not immaterial then Question 2 is irreconcilably in conflict with Question 5 and the more specific question (the one that incorporates the essence of the case) must win out.

[9]       Failure to give notice of Stable Operations.

[10]      Failure to give "opportunity" to conduct performance testing.

make.  Even if the Court finds the spreadsheet, conceptually, to have merit, it should still be disregarded in its entirety because every calculation was made using an incorrect formula which results in an overstatement of any amount of interest that would be due.  While Polaris attempts to explain the economic answer to Question 11[11], for which Polaris requested no predication, neither the Change Order amount nor the builder's risk recovery are available for Polaris for the reasons discussed herein.  Question 11 should be entirely disregarded.

30.    Polaris' is not legally entitled to recovery on its Change Order claims for a number of reasons:

- Well-settled case law establishes that Polaris failed in its proof because it never demonstrated that any of its Change Order charges were reasonable and necessary.  See, *McGinty v. Hennen*, 372 S.W. 3d 625 (Tex. 2012).

- Before anything could be owed for a breach, it was incumbent upon Polaris to have given written notice thereof, and an opportunity for TXIT to cure.  Nowhere in the record is there evidence demonstrating any attempt at compliance with this requirement, and because Polaris offered none. See, TXIT Ex 1, Section 16.3.

- Polaris did not prove that these Change Orders were signed by, ratified by, or otherwise accepted by, TXIT.  See. TXIT Ex 1, Article VI (changes can only be effected by an agreed, mutually acceptable Change Order).

---

[11]    In the schedule proposed by Polaris in its Motion for Judgment the amounts awarded are just the speculation of counsel and are not the answer of the Jury.  That is, the COVID Change Order amount is simply a number hypothesized by Polaris.

- All disputed Change Orders, as a condition precedent, also had to go through the contractual dispute process, or they were not ripe for adjudication in this Court[12]. See, TXIT Ex 1, Section 6.8, Section 19.1. These did not go through that process.

- The Change Orders were late when they arrived months after the litigation was well underway, well after the default notice, and subsequent to the time that the some of the agreements had been terminated[13]

- The COVID Change Orders, first delivered on December 18, 2020, in the Jury amount of $2,715,650.86[14] for the ISBL, OSBL, and Dock Agreements, all suffer from a special infirmity. First, the increase in labor, materials, and supplies was a risk exclusively borne by Polaris. See, TXIT Ex. 1, Section 5.1(a)("Contractor shall, at its own expense, obtain, provide for and/or furnish, on a turnkey basis … supplies, equipment, materials … labor."). Second, and in order to get a Change Order, it had to be an enumerated item in Section 6.2(a)(Change in law, force majeure, owner failure, discovery of hazardous materials, inaccuracy of Rely Upon Information, or other express authorization). See, TXIT, Ex. 1, Section 15.1. COVID is far from an enumerated event of force majeure.

31. These two charts, relying baseless estimates by Polaris on damages, chronicle the ISBL, OSBL and Dock Change Orders that should be set aside:

| UNRECOVERABLE ISBL UNSIGNED CHANGE ORDERS AFTER THE SEPTEMBER 25, 2020 LAWSUIT | | | |
|---|---|---|---|
| TXIT EX. | DESCRIPTION | INVOICE DATE | POLARIS BASELESS ESTIMATE[15] |

---

[12] The Jury did find in Question 6 that "… aside from the alleged failure to comply in Question 5 did Polaris fail to comply with the ISBL Agreement in any other ways?" The answer "YES" necessarily means that the Jury agreed with the other failures outlined by TXIT like conditions precedent.

[13] See, TXIT, Ex. 1, Section 19.2.

[14] This is the lesser amount that was found by the jury and not the total amount that Polaris used for their negotiation with the panel.

