## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| POLARIS ENGINEERING, INC. | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No.  3:21-CV-94 |
| TEXAS INTERNATIONAL | § | |
| TERMINALS, LTD., | § | |
| | § | |
| *Defendant.* | § | |

## TXIT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Pursuant to Federal Rules of Civil Procedure 7 and 50(b), Texas International Terminals, Ltd. ("TXIT") renews its Rule 50(a) motion for judgment as a matter of law. *See* Dkt. 707. Pursuant to Rule 50(b)(2), TXIT alternatively requests a new trial on the grounds included in this motion.

**TXIT requests an oral hearing on its motion.**

## TABLE OF CONTENTS

Table of Authorities ..................................................................................................iii

Introduction and Summary of Argument ............................................................1

Nature and Stage of the Proceeding.....................................................................1

Argument...................................................................................................................1

I.    Polaris's Claims and Affirmative Defenses Fail as a Matter of Law.............1

    A.    Polaris's Change Order Claims Fail as a Matter of Law......................1

        1.    Polaris did not offer legally sufficient evidence that its
change orders were timely. .................................................................2

        2.    Polaris did not offer legally sufficient evidence that its
change orders were reasonable.................................................3

        3.    Polaris did not offer legally sufficient evidence that it
complied with the contractual change order procedures. ........4

        4.    Polaris did not offer legally sufficient evidence that
COVID-19 caused delays to or impacted Polaris's work
on the project schedule. ...............................................................4

    B.    Polaris adduced no competent evidence that failing to provide
contractually required notice of steady, consistent operations
at an unspecified rate is causally connected to any damage
alleged. ...................................................................................................6

    C.    Polaris's remaining contract theories lack a legally sufficient
evidentiary basis....................................................................................7

    D.    Polaris's remaining affirmative defenses fail as a matter of law. .........9

II.    Westchester's Affirmative Defenses Fail As a  Matter of Law. ...............10

    A.    Westchester's material-alteration affirmative defense fails as a
matter of law. ......................................................................................10

        1.    The evidence conclusively proves that Westchester
waived  its material-alteration affirmative defense. ...............10

        2.    Even if it could assert its material-alteration affirmative
defense, Westchester has not adduced legally sufficient
evidence to support the defense............................................11

            a.    There is no legally sufficient evidence of a
material alteration to the ISBL Agreement. .................11

            b.    There is no legally sufficient evidence of a lack of
surety consent to the alleged material alteration. ........14

            c.    There is no legally sufficient evidence of harm
resulting from any alleged material alteration of
the ISBL Agreement....................................................14

B.   Westchester did not plead or adduce legally sufficient evidence to support the failure of a condition precedent. ...............................16

C.   Westchester's affirmative defense of waiver fails as a matter of law. .........................................................................................17

D.   Westchester's remaining affirmative defenses fail as a matter of law. .........................................................................................18

Conclusion ................................................................................................18

Certificate of Service...............................................................................20

ii

TABLE OF AUTHORITIES

PAGE(S)

## CASES

*Austin Hardwoods, Inc. v. Vanden Berge,*
   917 S.W.3d 320 (Tex. App.—El Paso 1995, writ denied) ................................. 16

*Ayres v. Baxter,*
   2001 WL 294224 (N.D. Tex. 2001) ................................................................ 17

*Centex v. Acstar Ins.,*
   448 F. Supp. 2d 697 (E.D. Va. 2006) ............................................................. 10

*Dardas v. Fleming, Hovenkamp & Grayson, P.C.,*
   194 S.W.3d 603 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) ............. 9

*E.E.O.C. v. Serv. Temps, Inc.,*
   2010 WL 1644909 (N. D. Tex. 2010) ............................................................. 17

*FDIC v. Nobles,*
   901 F.2d 477 (5th Cir. 1990) ........................................................................ 10

*FFE Transp. Servs., Inc. v. Fulgham,*
   154 S.W.3d 84 (Tex. 2004) ............................................................................. 3

*Frost v. Burge,*
   29 S.W.3d 580 (Tex. App.—Houston [14th Dist.] 2000, no pet.) .............. 11, 14

*Futerfas Family Partners v. Griffin,*
   374 S.W.3d 473 (Tex. App.—Dallas 2012, no pet.) ........................................ 14

*Gotham Ins. v. Warren E & P, Inc.,*
   455 S.W.3d 558 (Tex. 2014) ........................................................................... 8

*Hernandez v. Bexar County National Bank,*
   710 S.W.2d 684 (Tex. 1986) ......................................................................... 10

*Hill v. Shamoun & Norman, LLP,*
   544 S.W.3d 724 (Tex. 2018) ........................................................................ 8, 9

*Jernigan v. Langley,*
   111 S.W.3d 153 (Tex. 2003) ......................................................................... 17