[15] These figures are taken directly from Polaris' Motion for Judgment and the schedule attached in which their counsel "backs-in" to the supposed answers from the Jury. These amounts are for convenience but certainly should not be considered an agreement that they are accurate.

| 1276 | FCO 11 | 12/2/2020 | $36,576.35 |
|---|---|---|---|
| 1279 | FCO 14 | 12/2/2020 | $365,612.00 |
| 1282 | FCO 17 | 12/2/2020 | $195,530.17 |
| 1285 | FCO 20 | 12/2/2020 | $156,496.00 |
| 1291 | FCO 32 | 12/2/2020 | $501,842.00 |
| 1302 | FCO 50 | 12/2/2020 | $5,114.00 |
| 1325 | FCO 78 | 12/16/2020 | $8,702.00 |
| 1331 | FCO 84 | 01/27/2021 | $17,352.00 |
| 1335 | FCO 88 | 12/18/2020 | $1,391,814.90 |
| 905 | FCO 91 | 01/29/2021 | $698,105.00 |
| 906 | FCO 93 | 01/29/2021 | $17,372.60 |
| 1341 | FCO 94 | 01/29/2021 | $2,580.45 |
| | TOTAL | | $3,397,077.47 |

| UNRECOVERABLE OSBL AND DOCK UNSIGNED CHANGE ORDERS AFTER THE SEPTEMBER 25, 2020 LAWSUIT | | | |
|---|---|---|---|
| TXIT EX. | DESCRIPTION | INVOICE DATE | POLARIS BASELESS ESTIAMTE |
| 1283 | OSBL FCO 18 | 12/2/2020 | $266,721.89 |
| 1354 | OSBL FCO 19 | 12/2/2020 | $95,459.00 |
| 1362 | OSBL FCO 25 | 12/2/2020 | $336,656.00 |
| 1293 | OSBL FCO 34 | 12/2/2020 | $39,803.00 |
| 1303 | OSBL FCO 51,12 | 12/2/2020 | $448,402.00 |
| 1307 | OSBL FCO 55 | 12/2/2020 | $128,440.58 |
| 1316 | OSBL FCO 68 | 10/02/2020 | $61,393.00 |
| 1318 | OSBL FCO 70 | 12/2/2020 | $11,993.00 |
| 1328 | OSBL FCO 81 | 12/2/2020 | $110,759.66 |
| 1336 | OSBL FCO 89 | 12/18/2020 | $825,288.61 |
| 1339 | OSBL FCO 92 | 01/29/2021 | $670,013.30 |
| 1309 | DOCK FCO 57 | 01/25/2021 | $68,577.44 |
| 1310 | DOCK FCO 58 | 01/29/2021 | $1,171,161.00 |
| 1324 | DOCK FCO 77 | 12/16/2020 | $197,954.47 |

20230577.20230599/5333808.1

| 1327 | DOCK FCO 80 | 01/22/2021 | $78,870.80 |
| 1329 | DOCK FCO 82 | 12/2/2020 | $72,546.97 |
| 1337 | DOCK FCO 90 | 12/18/2020 | $498,547.35 |
| | TOTAL OSBL | | $2,994,930.04 |
| | TOTAL DOCK | | $2,087,658.03 |

32.    Of course, even if the Change Orders were somehow good,
Polaris' ability to recover any damages at all (including Change Orders)
became subordinate to the rights of TXIT once the agreements were
terminated.  Polaris admits that the OSBL was terminated on November 4,
2020, and the ISBL and Dock Agreements were terminated on January 4,
2021. See, Polaris Fourth Amended Complaint, Par 50.  At the moment of
termination, and to the extent TXIT's total damages exceeded any amounts
owing to Polaris, the Agreements required, at a minimum, a netting of claims
with broad parameters for that process.  The actual netting language, which
must inform the remedy for this Court, is as follows:

> "... **if the amount of damages, costs, losses and expenses
> incurred by Owner (including reasonable attorneys' fees,
> consultants' fees, litigation expenses, costs to complete the
> Work, and any and all damages for failure of performance
> and cost of financing or interest on all such foregoing items
> from the date they were incurred by Owner at the Base Rate)
> shall exceed the balance of the Contract Price, then at
> Owner's sole option**, Contractor shall pay Owner the difference
> within 30 Days after notice of the demand. ... **Owner shall have the
> right and authority to set off against and deduct from any
> such excess due Contractor by Owner any other liability of
> Contractor** to Owner under this Agreement."

21

33.    Section 16.2, quoted in part above, ultimately concludes that once terminated – an event that Polaris concedes occurred on the ISBL by January 4, 2021 – **the netting of claims became mandatory**, but the result cannot be determined at the present time as TXIT's fees have not been established -- and that will certainly eliminate any relief for Polaris.[16]  That is, the "net" per Section 16.2, must include the fees and expenses owed to TXIT.  A hearing on that will be necessary and, with notice, TXIT is ready to provide that evidence in whatever manner authorized by the Court.