*Jones v. Gambill,*
   241 S.W. 1067 (Tex. App.—Amarillo 1922, no writ) ....................................... 11

*Lemond v. North Shore Supply Co.,*
   667 S.W.2d 283 (Tex. App.—Houston [14th Dist.] 1984, no writ) ................... 10

*Mack Trucks, Inc. v. Tamez,*
   206 S.W.3d 572 (Tex. 2006) ........................................................................... 3

*Matter of KP Eng'g, LP,*
   63 F.4th 452 (5th Cir. 2023) ........................................................................... 8

*McGinty v. Hennen,*
   372 S.W.3d 625 (Tex. 2012) ........................................................................... 3

*Mustang Pipeline Co. v. Driver Pipeline Co.*,
  134 S.W.3d 195 (Tex. 2004)................................................................3

*Old Colony Ins. v. City of Quitman*,
  352 S.W.2d 452 (Tex. 1961)..................................................12, 13, 15

*Smith v. Chrysler Grp., LLC*,
  909 F.3d 744 (5th Cir. 2018)..............................................................3

*Spin–Line v. United Concrete Pipe Corp.*,
  420 S.W.2d 744 (Tex. App.—Dallas 1967),
  *aff'd in part, rev'd in part*, 430 S.W.2d 360 (Tex. 1968)...................11

*St. Petersburg Bank & Tr. Co. v. Boutin*,
  445 F.2d 1028 (5th Cir. 1971)...........................................................13

*Star Ins. v. Skansa USA Bldg., Inc.*,
  2015 WL 11538254 (W.D. Tex. 2015)................................................11

*Summit Glob. Contractors, Inc. v. Enbridge Energy, LP*,
  594 S.W.3d 693 (Tex. App.—Houston [14th Dist.] 2019, no pet.)......8

*Sun Explor. & Prod. Co. v. Benton*,
  728 S.W.2d 35 (Tex. 1987)................................................................17

*Truly v. Austin*,
  744 S.W.2d 934 (Tex. 1988)................................................................9

*Turbines, Inc. v. Dardis*,
  1 S.W.3d 726 (Tex. App.—Amarillo 1999, pet. denied)......................3

*United States v. Walsh*,
  115 F. 697 (2d Cir. 1901).................................................................13

*Vastine v. Bank of Dallas*,
  808 S.W.2d 463 (Tex. 1991)..............................................................16

*Veldekens v. GE HFS Holdings, Inc.*,
  2009 WL 10693904 (S.D. Tex. 2009).................................................16

*Vortt Exploration Co. v. Chevron U.S.A., Inc.*,
  787 S.W.2d 942 (Tex. 1990)................................................................8

*Wortham Bros., Inc. v. Haffner*,
  347 S.W.3d 356 (Tex. App.—Eastland 2011, no pet.)........................3

## RULES

Fed. R. Civ. P. 9(c)................................................................................17

Fed. R. Civ. P. 50(a)-(b)..........................................................................1

Fed. R. Civ. P. 50, 59...........................................................................1, 2

## OTHER AUTHORITIES

23 *Williston on Contracts* §61:31 (4th ed. 2000).................................10

iv

## INTRODUCTION AND SUMMARY OF ARGUMENT

Judgment as a matter of law is appropriate when a reasonable jury would not have a legally sufficient evidentiary basis to find for the nonmovant on the issue challenged. Fed. R. Civ. P. 50(a)-(b). Here, Polaris Engineering, Inc., Gerry Obluda, and Michael Nodier (collectively, "Polaris"), and Third-Party Defendant Westchester Fire Insurance Company ("Westchester") have failed to sustain their evidentiary burdens, as a matter of law, on multiple issues. The Court should grant TXIT judgment as a matter of law—or, in the alternative and as provided for by Rule 50(b)(2), a new trial—on the following issues.

## NATURE AND STAGE OF THE PROCEEDING

The Court has entered a final judgment, which triggered postjudgment-motion deadlines. Dkt. 772; *see* Fed. R. Civ. P. 50, 59.

## ARGUMENT

## I.    Polaris's Claims and Affirmative Defenses Fail as a Matter of Law.

Polaris alleges that TXIT breached the ISBL, OSBL, and Dock Agreements and seeks to avoid liability on its breaches as alleged by TXIT. Polaris failed to present legally sufficient evidence to support the following claims and affirmative defenses, so the Court should render judgment on them in TXIT's favor.

### A.    Polaris's Change Order Claims Fail as a Matter of Law.

The damages Polaris seeks on its unapproved change orders are, by definition, outside the parties' Agreements. Article VI of each Agreement provides:

> After the Effective Date of this Agreement ***any and all changes to this Agreement*** or any part of it including without limitation any changes to terms definitions conditions the Work the Project Schedule or the Contract Price ***can only be effected by an agreed mutually acceptable Change Order***.