34.    There is no evidence upon which Polaris should, or could, recover the builder's risk premiums found in Question 11(3) because there is no factual or legal basis for TXIT to be responsible for that charge.  A reasonable jury can only conclude that risk of loss for the Facility was no longer the responsibility of Polaris once Mechanical Completion, on March 21, 2020, was achieved. See, TXIT Ex. 1, Section 14.3.  Although it had the legal burden to so prove, nowhere did Polaris prove how a builder's risk insurance policy could be the responsibility of TXIT when care, custody, and control of the Facility -- the risk -- transferred at Mechanical Completion. See, TXIT Ex. 1 Therefore, there was no insurable builder's risk as a matter of law, and the

---

[16]    The ISBL Agreement states that "[i]n the event that Owner terminates this Agreement for a Contractor default, the Owner may ... set off against and deduct from any such excess due Contractor by Owner any liability of Contractor to Owner under this Agreement."  Those liabilities include "... reasonable attorney's fees, consultants' fees, litigation expenses ...."  See, TXIT Ex 1, Section 16.2(a)(iv).

20230577.20230599/5333808.1

amounts claimed in the following chart are for periods long after Mechanical Completion:

| UNRECOVERABLE ISBL BUILDER'S RISK CHARGES AFTER MECHANICAL COMPLETION | | | |
|---|---|---|---|
| EXHIBIT | DESCRIPTION | INVOICE DATE | CLAIMED BALANCE |
| 1437 | Builders Risk Ext | 07/13/2020 | $92,268.00 |
| 1445 | Builders Risk Ext | 09/14/2020 | $186,423.30 |
| 1451 | Builders Risk Ext | 11/05/2020 | $237,170.43 |
| 1488 | Builders Risk Ext | 12/16/2020 | $45,537.40 |
| 1517 | ISBL BR Risk Ext | 01/27/2021 | $30,358.27 |
| 1436 | Builders Risk Ext | 06/05/2020 | $144,422.12 |
| | TOTAL | | $736,179.52 |

35.    With regard to the OSBL damages, Question 21 must be disregarded, in part, because Polaris did not comply with its condition precedent for those Change Orders (Question 11(1)) or the additional work (Question 11(3)) for the same reasons stated above.  In fact, Polaris walked off the job.

36.    With regard to the Dock Agreement, Question 28 must be disregarded, in part, because Polaris did not comply with its condition precedent for Change Orders (Question 28(1)) in those instances either.  The problems with these damages under the Dock Agreement mirror the issues under the ISBL Agreement including the fact that Polaris failed to prove that such Change Orders were for "reasonable and necessary" expenses.  See,

*McGinty v. Hennen*, 372 S.W.3d 625 (Tex. 2012)(a party seeking remedial damages must prove that the damages are reasonable and necessary).

37.    Because Polaris was found liable to TXIT, WFIC's attempt to avoid its surety contract fails as well.  The question submitted by WFIC (Question 13) does not yield the result WFIC hopes to receive.  As WFIC repeatedly said, WFIC rises and falls with its principal – if Polaris is liable then so is WFIC.  See, *Wright Way Const. Co., Inc. v. Harlingen Mall Co.*, 799 S.W.2d 415, 426 (Tex. App. 13th Dist., 1990)(liability of the surety is derivative in nature).  Although the Jury never reached any of WFIC's "defenses" TXIT also contends that Question No. 13, dealing with WFIC's compliance with the Bond, must be disregarded because the Bond requires a two-step algorithmic process and not the one WFIC insisted that the Court give in Question No. 13.  As a result, Question No. 13 is fatally flawed and misstates the Bond's agreed upon conditions.

38.    Explaining this algorithm requires contextual detail that WFIC omitted in its narrative.  To initiate a claim, the following conditions must be met: (i) Principal (Polaris) is in default under the Contract (Questions 5&6); (ii) Principal (Polaris) has been declared by Obligee to be in default under the Contract (TXIT Ex. 600); and (iii) the Obligee (TXIT) has performed its obligations under the Contract.  The express language of the Bond states that

24

upon the "occurrence of the above conditions", WFIC's duty to investigate commences.  The evidence and trial testimony by WFIC proves that WFIC was solely satisfied that these conditions had occurred, and therefore it began its investigation – an investigation Polaris representatives testified, at trial, is still on going.  The predicate language imbuing this result appears below.  See, TXIT Ex 183 (Paragraph A):