DX-1 art. VI; DX-2 art. VI; DX-3 art. VI (emphases added).

Polaris failed to prove that these changes became a part of the parties'
Agreements because Polaris failed to offer legally sufficient evidence that it
complied with the procedures required to make changes to the Agreements.

### 1.    Polaris did not offer legally sufficient evidence that its change orders were timely.

Section 6.2 of each Agreement provides for changes to scope of work and
total price of the Agreements requested by Polaris. And §6.4 of each Agreement
imposes the same time and notice requirement on such requests to change the
Agreement:

> **Section 6.4 <u>Timing Requirements for Notifications and
> Change Order Requests by Contractor.</u>** Should Contractor
> desire to seek a Change Order pursuant to Section 6.2, Contractor
> shall with respect to each such circumstance:
>
> (a) Notify Owner in writing of the existence of such circumstance as
> soon as reasonably practicable. [Required contents of the notice.];
> and
>
> (b) Submit to Owner a request for a Change Order no later than two
> (2) Business Days after notifying Owner pursuant to Section 6.4(a)
> together with a written statement [required information].
>
> (c) Oral notice, shortness of time, or Owner's actual knowledge of a
> particular circumstance shall not waive, satisfy, discharge or
> otherwise excuse Contractor's strict compliance with this Section
> 6.4. Contractor shall have the burden of proof with respect to any
> request for a Change Order made by it.

DX-1 §6.4; DX-2 §6.4; DX-3 §6.4. Section 6.4 requires "*strict compliance.*" *Id.*
(emphasis added).

Polaris did not adduce legally sufficient evidence that it strictly complied
with §6.4, so its changes never became a part of the Agreements. For example, it is
undisputed that Polaris failed to seek change orders relating to COVID-19 until
nearly one year after it faced the circumstances that allegedly justified their belated
submission. Polaris offered no evidence of why this one-year delay falls within a
zone of "reasonably practical"— particularly considering the clear provisions that

permit estimates for ongoing harm and supplementation of change orders in the ISBL Agreement. DX-1 §6.4(a). For these reasons, Polaris may not recover the change order amounts as damages.

### 2. Polaris did not offer legally sufficient evidence that its change orders were reasonable.

Both as a matter of contract and proving damages, Polaris was required to show that the amounts sought for the change orders are both reasonable and necessary. *See* DX-1 §6.6; DX-2 §6.6; DX-3 §6.6; *McGinty v. Hennen*, 372 S.W.3d 625 (Tex. 2012); *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200-01 (Tex. 2004). It did not meet its burden with legally sufficient evidence.

"Expert testimony is required when an issue involves matters beyond jurors' common understanding." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006); *Smith v. Chrysler Grp., LLC*, 909 F.3d 744, 751 (5th Cir. 2018). The reasonableness of amounts sought in change orders for technically complex construction projects requires expert testimony because those projects "involve[] the use of specialized equipment and techniques unfamiliar to the ordinary person." *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 91 (Tex. 2004); *see also, e.g.*, *Turbines, Inc. v. Dardis*, 1 S.W.3d 726, 738 (Tex. App.—Amarillo 1999, pet. denied) (holding that inspection and repair of an aircraft engine are not within the experience of the layman) (cited favorably in *FFE Transp. Servs.*); *Wortham Bros., Inc. v. Haffner*, 347 S.W.3d 356, 360–62 (Tex. App.—Eastland 2011, no pet.) (holding that expert testimony is required to establish reasonableness and necessity of cost of roof replacement).

Polaris elicited no expert testimony that the amounts were reasonable, and its omission is not by oversight. In fact, it designated an expert to testify about the

3

validity of the change orders, but the Court excluded the opinion on this technical and specialized topic. *See* Dkt. 451 at 5.

Polaris did not even adduce competent *lay* testimony as to reasonableness. Mr. Nodier, Polaris's owner, could testify only that he engaged in "heavy estimating" to calculate some change orders and that he did so because "there's no methodologies" to calculate them. 2.8.24(AM) Tr. 60:7-11. That conclusory testimony is legally insufficient.

### 3. Polaris did not offer legally sufficient evidence that it complied with the contractual change order procedures.

The Agreements contain detailed procedures that must be followed before the scope of work may be changed. Polaris failed to adduce evidence that it complied with these procedures. Specifically, Polaris failed to show that any of the disputed change orders are "agreed" or "mutually acceptable." DX-1 art. VI; DX-2 art. VI; DX-3 art. VI. Nor did Polaris supply any evidence that it submitted the unresolved change order disputes to mediation, as required by the Agreements. DX-1 §6.8 & art. XIX; DX-2 §6.8 & art. XIX; DX-3 §6.8 & art. XIX.