A. NOW, THEREFORE, THE CONDITIONS OF THIS OBLIGATION are such that, if Principal shall promptly and faithfully perform said Contract, then this obligation shall be null and void; otherwise it shall remain in full force and effect, subject to the following conditions:  (i) Principal is in default under the Contract; and (ii) Principal has been declared by Obligee to be in default under the Contract; and (iii) the Obligee has performed its obligations under the Contract.  Upon the last occurrence of each of the above conditions, Surety shall have 30 days ("Investigatory Period") from the last event to occur of the following: (a) receipt of the written notice of default; (b) the date access to the Project site is provided to Surety; or (c) the date the information and documentation in Obligee's or its agent's possession and requested by Surety is received by the Surety, which information and documentation must be requested by Surety within 10 days of its receipt of Obligee's written notice of default, to:

39.    In its effort to divert the Jury away from its nascent **30-day investigatory obligation**, Westchester later hitched itself to TXIT's December 4, 2020, letter in order to assert that Obligee (TXIT) had failed to perform under the ISBL Agreement.  However, TXIT's fate can only be determined as of September 3, 2020 -- the date on which TXIT sent its notice of default to Polaris and to WFIC (TXIT Ex 600) as required by the bond.  The notice was sent by TXIT to both Polaris and WFIC, describes a number of contractual performance problems, and unambiguously informs the reader of its significance for it begins with "... [t]his Notice of Default ...."

25

Even better, the bond does not particularize what must be included in a written notice other than mandate that it be sent "... to the address shown on the page on which their signature appears." The date of September 3, 2020, is controlling and, critically, there is no evidence of default by TXIT, or a claim thereof by Polaris, as of that date. Moreover, there is no evidence of any default being issued by Polaris to TXIT before or after such date.

40.     Again, the impact of TXIT Ex. 600, and its September 3, 2020 date, is decisive as the commencement of WFIC's investigatory obligation and its commensurate duty to timely determine a remedy. See, WFIC Performance Bond, TXIT 183, Sections A(1) – (6). The imposition of that timing is unambiguous. Westchester had an obligation to make its determinative decision **within thirty (30) days** from **the last to occur of** (a) notice of default (September 3, 2020); (b) the date access to the Project is granted to the surety (September 3, 2020; "... TXIT is prepared to provide access to the project"); or (c) the date the information is received by the surety (September 14, 2020 (TXIT 616)). The evidence proved that Scott Mixon, TXIT's General Counsel, even made the data available to WFIC by September 25, 2020 (TXIT 644). But Polaris and WFIC never took any step toward a cure! Even if WFIC is entitled to 30 days under the bond's language the calendar proves that October 25, 2020, was well beyond the last possible

26

date – the math is clear and WFIC is entitled to no relief from the answer to Question No. 13.

41.     Finally, TXIT objects to the proposed interest calculations because, until the Court determines which damages, if any, may be awarded there is no basis upon which to calculate interest.  There is no factual agreement on the date that payment was due for the unsigned, and disputed, Change Orders.  And the ISBL Agreement cannot be the source for any calculation in favor of Polaris because it is limited to "**undisputed amounts**" and everything in this lawsuit was disputed. See, TXIT Ex. 1, Section 8.7.  The Prompt Payment Act is equally inapplicable because of its exemptions for good faith disputes, liens, and unsigned Change Orders.  See, Property Code, Section 28.001 et. seq.  In contrast, the calculation for TXIT's interest is simple.[17]

42.     Moreover, if the Agreements are to be applied in their most fulsome manner, the parties agreed that a condition precedent to any disputed Change Order being owed was compliance with the pre-suit mediation process.  Polaris offered no evidence of any such compliance and, as the record established from Todd Sullivan, TXIT fully embraced the

---

[17]     Example calculation:  Principal amount of $18,797.838.10 x. 8.5% pre-judgment interest rate ÷ 360 days x 1287 days is the interest calculation from September 25, 2020, through April 5, 2024 based upon the published rate with the Texas Consumer Credit Commissioner.  The Finance Code accrues the obligation on the date of filing.  See, Finance Code Section 304.104.

contract's dispute resolution process. Transcript, Day 14, Page 37, Lines 14 – 21. Based upon the accounting proposed by Polaris at least $9,215,845.06 of Polaris' award is unrecoverable.