### 4. Polaris did not offer legally sufficient evidence that COVID-19 caused delays to or impacted Polaris's work on the project schedule.

Ten months after COVID-19 reached the United States, four months after filing suit, and 29 days after TXIT terminated the ISBL Agreement, Polaris submitted three change orders seeking more than $18 million for amounts allegedly associated with COVID-19.[1] Polaris cannot recover damages for these change orders as a matter of law because it failed to offer competent evidence establishing the causal link between COVID-19 and the alleged delay to or impact

---

[1] PX-593A_FCO-88 ($9,278,765.52 for ISBL Agreement), FCO-89 ($5,501,924.04 under OSBL Contract), and FCO-90 ($3,323,648.83 under Dock Contract).

4

on Polaris's work on the project schedule. And the infirmity of their COVID-19 juggernaut infects all of the change order damages recovered because of the way Polaris chose to submit their damages.

Polaris designated two experts—Timothy R. Overman and Timothy D. Rooney—to testify about the impact COVID-19 had on Polaris's project schedule and damages related to that delay. *See* Dkt. 451 at 2. Overman's report stated that construction was disrupted by labor "absenteeism" and COVID-19 restrictions. *Id.* at 3-4. But his conclusion simply cited the average number of people who missed work during certain periods and listed COVID-19 safety protocols, like social distancing and sanitizing. *See id.* at 4. Because he did "not use any method or attempt to explain how or to what extent these protocols and labor absenteeism caused any delay at all," this Court excluded his opinion that "COVID-19 caused delays to or impacted Polaris's work on the project schedule." *See id.* at 3-4. As for Rooney, the Court barred any opinion Polaris intended to offer suggesting that "the delay was caused by COVID-19" because it lacked sufficient underlying facts and a reliable methodology. *See id.* at 3-6.

Undeterred, Polaris tried to skirt the Court's exclusionary ruling by eliciting opinion testimony from its fact witness and man for all seasons, Mr. Nodier. *See* 2.7.24(AM) Tr. 30:2-34:25. Although he discussed COVID-19, he neglected to testify in any meaningful way about its causal relationship to delay on the project. Even if he had, expert testimony is required to assess the impact of delay on a construction project, and he is not an expert in that field.

But even assuming Mr. Nodier offered an opinion on causation, and was qualified to do so, it would have rested on the same information deemed insufficient to support the causation opinion offered by Overman and struck by the Court. Like Overman, Mr. Nodier did not use Critical Path Method delay-analysis

techniques or divide delays into sequential review periods. And, like Overman, Mr. Nodier merely referenced labor disruptions and safety protocols without using any method or trying to explain "how or to what extent these protocols and labor absenteeism caused any delay at all." Dkt. 451 at 3-6. The Court should render judgment on the portion of Polaris's breach-of-contract claim seeking damages for the three change orders allegedly associated with COVID-19 (FCOs 88, 89, and 90).

> **B.    Polaris adduced no competent evidence that failing to provide contractually required notice of steady, consistent operations at an unspecified rate is causally connected to any damage alleged.**

At summary judgment, the Court concluded that TXIT failed to give contractually required notice of stable operations. The Court's summary judgment ruling was error, but even accepting it, Polaris's claim fails because it failed to show any damages from lack of contractually required notice.

Accepting for this Motion that "stable operations" means "steady, consistent operations at an unspecified rate" and that the Facility can be operating "steady" despite being unsafe to operate, Dkt. 490 at 18-19, then Polaris had *actual* notice of stable operations because its representatives were at the Facility observing steady, consistent operations at an unspecified rate. Specifically, the uncontradicted testimony at trial was that when the Facility achieved steady, consistent operations at an unspecified rate in the summer of 2020, TXIT and Polaris were "right there side by side in the control room pretty much the whole way, trying to do this together."[2] Polaris cannot now disclaim its knowledge and appreciation of the facts establishing that Stable Operations had been achieved.

---

[2] 2.20.24(AM) Tr. 49:17-50-50:3; 2.14.24(AM) Tr. 44:2-45:5.

With actual knowledge of steady, consistent operations at an unspecified rate, any additional notice could have no effect on Polaris's behavior and thus lack of that additional notice could not damage Polaris. That is why Polaris was unable to adduce any evidence at trial suggesting that it would have acted differently had it received additional notice of steady, consistent operations at an unspecified rate.

Indeed, the evidence conclusively showed that the summer of 2020 was spent trying to get the facility to complete step one of the performance test procedure that proceeds from steady, consistent operations at an unspecified rate—running in 3 Product Mode at 50,000 BPD, DX-1, App'x G—an effort that ended with Polaris admitting that step one could not achieved, DX-547, DX-549. As a result, TXIT is entitled to judgment as a matter of law on Polaris' breach-of-contract claim arising from its failure to provide notice of stable operations.