43. Even though Polaris agrees to offset the $2,050,000 owed to TXIT/GGC they even perform that calculation in error. Useful cases for offsetting before calculating interest are *ARA Auto. Group v. Cent. Garage, Inc.*, 1998 WL 47638, at *1 (N.D. Tex. Jan. 22, 1998) (offsetting judgments before computing prejudgment interest); *Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363, 461 (N.D. Tex. 2016), *aff'd as modified and remanded*, 725 Fed. Appx. 256 (5th Cir. 2018). Other useful cases may be *In re Henry*, 388 S.W.3d 719, 729 (Tex. App.— Houston [1st Dist.] 2012 pet. denied) (ordering that breach of contract awards in favor of two different parties be offset against each other); *Wood v. PennTex Res. LP*, 2008 WL 2609319, at *11-12 (S.D. Tex. June 27, 2008) (offsetting mutual monetary awards in an arbitration award). And if the Court awards damages to Polaris it should not award prejudgment interest on the Jury's findings of damages for unpaid Change Orders -- i.e., the Jury's answers to Questions 11(1), 21(1), and 28(1). The Court should not do so because Polaris failed to satisfy contractual conditions precedent and did not obtain the necessary Jury

findings to allow for calculations of prejudgment interest on unpaid Change Orders.  Simply put, Polaris dropped the accrual ball.

44.    The controlling principle of law is this: When damages are not properly segregated, a party may be unable to obtain prejudgment interest in its award.  The most typical example is when a party fails to ask for separate findings of past and future damages.  Prejudgment interest accrues only on past damages, not future damages.  Thus, without a finding of how much the Jury awarded in past versus future damages, prejudgment interest cannot be awarded in the judgment. Courts have specifically so held. See, e.g., *Grandstaff v. City of Borger*, 846 F.2d 1016, 1018 (5th Cir. 1988); *Monsanto Co. v. Johnson*, 696 S.W.2d 558, 559 (1985) (per curiam); *Domingues v. City of San Antonio*, 985 S.W.2d 505, 511 (Tex. App.—San Antonio 1998, pet. denied); Texas Pattern Jury Charges—Business, Consumer, Insurance & Employment 115.9, Comment (2022) ("Separating economic from noneconomic and past from future damages is required . . . to allow calculation of prejudgment interest); 5 McDonald & Carlson Tex. Civ. Prac. § 27:31 (2d. ed.).

45.    The same principle applies here.  The Jury was asked a single question on damages claimed under numerous Change Orders.  Each Change Order has a different accrual date for prejudgment interest.  Even Polaris

29

agrees that the Jury did not award 100% of the total amount of the Change Orders.  In seeking its judgment, Polaris hypothesizes in its post-trial created spreadsheet that the Jury's less-than-100% award translates that it won everything except 15% of the so-called COVID Change Orders.  That is simply a post-trial fabrication.

46.     Consider any of the following hypotheticals: The Jury may not have awarded 100% of any Change Order, or it may have awarded 100% of every COVID Change Order and reduced all Change Orders. The Jury also may have fully rejected some non-COVID Change Orders and awarded 100% of others. The possible speculation on what the Jury did is endless, and it is at this point pure speculation. Consequently, the Jury's verdict does not give the Court sufficient information to calculate prejudgment interest on the amounts found by the Jury for unpaid Change Orders, so no prejudgment interest should be awarded to Polaris on those amounts.

WHEREFORE, Texas International Terminals, Ltd., and GCC Supply & Trading LLC pray as follows:

1.     That Polaris Engineering, Inc.'s and Westchester Fire Insurance Company's Motion for Judgment be Denied, and that their proposed Judgment is not entered; and

2.     That this Court set this matter for an oral hearing (but not between May 1, 2024, and May 6, 2024); and

3.     That the Judgment proposed by Texas International Terminals, Ltd. and GCC Supply & Trading LLC be entered.

Respectfully submitted,

**HIRSCH & WESTHEIMER, P.C.**

By: _____*/s/Eric Lipper*_____
　　　Eric Lipper
　　　State Bar No. 12399000
　　　Federal ID  11442
　　　1415 Louisiana, 36th Floor
　　　Houston, Texas  77002
　　　Phone:  713-220-9181
**OF COUNSEL:**　　　Fax:  713-223-9319
　　　Email:  elipper@hirschwest.com
**HIRSCH & WESTHEIMER, P.C.**
**ATTORNEYS FOR DEFENDANT, TEXAS INTERNATIONAL TERMINALS, LTD. AND GCC SUPPLY & TRADING LLC**

31