### C. Polaris's remaining contract theories lack a legally sufficient evidentiary basis.

Polaris alleges a litany of other theories to support its breach of contract claim. Specifically, Polaris alleges that TXIT breached by (a) failing to "engage in the requisite dispute resolution procedures" of §19.1 of the ISBL, OSBL, and Dock Agreements, (Dkt. 197 at 27); (b) "ignoring the requirements of Article XIII related to any alleged defects," (*id*. at 27); (c) "refusing to use crude oil that conformed with the specifications set forth in Appendix F," (*id*. at 28); and (d) "wrongfully issuing a Notice of Default based on alleged scheduling delays without accounting for scheduling changes and additional time for completion allowed under the ISBL Agreement for Force Majeure events (*id*.)" None of these allegations finds sufficient evidentiary support in the record. And, regardless, Polaris has failed to present sufficient evidence that any such failure is material or causally connected to any damage alleged here.

During trial, Polaris alluded to other unpleaded breaches, including failing to designate an owner's representative. Even if Polaris had not forfeited reliance on those supposed breaches, Polaris presented no evidence that any such failure to designate is (a) material or (b) causally connected to any damage sought.

In addition to its breach-of-contract claims, Polaris brings an equitable claim for quantum meruit. *See* Dkt. 197 at 29-30. Quantum-meruit claims are *extra*-contractual. *See Matter of KP Eng'g, LP*, 63 F.4th 452, 456 (5th Cir. 2023) (citing *Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990)); *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 733 (Tex. 2018). But the basis for Polaris's claim is a wholesale incorporation by reference of the facts alleged to support Polaris's breach-of-contract claims. Dkt. 197 ¶77. Polaris thus offers no extra-contractual basis for its quantum-meruit claim. Polaris does not allege that the Agreements are invalid—indeed Polaris is trying to enforce those Agreements. Polaris points to no claim for damages that would not be covered by the express Agreements with TXIT.

The fact that the parties' Agreements expressly address change orders is dispositive: Polaris is entitled to recover on work outside only in compliance with the Agreements' change-order provisions. Allowing a quantum-meruit despite the parties' express agreement on how work outside the Agreements would be addressed conflicts with Texas law. For example, in *Summit Global Contractors, Inc. v. Enbridge Energy, LP,* a contractor appealed the trial court's dismissal of its quantum-meruit claim, arguing that "the services rendered in the requested change orders were not covered by the parties' agreement." 594 S.W.3d 693, 705 (Tex. App.—Houston [14th Dist.] 2019, no pet.). The court of appeals disagreed because the parties' agreements expressly addressed the approval process for change orders. *Id.* at 705–06 (citing *Gotham Ins. v. Warren E & P, Inc.*, 455

S.W.3d 558, 563 (Tex. 2014) ("[T]hese clauses indicate that the contract addresses the matter at issue, and [the plaintiff] is limited to the contract rather than equity when determining liability."); *Dardas v. Fleming, Hovenkamp & Grayson, P.C.*, 194 S.W.3d 603, 620 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) ("[W]hen a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a [quantum meruit] theory.")).

In any case, Polaris has failed to adduce any evidence that it performed, or TXIT accepted, any work not addressed by the ISBL Agreement, OSBL Agreement, or Dock Agreement. Nor did Polaris allege or adduce proof that it was prevented from completing the work described in the change orders or that the subject work was extra-contractual. *See Truly v. Austin,* 744 S.W.2d 934, 936-37 (Tex. 1988).

Still more, even if Polaris could point to some extra-contractual service, Polaris adduced no competent evidence of the reasonable value of the extra-contractual work performed or the materials furnished. *Hill*, 544 S.W.3d at 733; *see supra* Part I.A.2 (discussing the need for expert testimony).

For all these reasons, Polaris may turn to quantum meruit to salvage its unproven contract claims.

### D. Polaris's remaining affirmative defenses fail as a matter of law.

The jury rejected Polaris's defenses of mutual mistake and commercial impracticability. The Court should render judgment on the remaining affirmative defenses asserted by Polaris because they lack sufficient evidentiary support: (a) prior material breach of contract, (b) anticipatory breach of contract, (c) repudiation of contract, (d) justification, (e) failure of conditions precedent or subsequent, (f) failure of consideration, (g) waiver and release, (h) estoppel, (i)

9

unclean hands, (j) modification, (k) failure to mitigate damages, and (l) offset, credit, setoff, and recoupment.

## II.  Westchester's Affirmative Defenses Fail As a Matter of Law.

The Court should render judgment on the following affirmative defenses asserted by Westchester.

### A.  Westchester's material-alteration affirmative defense fails as a matter of law.

#### 1.  The evidence conclusively proves that Westchester waived its material-alteration affirmative defense.

Westchester waived any material-alteration affirmative defense when it expressly waived the right to receive notice of change:

> *[Westchester] hereby waives notice of change, including changes of time, to the Contract, purchase orders or other obligations.*

DX-183 at 3 §J (emphasis added).

A surety may waive its rights or consent to an alteration of the underlying agreement and, when that happens, the general rule calling for the discharge of the surety does not apply. 23 *Williston on Contracts* §61:31 (4th ed. 2000). Texas law permits such waivers. *See generally Hernandez v. Bexar County National Bank*, 710 S.W.2d 684, 688-89 (Tex. 1986) (holding note guarantor contractually waived right to notice of renewal, extension, or alteration of obligation); *Lemond v. North Shore Supply Co.*, 667 S.W.2d 283, 286 (Tex. App.—Houston [14th Dist.] 1984, no writ) (finding implied consent to alterations through language in guaranty agreement); *FDIC v. Nobles*, 901 F.2d 477, 480-81 (5th Cir. 1990) ("The unambiguous language . . . relieves the FDIC of any duty that might otherwise exist to preserve and protect the collateral."); *see also Centex v. Acstar Ins.*, 448 F. Supp. 2d 697 (E.D. Va. 2006) (holding surety waived its right to the discharge defense due to language in agreement).

10

*Jones v. Gambill* sets forth well-established principles of surety contractual consent. In *Jones*, the original contract included a provision that allowed the owners to make changes to the contract. 241 S.W. 1067, 1070 (Tex. App.—Amarillo 1922, no writ). The court explained that if the contract between the owner and the contractor permits alterations to the work to be done, or if the bond itself permits the alteration, then "the surety will not be discharged by reason of material alteration made without his express consent." *Id.*

The consent-to-modification clause in Paragraph J of the bond forecloses a material alteration defense as a matter of law. *Star Ins. v. Skansa USA Bldg., Inc.*, 2015 WL 11538254 (W.D. Tex. 2015) (disposing of material-alteration affirmative defense as a matter of law because surety had consented to alterations of contract by waiver-of-notice provision in bond) (citing *Jones*, 241 S.W. at 1070).

### 2. Even if it could assert its material-alteration affirmative defense, Westchester has not adduced legally sufficient evidence to support the defense.

To prevail on its affirmative defense, Westchester must prove: (1) the existence of a material alteration, (2) lack of consent to the alteration, and (3) harm resulting from the alteration. *Frost v. Burge*, 29 S.W.3d 580, 588 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Westchester failed to present sufficient evidence of all three elements.

### a. There is no legally sufficient evidence of a material alteration to the ISBL Agreement.

The primary question in a material-alteration affirmative defense is whether "the altered writing describes the contract entered into by the parties, or whether the instrument's legal effect has been varied." *Frost*, 29 S.W.3d at 588 (citing *Spin–Line v. United Concrete Pipe Corp.*, 420 S.W.2d 744, 751–52 (Tex. App.—Dallas 1967), *aff'd in part, rev'd in part*, 430 S.W.2d 360 (Tex. 1968)). But Westchester

11

does not urge that there has been an alteration *to the writing*. Instead, Westchester suggests an alteration of the contract *by conduct*.

The Supreme Court's opinion in *Old Colony Insurance v. City of Quitman*, illustrates what is required to materially alter a contract by conduct. 352 S.W.2d 452, 455 (Tex. 1961). In *Old Colony*, the City of Quitman contracted a well-drilling company to "drill and equip a water well" and obtained a bond on the drilling company's performance. *Id.* at 452. Contractually, the drilling company needed (a) to drill the well to a depth of 400 feet; (b) to test the water and obtain chemical certification to ensure that the water had an iron content of no more than .3 parts of iron to 1,000,000 parts of water; and (c) to guarantee that the completed well "would produce water of no greater iron content than that produced by the test well." *Id.*

The City, acting on the drilling company's representation that the drilling and iron content terms were satisfied, provided a completion certificate to the drilling company *without requiring certified copies of the conforming chemical analysis required by the contract*. The City paid the final balance due on the contract. Unfortunately, the City secured no chemical analysis "until the water was turned into the City mains" and, upon complaints four months later, the City conducted a test and learned that the iron content was so high the water was unfit for domestic use. *Id.* at 454–55.

In the City's suit on the bond, the Texas Supreme Court held the surety not liable. *Id.* at 454. Specifically, the Court held that the contractor failing to meet the material term of the contract (chemical analysis certificate) and the City making final payment on the contract before the water test had been certified complete, as the contract required, operated as a material alteration that prejudiced the surety; thus, no recovery was permitted. *Id.* at 456.

12

The Court explained that the case presented a "classic example" of the reason for the material-alteration rule. The Court makes abundantly clear that the alteration of the drilling contract occurred when, first, the drilling company failed to meet the terms of the contract and, second, knowing this failure, the City nonetheless permitted enforcement of the contract. *Id.* at 455-56. Indeed, the Court rejected the City's authority in which the non-breaching party did not accept the work with knowledge of the defect. *Id.* at 455 (citing *United States v. Walsh*, 115 F. 697 (2d Cir. 1901)). Both parties to the assured contract must be complicit in the alteration.

That rule makes perfect sense. A unilateral breach of contract cannot support the meeting of the minds required to change a contract. And the Texas Supreme Court has never held that a surety may avoid its obligations via a material-alteration defense based upon a putative or attempted unilateral alteration of the terms of the underlying contract. Westchester knows this rule.[3]

Nevertheless, Westchester failed to adduce sufficient evidence that TXIT *and Polaris* agreed, expressly or impliedly, to an alteration of the ISBL Agreement. To the contrary, Polaris took a bullet train to the courthouse to sue TXIT over a perceived failure of TXIT to comply with the Agreement. There is no evidence here resembling a material alteration by a failure to comply by one party coupled with a knowing failure to enforce by the other. Westchester's defense fails on this point alone.

---

[3] *See* Dkt. 265 at 16 (stating a material alteration "need not be accomplished by changes in the language of the instrument but may be by material departures from its terms in its execution and enforcement") (citing *St. Petersburg Bank & Tr. Co. v. Boutin*, 445 F.2d 1028, 1031 (5th Cir. 1971)).

### b. There is no legally sufficient evidence of a lack of surety consent to the alleged material alteration.

Even if Westchester could overcome the absence of actual modification, and it cannot, Westchester's defense fails on the second element as well. Westchester has failed to adduce sufficient evidence that it did not consent to a material alteration of the ISBL Agreement. Understandably, Westchester shies away from the lack-of-consent element because of the following provision in the performance bond:

> [Westchester] hereby waives notice of change, including changes of time, to the Contract, purchase orders or other obligations.

DX-183 at 3 §J. This consent-to-modification clause makes clear that Westchester contractually agreed to alterations. Nothing in *Old Colony* can rescue Westchester from the consequences of this unambiguous language.

### c. There is no legally sufficient evidence of harm resulting from any alleged material alteration of the ISBL Agreement.

Even if Westchester had presented sufficient evidence on the first two elements, a judgment should still be rendered on its affirmative defense because no evidence supports the harm element. Specifically, Westchester presented no evidence that (a) it suffered articulable harm, or (b) the harm *resulted from* the material alteration. *See Frost*, 29 S.W.3d at 588. Westchester agrees with this causation component of harm.[4] Yet it adduced no evidence to prove harm or a causal connection between it and the putative material alteration.

In *Old Colony*, the Supreme Court outlined the surety's harm: If the City had insisted on the results of the chemical test, as the contract required, then the City

---

[4] *See* Dkt. 265 at 12 ("A surety is entitled to judgment on a defense of material alteration if it demonstrates . . . harm resulting from the alteration.") (citing *Futerfas Family Partners v. Griffin*, 374 S.W.3d 473, 478 (Tex. App.—Dallas 2012, no pet.)).

would have either obtained a compliant test or not have paid the contract in full. 352 S.W.2d at 455-56. The surety was harmed when asked to make good on a performance bond where contract completion would have been avoided but for the City's knowing willingness to proceed without compliance.

Here, by contrast, there was absolutely no change in risk to the surety. In its original motion, Westchester urges that it was harmed because TXIT's undertaking of corrective work "forever deprived Polaris and Westchester of the ability to demonstrate that the facility complied with the Performance Guarantee." Dkt. 265 at 16. Setting aside that the undisputed evidence in this case is that the facility *did not comply* with the Performance Guarantee, Westchester's harm argument ignores what the ISBL Agreement specifically allows.

The ISBL Agreement allows TXIT to perform corrective work immediately if Polaris is unwilling to perform the corrective work and the defect could reasonably be expected to result in a shutdown of the Facility. DX-1 §13.3(b). Because the parties contracted for TXIT to step in and perform corrective work, Westchester cannot show a causal connection between its alleged material alteration and its putative harm.

Westchester also ignores the ample opportunities that TXIT provided to Polaris *and* Westchester to inspect and undertake corrective work. Westchester's own failure to take any step to compel Polaris to perform corrective work once it had notice breaks any causal connection that could hypothetically exist. Westchester's disregard of knowledge of the problem defeats its own affirmative defense under *Old Colony*.

On harm, *Old Colony* tracks the typical material-alteration circumstance. The failure to obtain chemical certificates, the knowing payment without such certificates, and the subsequent unfavorable test results were not

contemporaneously known by the surety because the City did not know or attempt to know whether its blind faith in the drilling contractor was well placed until four months after payment. The alteration is ordinarily a complete surprise to the surety. *See., e.g.*, *Vastine v. Bank of Dallas*, 808 S.W.2d 463, 464–65 (Tex. 1991) (reversing grant of summary judgment for a creditor where there was support for the guarantor's allegations that deviations from an underlying loan agreement were made without his knowledge or consent, prejudicing him by increasing the risk of nonperformance and by substituting a new contract he had not guaranteed).

But here, nothing happened in secret. Westchester was included on the notice of default correspondence. DX-600 at 1. Any alleged deviation from the ISBL Agreement from that point forward was with Westchester's full knowledge because TXIT asked Westchester to fix the Facility with Polaris. From a causation standpoint, this case is far more like *Veldekens v. GE HFS Holdings, Inc.*, where the undisputed alteration of a loan instrument played no causal role in the contractual default. 2009 WL 10693904, at *7 (S.D. Tex. 2009) (Rosenthal, J.). There, as here, the record is clear that the "alteration" alleged plays no role in the putative default. *Id.*; *see also Austin Hardwoods, Inc. v. Vanden Berge*, 917 S.W.3d 320, 326 (Tex. App.—El Paso 1995, writ denied) (same). Westchester presented no evidence showing the parties materially altered the ISBL Agreement or that any alteration (by both parties) played any causal connection in harm.

### B.    Westchester did not plead or adduce legally sufficient evidence to support the failure of a condition precedent.

In its complaint, TXIT generally averred that "[a]ll conditions precedent to TXIT's right to recover from Polaris and [Westchester] have occurred, have been performed, or have otherwise been waived." Dkt. 199 at 42 ¶85. In its answer, Westchester generally "denie[d] the conditions precedent to TXIT's claims for

16

relief have been performed, have occurred, and have not been waived and/or excused." Dkt. 202 at 12 ¶85. In doing so, Westchester failed to deny that a condition precedent has occurred or been performed "*with particularity.*" *E.E.O.C. v. Serv. Temps, Inc.*, 2010 WL 1644909, at *3 (N. D. Tex. 2010) (quoting Fed. R. Civ. P. 9(c)). Failing to deny any condition precedent with particularity is deemed admitted, and it cannot be raised later in the litigation. *Ayres v. Baxter*, 2001 WL 294224, at *4 (N.D. Tex. 2001). Even if not waived, the record contains legally insufficient evidence to support submitting the defense to the jury. Thus, the Court should render judgment on the affirmative defense of the failure of condition precedent as a matter of law.

## C. Westchester's affirmative defense of waiver fails as a matter of law.

The Court should render judgment on Westchester's affirmative defense of waiver. Waiver is "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Sun Explor. & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987). Waiver is predominantly a matter of intent, and there is no implied waiver through a party's actions absent intent clearly demonstrated by the surrounding facts and circumstances. *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003).

Westchester presented no evidence showing that TXIT intentionally relinquished its rights under the ISBL Agreement or the bond. Nor has Westchester presented any evidence showing that TXIT intentionally acted in a manner inconsistent with those rights. To the contrary, the evidence demonstrates that TXIT's aim, from the beginning, has been to enforce its rights under both the ISBL Agreement and the bond. As such, the Court should render judgment on the affirmative defense of waiver as a matter of law.

**D.    Westchester's remaining affirmative defenses fail as a matter of law.**

The Court should render judgment on the following affirmative defenses asserted by Westchester because they lack sufficient evidentiary support: (a) estoppel, (b) failure to mitigate damages, (c) economic loss rule, and (d) economic waste doctrine. *See* Dkt. 202 at 13–14.

### CONCLUSION

The Court should render judgment as a matter of law against Polaris on its claims and affirmative defenses, and against Westchester on its affirmative defenses. In the alternative, the Court should grant a new trial.

18

Dated:  June 7, 2024                    Respectfully submitted,

                                        /s/ *Constance H. Pfeiffer*
                                        Constance H. Pfeiffer
                                        cpfeiffer@yettercoleman.com

                                        Reagan W. Simpson
                                        Grant B. Martinez
                                        Jason R. LaFond
                                        Lily E. Hann
                                        YETTER COLEMAN LLP
                                        811 Main Street, Suite 4100
                                        Houston, Texas 77002
                                        Main (713) 632-8000

                                        Eric Lipper
                                        HIRSCH & WESTHEIMER
                                        1415 Louisiana, 36th Floor
                                        Houston, Texas 77002
                                        Main (713) 220-5181

                                        Attorneys for Texas International
                                        Terminals, Ltd.

## CERTIFICATE OF SERVICE

I certify that on June 7, 2024, a copy of this document was served on all counsel of record using the Court's e-filing system.

/s/ *Constance H. Pfeiffer*
Constance H. Pfeiffer