## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

POLARIS ENGINEERING, INC.,

*Plaintiff/Counter-Defendant*

v.

TEXAS INTERNATIONAL
TERMINALS, LTD.,

*Defendant/Counter-Plaintiff/Third-Party Plaintiff.*

CIVIL ACTION NO. 3:21-cv-00094

## **POLARIS'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND CONDITIONAL PARTIAL MOTION FOR NEW TRIAL**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

LEGAL STANDARD ...............................................................................................1

SUMMARY OF ARGUMENT ................................................................................ 2

ARGUMENT ........................................................................................................... 4

I.     Polaris is entitled to judgment as a matter of law on certain issues that were
resolved against it in the final judgment.................................................. 4

     A.     TXIT's conversion claim fails as a matter of law (Questions 32 and
33). ..........................................................................................5

          1.     TXIT's conversion claim rests on an erroneous
interpretation of the Dock Agreement. ...........................5

          2.     TXIT offered no competent evidence of conversion
damages............................................................................ 8

     B.     TXIT's promissory estoppel claim on behalf of GCC fails as a
matter of law (Questions 34 and 35). ......................................10

          1.     Because TXIT argued that alleged promises about non-
Table 1 crude were incorporated by reference into the ISBL
Agreement, they cannot be the basis of a promissory
estoppel claim. ............................................................... 11

          2.     TXIT failed to establish GCC's justifiable reliance on
Polaris's purported promises as a matter of law. .......................12

          3.     TXIT/GCC do not have standing to bring this claim...............15

          4.     The damages sought by TXIT were unrecoverable under a
promissory estoppel theory........................................................18

          5.     GCC's promissory estoppel claim is barred because
promissory estoppel cannot be asserted offensively. ................21

     C.     The evidence conclusively established that TXIT breached the
OSBL Engineering Agreement and that Polaris suffered $537,000 in
damages (Questions 23 and 24). ......................................... 22

II.    Regardless of the outcome of any challenge to the jury's prior material
       breach finding, TXIT's claim for breach of the ISBL Agreement fails as a
       matter of law for many other reasons.................................................................. 24

       A.    The evidence conclusively established that TXIT accepted the ISBL
             Facility and, thus, its exclusive remedy was a warranty claim
             (Question 4). ............................................................................................. 24

             1.    TXIT took and retained the Facility. ......................................... 26

             2.    TXIT never rejected the Facility. .............................................. 26

             3.    TXIT exercised control over the Facility in a manner
                   inconsistent with Polaris's ownership of the Facility. ...............27

             4.    TXIT did not plead, prove, or obtain a jury finding that it
                   revoked acceptance of the ISBL Facility. .................................. 28

       B.    TXIT's claim for breach of an alleged performance guarantee
             relating to naphtha fails as a matter of law (Question 5). ....................... 29

       C.    TXIT's claim for breach of a performance guarantee relating to non-
             Table 1 crude fails as a matter of law (Question 6). ...............................31

       D.    TXIT's ISBL damage claims fail as a matter of law (Question 12) .......................35

             1.    TXIT's claim for liquidated damages under Article XI of the
                   ISBL Agreement fails as a matter of law. ..................................35

             2.    TXIT's claim for retrofit costs fails as a matter of law. ............37

             3.    TXIT's damages are capped at 10% of the contract price. .........43

CONDITIONAL MOTION FOR NEW TRIAL .......................................................... 44

III.   *If* the Court were to grant TXIT's motion for new trial (which it should not
       do), Polaris is entitled to a new trial on the issue of its lost profits damages. ................... 44

       A.    The court erred in concluding that the *Zachry* bad faith exception
             did not apply to the ISBL Agreement's consequential damages bar. .................. 44

       B.    Polaris presented sufficient evidence of bad faith and lost profits to
             be entitled to the submission of these issues to the jury. ....................... 46

             1.    There is sufficient evidence of bad faith. ................................. 46

             2.    There is sufficient evidence of lost profits. ............................... 49

CONCLUSION AND PRAYER ................................................................................................ 51

CERTIFICATE OF SERVICE ............................................................................................... 53

In Part I of this Motion, pursuant to Fed. R. Civ. P. 50(b), Polaris seeks a judgment as a matter of law that:

- TXIT take nothing on its promissory estoppel and conversion counterclaims (requiring the removal from the judgment of the $2.05 million offset tied to these claims); and

- TXIT breached the OSBL Engineering Agreement as a matter of law, resulting in additional damages in the amount of $537,000.

In Part II of this Motion, Polaris reasserts its arguments as to why TXIT's counterclaim for breach of the ISBL Agreement fails as a matter of law. Because this Court already ruled that TXIT should take nothing on this claim based on the jury's findings that TXIT materially breached the contract first, *this Court need not reach these arguments*, which are asserted solely to preserve Polaris's right to assert these many alternative grounds for affirmance of this Court's judgment on appeal.

In Part III of this Motion, pursuant to Federal Rule of Civil Procedure 59(a)(1)(A), Polaris moves for a *conditional*, partial new trial. Again, *this Court need not reach these arguments* unless it were to grant a new trial on TXIT's motion or on its own initiative. Under that scenario, it should also include within the scope of the new trial Polaris's claim for lost profits damages arising from TXIT's bad faith breach of the ISBL Agreement.

## LEGAL STANDARD

Rule 50(b) allows a party to file a "renewed" motion for judgment as a matter of law after trial. The Court should grant a Rule 50(b) motion "not only when the non-movant presents no evidence, but also when there is not a sufficient conflict in substantial evidence

to create a jury question." *Travis v. Bd. of Regents of the Univ. of Tex. Sys.*, 122 F.3d 259, 263 (5th Cir. 1997) (citations and quotation marks omitted); *Allen v. Radio One of Tex. II, L.L.C.*, 515 F. App'x 295, 301 (5th Cir. 2013) ("The court applies the same standard provided under Rule 50(a) to evaluate a Rule 50(b) motion . . .").

The Court may grant a new trial under Rule 59 if it finds "the verdict [was] against the weight of the evidence, the damages awarded [were] excessive, the trial was unfair, or prejudicial error was committed in its course." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 784 (5th Cir. 2018).

## SUMMARY OF ARGUMENT

This Court's final judgment is mostly correct. But, as Part I of this Motion explains, three changes are necessary.

*First*, the $1 million offset arising from TXIT's conversion counterclaim (based on the jury's answers to Questions 32 and 33) should be removed because the conversion claim fails as a matter of law. Under the correct interpretation of section 14.2 and Appendix B of the Dock Agreement, Polaris unambiguously holds title to the disputed equipment that was the subject of TXIT's conversion claim, and in any case, TXIT offered no competent evidence of conversion damages, *i.e.*, the value of the disputed equipment.

*Second*, the $1,050,000 offset arising from TXIT's promissory estoppel counterclaim (based on the jury's answers to Questions 34 and 35) should be removed because the promissory estoppel claim fails as a matter of law for multiple independent reasons, including:

- TXIT's argument that the alleged promises were incorporated by reference into the ISBL Agreement defeats the promissory estoppel claim, which cannot rest on a contractual promise;

- As a matter of law, GCC could not have justifiably relied on a promise regarding non-Table 1 crudes that was the subject of the ISBL Agreement;

- GCC lacks standing because its decision to pay TXIT's operational costs was purely voluntary and thus there was no injury-in-fact;

- TXIT failed to present any evidence of reliance damages incurred from Polaris's breach of purported promises regarding non-Table 1 crude; and

- Under Texas law, promissory estoppel cannot be asserted offensively to recover damages and can only be asserted defensively.

*Third*, because Mr. Sullivan's own testimony conclusively established that TXIT breached the OSBL Engineering Agreement by failing to make Progress Payment No. 5, this Court should disregard the jury's contrary finding in Question 23 (Dkt. 714, p. 33) and amend the judgment to award an additional recovery in the amount of $537,000.

*The Court need not reach the arguments in Part II of this Motion* because it correctly rendered judgment that TXIT shall take nothing on its claim for breach of the ISBL Agreement. Dkt. 772 ¶ 4. *Polaris includes them for preservation purposes only*. But these arguments provide numerous alternative and independent reasons why the jury's findings that Polaris breached the ISBL Agreement cannot support a recovery for TXIT as a matter of law, including that: (1) the evidence conclusively establishes that TXIT accepted the Facility and, thus, its exclusive remedy was for breach of warranty, (2) TXIT's claim for breach of an alleged performance guarantee relating to naphtha is based on a legally erroneous interpretation of the contract, (3) TXIT's claim for breach of an alleged

performance guarantee relating to non-Table 1 crude conflicts with the express terms of the ISBL Agreement and is based on a theory of incorporation by reference that is waived, barred by estoppel and judicial admission, and flat wrong on the merits; and (4) TXIT's damages claims suffer from a litany of errors that render them unrecoverable.

Finally, as set forth in Part III of this Motion, in the unlikely event that this Court erroneously grants TXIT's request for a new trial, Polaris requests that the trial include its claim for lost profits damages arising from TXIT's breach of the ISBL Agreement. Although the ISBL Agreement contains a limitation on consequential damages, the Texas Supreme Court has made clear that such provisions are unenforceable to the extent they exempt a party from liability for harm caused intentionally or in bad faith. *See Zachry Constr. Corp. v. Port of Hous. Auth. of Harris Cnty.*, 449 S.W.3d 98, 116 (Tex. 2014). Polaris presented sufficient evidence of bad faith to get a jury finding on this issue.

## ARGUMENT

### I. Polaris is entitled to judgment as a matter of law on certain issues that were resolved against it in the final judgment.

This Court should enter a modified judgment eliminating the offsets against Polaris based on the jury's conversion and promissory estoppel findings (*see* Parts I.A and I.B) and award Polaris an additional $537,000 in damages for TXIT's admitted breach of the OSBL Engineering Agreement (*see* Part I.C).

## A.    TXIT's conversion claim fails as a matter of law (Questions 32 and 33).

The Court offset Polaris's actual damages by $1 million based on the jury's finding that Polaris converted TXIT's property. *See* Dkt. 714 at 43; Dkt. 772 ¶ 2. But TXIT's conversion claim fails as a matter of law for two reasons. *First*, under the correct interpretation of section 14.2 and Appendix B of the Dock Agreement, Polaris unambiguously holds title to the disputed equipment that was the subject of TXIT's conversion claim. *See* Dkt. 260 at 35-37. *Second*, TXIT offered no competent evidence of conversion damages—the market value of the disputed equipment.

### 1.    TXIT's conversion claim rests on an erroneous interpretation of the Dock Agreement.

TXIT's argument that Polaris converted equipment relating to the Dock Agreement runs headlong into section 14.2 of that Agreement, which states that "[e]quitable title to … Equipment provided by [Polaris] … will pass to [TXIT] as and to the extent payment therefor is made by [TXIT] in accordance with this Agreement." PX4, § 14.2. It is undisputed that TXIT never made Progress Payments 6-8,[1] so title to the equipment never passed to TXIT.

TXIT argues otherwise based on a misreading of Appendix B of the Dock Agreement, reproduced below for the Court's convenience:

---

[1] 2/13/24 PM Tr. at 68, 70, 72; 2/22/24 AM Tr. at 109-10.

**APPENDIX B: PROGRESS PAYMENT SCHEDULE**

| Payment Number | Percent Contract Price | Progress Payment | Payment, USD | Operational Milestone Indications |
|---|---|---|---|---|
| 1 | 20% | December 11, 2019 | 8,063,466.20 | • Begin Engineering<br>• Procure Materials<br>• Begin Shop Fabrication<br>• Order Equipment |
| 2 | 20% | February 5th, 2020 | 8,063,466.20 | • Engineering 35%<br>• Mobilize to field<br>• Shop Fabrication 35% |
| 3 | 20% | April 3, 2020 | 8,063,466.20 | • Engineering 70%<br>• Field Installation 25%<br>• Shop Fabrication 90%<br>• Equipment Payments 50% |
| 4 | 15% | May 28, 2020 | 6,047,599.65 | • Engineering 100%<br>• Field Installation 50%<br>  Shop Fabrication 100% |
| 5 | 15.5% | July 24, 2019 | 6,249,186.31 | • Field Installation 75%<br>• Shop Fabrication 100%<br>• Equipment Payments 100% |
| 6 | 4.5% | Mechanical Completion | 1,814,279.90 | • Mechanical Completion Achieved |
| 7 | 4.5% | Substantial Completion | 1,814,279.90 | • Substantial Completion Achieved |
| 8 | .5% | Final Completion | 201,586.66 | • Final Completion Achieved |
| | 100% | Contract Price | $40,317,331.00 | |

PX4, App. B.

Appendix B lists "Equipment Payments 100%" as one of the "Operational Milestone Indications" for Progress Payment 5. TXIT interprets this to mean that it needed only to pay Progress Payment 5 to obtain title to the equipment. But a plain reading of all the other milestone indications listed in the right-hand column makes it clear that nothing in that column relates to any tasks *TXIT* performed; rather, the items in this column were goals that *Polaris* was required to complete to achieve each milestone and earn the associated Progress Payment. So, under the only reasonable reading of the Dock

Agreement, TXIT's mere fulfillment of its contractual duty to pay Progress Payment 5 did not give it title to the equipment.

Even if the Dock Agreement were somehow ambiguous on this point, the evidence conclusively establishes that Polaris's interpretation should control. Mr. Sullivan conceded on cross-examination that TXIT's interpretation of Appendix B was wrong, and that Polaris's interpretation was correct:

Q.      … Just the right-hand side, the: Begin engineering, procure materials, begin shop fabrication, and order equipment. TXIT wasn't responsible for any of that; right?

A.      No, sir. Polaris was.

Q.      Right. This was Polaris's indicators. This is what Polaris had to do; correct?

A.      Yes, sir.

. . . . .

Q.      Okay. So the second box: Engineering 35 percent. TXIT wasn't responsible for that; right?

A.      No, sir.

Q.      [As read:] Mobilizing to field. TXIT not responsible for that; right?

A.      No, sir.

Q.      [As read:] Completing 25 percent of shop fabrication. Is TXIT responsible for that? . . . TXIT was not responsible for that; correct?

A.      No, sir.

Q.      These are, again, all indicators for Polaris to earn the payment schedule; correct?

A.    These are -- yeah, they're milestone percentages of completion. Yes, sir.

Q.    Right. And TXIT wasn't responsible for any of that; right?

A.    We're not responsible to do the work. No, sir.

Q.    Exactly.

….

Q.    [As read:]  Engineering, 100 percent. Field installation, 50 percent. Shop fabrication, 100 percent. TXIT wasn't responsible for any of that; right?

A.    No, sir. That's Polaris's scope of work.

Q.    Exactly. . . . All these are Polaris's indicators. None of these are TXIT responsible for, correct?

A.    It's Polaris's scope of work.

2/28/24 AM Tr. at 61-64.

Because Polaris indeed made 100% of the required payments to its equipment vendors and completed the other listed milestones, Polaris earned the right to Progress Payment 5. And because TXIT never made the remaining progress payments 6-8, *supra* fn. 1, title to the equipment never passed to it. Therefore, Polaris cannot be liable for conversion as a matter of law.

### 2.    TXIT offered no competent evidence of conversion damages.

TXIT's conversion claim independently fails because it offered no competent evidence of the "market value" of the allegedly-converted equipment. Dkt. 714, p. 45. When Polaris identified this deficiency, TXIT pointed to Mr. Sullivan's testimony that the value of the equipment was $1 million, testimony that the jury apparently credited. *See*

3/4/24 Tr. at 130, 151-52; 3/5/24 AM Tr. at 16; 2/27/24 AM Tr. at 89-90. But that

testimony was entirely conclusory:

> Q.    And I want to talk about some of that equipment. Specifically, there were two gangways that Polaris has possession of. Is that right?
>
> A.    Right. And they still do today. Mr. Nodier attested to that. They're the access platforms from those large hose towers on the Dock, where the ship pilots and ship crews could access the shore. So it's a very customized unit that was purchased out of Spain, to reach out to the ship and allow the ship to go up and down. And Polaris diverted those to Lake Charles.
>
> Q.    And approximately what was the value of those two gangways?
>
> A.    More than a million, less than two, I believe. I don't really know the exact number.

2/27/24 AM Tr. at 89-90.

Mr. Sullivan provided *no* explanation as to how he arrived at his estimate. It was a

mere guess. This testimony does not constitute legally sufficient evidence of market value

under Texas law. *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 161 (Tex. 2012)

(holding that landowner's opinion testimony was conclusory and no evidence even though

he demonstrated that he was familiar with market values in the area because he failed to

explain the factual basis behind his determination of the diminution in property value to

which he opined); *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 790 (Tex. 2020)

(expert's testimony that business was valued at $12 million was conclusory and thus legally

insufficient to support damages award); *Zhu v. Lam*, 426 S.W.3d 333, 341 (Tex. App.—

Houston [14th Dist.] 2014, no pet.) (holding that testimony about property value "must be

substantiated; a naked assertion of market value is not enough" and that a "witness's

testimony is conclusory as a matter of law if he simply states a conclusion without any explanation." (cleaned up)).

Because TXIT failed to offer competent proof of the required element of damages, its conversion claim fails as a matter of law. *See United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147 (Tex. 1997) ("A plaintiff must prove damages before recovery is allowed for conversion.").

This Court should modify the judgment to eliminate the $1 million offset attributable to TXIT's conversion claim and render judgment that TXIT take-nothing on its conversion claim.

### B.   TXIT's promissory estoppel claim on behalf of GCC fails as a matter of law (Questions 34 and 35).

The Court offset Polaris's actual damages by $1,050,000 based on the jury's adoption of the TXIT/GCC promissory estoppel claim. *See* Dkt. 714 at 46; Dkt. 772 ¶ 2. Specifically, the jury found that GCC relied to its detriment on Polaris's promises about the Facility's performance regarding non-Table 1 crudes, and awarded damages based on the "reasonable expenditures made by GCC in anticipation of a timely, safe, and operational Facility." Dkt. 714 at pp. 47-48. This promissory estoppel theory fails as a matter of law for at least five independent reasons.

### 1. Because TXIT argued that alleged promises about non-Table 1 crude were incorporated by reference into the ISBL Agreement, they cannot be the basis of a promissory estoppel claim.

*First*, TXIT improperly argued that Polaris's alleged promises about the Facility's performance regarding non-Table 1 crudes were *inside the ISBL Agreement* for purposes of its breach claim (via alleged incorporation by reference of the FEL-2 contract), *see* 3/4/24 Tr. at 22-23, 162-64, but *outside the ISBL Agreement* for purposes of its promissory estoppel claim (because promissory estoppel claims cannot rest on a contractual promise).[2]

TXIT cannot have it both ways. It made its choice. In closing argument, TXIT asserted that Polaris breached the ISBL Agreement by failing to deliver on its alleged promises relating to non-Table 1 Crude performance:

> This whole notion about FEL-2 not being a part of the contract. Here is Mr. Nodier's testimony. This is what he says about FEL-2: "QUESTION: And entering 2887 as part of FEL-2 the study we looked at? ANSWER: Yeah, that's correct. QUESTION: And this phase 2 was made part of the contract?" ANSWER: Yes, that's correct. " *There is no question that the FEL-2, which is specifically referenced in the ISBL Agreement in TXIT Exhibit 1 is, in fact, part of this*. It was the design basis for the whole thing, and it started back in March of 2019. . . .
>
> So when we ask you in terms of whether they failed to comply, we're going to ask you to answer yes they did fail to comply. . . . They were telling us all the way through this time that they could do 17 percent naphtha, and they asked for the assay for D7169. And we gave it to them. And it was designed on that basis, *and the FEL-2 is incorporated in this contract*.

---

[2] In partially granting and partially denying Polaris's summary judgment motion on the promissory estoppel claim, the Court allowed the claim to survive to the extent it was premised on alleged promises regarding non-Table 1 crudes, because such alleged promises were *outside* the scope of the ISBL Agreement. Dkt. 491 at 16-23. TXIT therefore knew the risk of switching gears at trial and arguing that the alleged non-Table 1 crudes were *within* the scope of the ISBL Agreement.

3/5/24 PM Tr. at 47-48 (emphasis added).

Polaris tried to address this problem by seeking an instruction clarifying that any alleged promises in the FEL-2 Report were not incorporated by reference, but the Court denied the request. 3/4/24 Tr. at 58-59, 159-70. Still, the Court clearly recognized that there was an issue, stating: "**If we get an affirmative finding on promissory estoppel that I need to disregard and take away the damages, I will.** But that's where I am on this point." 3/4/24 Tr. at 170 (emphasis added). The Court should now follow through and take away the promissory estoppel damages because a promissory estoppel claim cannot rest on a contractual promise, as this Court has previously held. Dkt. 491 at 16 (citing *Dardas v. Fleming, Hovenkamp & Grayson, P.C.*, 194 S.W.3d 603, 621 (Tex. App.—Houston [14th Dist.] 2006, pet. denied)); *see also Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 226 (Tex. 2002).

### 2. TXIT failed to establish GCC's justifiable reliance on Polaris's purported promises as a matter of law.

*Second*, even if TXIT reverts to arguing that the alleged non-Table 1 promises were outside the ISBL Agreement, its claim would fail as a matter of law because TXIT cannot satisfy the third element of a promissory estoppel claim—that GCC substantially relied on the alleged promise to its detriment, and that such reliance was "reasonable and justified." *Walker v. Walker*, 631 S.W.3d 259, 264 (Tex. App.—Houston [14th Dist] 2020, no pet.); *Ortiz v. Collins*, 203 S.W.3d 414, 421 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

In such circumstances, TXIT would be improperly attempting to recover for a broken promise *contradicted by* a written agreement, which Texas law does not allow. *See Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 559 (Tex. 2019) (a conflict between an oral representation and an express contract's unambiguous terms negates justifiable reliance as a matter of law); *see also JPMorgan Chase Bank, NA v. Orca Assets GP, LLC*, 546 S.W.3d 648, 658, 660 n.2 (Tex. 2018).

The practical rationale for this principle is straightforward. "If written contracts are to serve a purpose under the law, relative to oral [or otherwise informal] agreements, it is to provide greater certainty regarding what the terms of the transaction are and that those terms will be binding, thereby lessening the potential for error, misfortune, and dispute." *DRC Parts & Accessories, LLC v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). An alternative rule "would defeat the ability of written contracts to provide certainty." *Id.* at 859. Therefore, when "[t]he subject matter of [extracontractual] representations" are "specifically dealt with at significant length in the contracts between the parties," there cannot be justifiable reliance. *Miller Global Props., LLC v. Marriot Int'l, Inc.*, 418 S.W.3d 342, 348 (Tex. App.—Dallas 2013, pet. denied).

This rule controls here. The only category of extracontractual promises that survived this Court's summary judgment were supposed promises "related to the facility's performance on crude with properties materially different than those outlined in Table 1." Dkt. 491 at 18. And the subject matter of these promises—the Facility's performance—is already expressly covered by the ISBL Agreement, the GCC-TXIT Tolling Agreement,

and the Terminal Services Agreement. *See, e.g.*, Dkt. 491 at 20-21 ("The ISBL Agreement expressly covers how the facility would perform with crude that meets the Table 1 properties or is not materially different from that crude. It also expressly covers when the facility would be ready for commercial operation."; "The GCC-TXIT Contract addresses the facility's start-up date and makes promises related to crude that meets 'Crude Oil Specifications.'"). These Agreements intentionally allocate the risk of any injuries related to the timeliness, safety, and functionality of the Facility. Therefore, to the extent Polaris, Mr. Nodier, or Mr. Obluda made other promises about the Facility's performance beyond the four corners of these agreements, GCC could not have justifiably relied on them.[3]

This argument is further bolstered by the ISBL Agreement's merger clause. Section 24.1 of the ISBL Agreement provides:

> This Agreement represents the entire agreement between the Parties hereto relating to the subject matter hereof and may be amended or varied only in writing by duly authorized representatives of the parties. *The Parties waive all provisions contained in any past agreement or correspondence which negate, limit, extend or conflict with the provisions herein.*

PX1, § 24.1 (emphasis added). Courts interpreting similar provisions have held that this language "prevent[s] reliance on any of the promises made before the [contract's] execution." *Spicer*, 616 S.W.3d at 124. Accordingly, any promises made prior to the ISBL Agreement's execution on March 16, 2019 are independently barred by the merger clause

---

[3] Common sense dictates the same result. The Agreement painstakingly sets forth the specific characteristics the crude must satisfy for the performance guarantees to apply. These provisions are rendered meaningless if TXIT was entitled to expect the same performance guarantees to apply to all other crudes based on extracontractual statements.

and cannot "provide a basis for [a] promissory estoppel award." *Spicer, Trustee for Est. of Brady v. Maxus Healthcare Partners, LCC*, 616 S.W.3d 59, 124 (Tex. App.—Fort Worth 2020, no pet.); *see also* Dkt. 199 at 38. GCC cannot establish the reasonable and justified reliance element of its promissory estoppel claims, and they should be barred.

### 3.    TXIT/GCC do not have standing to bring this claim.

*Third*, GCC—and therefore TXIT, its assignee—cannot establish Article III standing to pursue this claim. To establish constitutional standing, a party must demonstrate an (1) injury in fact, (2) which is fairly traceable to the challenged action of the defendant and is (3) likely to be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). An injury in fact must be "an invasion of a legally protected interest which is (a) concrete and particularized" and "(b) actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citation omitted). Because these elements are "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* Here, they must be "supported adequately by the evidence adduced at trial." *Id.* (quotation omitted).

TXIT cannot meet this bar. GCC's only purported "injury" stems from operational costs GCC paid to TXIT during the summer of 2020. But Polaris established at trial that these payments were strictly voluntary as to GCC—TXIT and GCC had a written

agreement that explicitly stated that GCC *did not have to pay* operational costs until after performance testing was completed, which never occurred.

Mr. Innes, TXIT's damages expert, explained as follows:

Q.      … So TXIT is the one that incurred the operation costs, correct, in 2020?

A.      They incurred the operation costs. They billed GCC. GCC actually paid the operating costs. So that is not in this agreement.

Q.      And you're saying because GCC is not a party to this agreement; right?

A.      That's right.

Q.      Yeah. So TXIT incurred the costs, and then GCC paid TXIT for the costs; right?

A.      Yes.

. . .

Q.      Okay. So the invoices that TXIT sends to GCC to have GCC pay TXIT for operating costs, those invoices start September 30th?

A.      That's correct.

Q.      And the notice of default was served on Polaris on September 3rd; correct?

A.      That's what I think you indicated, yes.

Q.      And that's the time that TXIT and GCC are telling Polaris, we don't think this facility works; right?

A.      That's correct.

Q.      And so GCC does not pay any money to reimburse TXIT for operation costs until after the parties were aware that they didn't think the facility worked; correct?

A.      That's right. Because TXIT is not going to recover those costs through the tolling fee because the facility is not working.

Q.      Okay. And when GCC paid that, GCC actually had no obligation to pay that according to the parties' written agreement. Isn't that true?

A.      You're talking about the tolling agreement between GCC and TXIT?

Q.      Yes.

A.      Yes.

 …

 Q.      And, in fact, in the written agreement between TXIT and GCC, there's a provision that specifically says: If the unit hasn't achieved the performance guarantee, TXIT has to take remedial action at its sole cost to get the unit to performance guarantee, doesn't it?

A.      Yes. That's the retrofit costs.

Q.      And there is also a processing fee that GCC agreed to pay to TXIT, as you mentioned before; correct?

A.      Yes.

Q.      But that provision says that those costs remain at TXIT's sole account if TXIT fails to operate as a prudent operator or breaches the agreement, including failing the performance test at 50,000, doesn't it?

A.      Yes.

…

Q.      You just agreed with me there is an agreement in writing saying that GCC did not owe those costs until the performance test is met. And you would agree with me that performance test was never met?

A.      That's right.

*See* 2/26/24 AM Tr. at 37–42.

In other words, to the extent GCC was injured, it was self-inflicted (and an attempt to circumvent the consequential damages limitation that was binding on TXIT) and therefore is not traceable to any breach by Polaris, Mr. Nodier, or Mr. Obluda. *See, e.g.*, *Zimmerman v. City of Austin*, 881 F.3d 378, 389–90 (5th Cir. 2018) ("Standing cannot be conferred by a self-inflicted injury"). Therefore, GCC—and TXIT, as its assignee—cannot establish standing to bring this claim.

### 4. The damages sought by TXIT were unrecoverable under a promissory estoppel theory.

*Fourth*, TXIT's damages for its promissory estoppel claim are legally barred.

In its final proposed jury charge—which this Court adopted in relevant part—TXIT included as the sole measure of promissory estoppel damages: "[t]he reasonable expenditures made by GCC in anticipation of a timely, safe, and operational Facility." Dkt. 708 at 405; Dkt. 714 at 47. At trial, TXIT's damages expert, Mr. Innes, characterized these amounts as $13,111,128 in costs to operate and maintain the Facility during the summer of 2020. 2/23/24 AM Tr. at 9–10.

But during closing arguments, TXIT urged the jury to include several other amounts in its promissory estoppel damages award, including:

- $3,268,955 in costs from re-selling crude and unused slurry—that is "startup costs"; and

- $1,913,306 in costs from the lost property value of the crude processed through the ISBL Facility.

3/5/24 PM Tr. 70–71. These amounts directly correspond to two other damages measures TXIT had previously included in its breach of contract and promissory estoppel damages questions in earlier versions of its proposed charge, but wholly omitted in the final version:

- "The reasonable costs and losses incurred by TXIT during startups of the ISBL Facility; and

- "[t]he lost property value of crude processed through the ISBL Facility which resulted in produced products that did not meet guaranteed product quality specifications."

*See* Dkt. 697 at 39–40; 41–42.[4] TXIT undoubtedly omitted these damages measures in its final proposed charge because it knew they were legally barred. The ISBL Agreement's consequential damages limitation and 10% damages cap preclude TXIT from recovering these damages under a breach of contract theory. And for the reasons discussed below, they are also barred under a promissory estoppel theory. But rather than adhere to its contract and Texas law, TXIT attempted to smuggle these damages in through its closing argument.

Regardless of whether TXIT submitted these damages through its charge or improper argument, they are unrecoverable. Even assuming TXIT could assert an offensive promissory estoppel claim (it cannot), only reliance damages would be recoverable. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 734 (Tex. 1981); *Metroplexcore, L.L.C. v. Parsons Transp. Inc.*, 743 F.3d 964, 977-78 (5th Cir. 2014). As Polaris explained in its Rule 50(a) motion, damages incurred re-selling crude and slurry are classic lost profits damages. Dkt. 705 at

---

[4] That TXIT included these damages measures in *both* its breach of contract damages and promissory estoppel damages questions in its prior charge further evinces its gamesmanship. As explained, TXIT has always aimed to use its promissory estoppel claim to recover for contractually-covered promises to evade the ISBL Agreement's consequential damages limitation and 10% cap.

20. The same goes for the lost property value of crude run through the ISBL Facility. *Id.* at 21.

The only claimed amounts resembling reliance damages are those GCC purportedly incurred for operating and maintaining the ISBL Facility during the summer of 2020. But these damages must be supported by evidence that TXIT justifiably relied to its detriment on an extracontractual promise. Again, the only eligible promise relates to the ISBL Facility's performance on non-Table 1 crudes. But TXIT's jury instruction setting forth the measure of damages in no way was tied to any alleged promise regarding non-Table 1 crudes. Dkt. 417 at 47.

And neither TXIT nor GCC presented any evidence that they relied to their detriment on any purported promise by Polaris regarding non-Table 1 crude or that they suffered any damages as a result of such reliance. In support of their promissory estoppel claim, TXIT and GCC focus on a December 11, 2018, email from Gerry Obluda. *See* DX88; 3/5/24 PM Tr. at 69-70. But TXIT conceded at trial:

> Q.    None of these crudes on TXIT Exhibit 88 were ever run during the Summer of 2020 except for 100 percent WTI MEH, correct?
>
> A.    Oh. Of the ones that are on the sheet, yes. Yeah, I think that's true."

2/20/24 PM Tr. at 69-70. So even if TXIT were to attempt to expand its argument to rely on other purported promises, TXIT has presented no evidence that any non-Table 1 crude ever referenced by Polaris was run through the Facility in the summer of 2020.

TXIT's damages are legally improper and unsupported by the evidence. Absent any evidence of detrimental reliance or damages, TXIT's and GCC's promissory estoppel claims are barred as a matter of law. *See English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983) (holding that a promissory estoppel claim was not viable where the plaintiff failed to present any evidence of detrimental reliance or damages).

> **5.** **GCC's promissory estoppel claim is barred because promissory estoppel cannot be asserted offensively.**

*Finally*, GCC, via TXIT, is not permitted to use the doctrine of promissory estoppel offensively to obtain damages (or here, an offset). Under Texas law, promissory estoppel is a defensive doctrine and cannot be used to "affirmatively create contract rights." *Construcciones Industriales Del Golfo, S.A. de C.V. v. Searex, Inc.*, 182 F.3d 914 (5th Cir. 1999); *Stanwood Boom Works, LLC v. BP Expl. & Prod., Inc.*, 476 Fed. Appx. 572, 576 (5th Cir. 2012) (internal citation omitted) (same); *see also In re Weekley Homes, L.P.*, 180 S.W.3d 127, 133 (Tex. 2005) (orig. proceeding) ("Promissory estoppel does not create liability where none otherwise exists . . ."); *Moore Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 936 (Tex. 1972) ("Promissory estoppel is a defensive plea; it is a plea in confession and avoidance."); *Stanley v. CitiFinancial Mortg. Co., Inc.*, 121 S.W.3d 811, 820 (Tex. App.—Beaumont 2003, pet. denied) ("[P]romissory estoppel is defensive only, and cannot constitute a basis for affirmative relief.").

In other words, Texas law only recognizes promissory estoppel as a *defense* to an "attack on the enforceability" of an extracontractual promise. *Robbins v. Payne,* 55 S.W.3d

740, 747 (Tex. App.—Amarillo 2001, pet. denied) ("Promissory estoppel is a defensive doctrine which permits one who has relied on a promise to prevent an attack on the enforceability of the promise.). Because TXIT attempted to use promissory estoppel as a sword, not a shield, this claim fails. *Id.*

\* \* \*

In sum, TXIT's promissory estoppel claim fails as a matter of law for each of the five independent reasons set forth above. Accordingly, the Court should modify the judgment to eliminate the offset for TXIT's recovery on this claim.

### C.    The evidence conclusively established that TXIT breached the OSBL Engineering Agreement and that Polaris suffered $537,000 in damages (Questions 23 and 24).

Because the evidence conclusively established that TXIT failed to comply with the OSBL Engineering Agreement by failing to make Progress Payment 5 under that agreement, this Court should disregard the jury's contrary finding in Question 23 (Dkt. 714, p. 33) and amend the judgment to award an additional recovery of $537,000.

Mr. Sullivan admitted that TXIT never paid the invoice for Progress Payment 5 in the amount of $537,000. 2/28/24 AM Tr. at 45-48; PX592_0001 (listing the progress payment invoice date and amount, among damages); PX592A_0043-44 (copy of invoice). His excuse for nonpayment was that he did not get the work product *before* he paid the bill:

> Q.    Let's talk about the OSBL engineering contract. You were presented with an invoice for $537,000 for the balance owed for the engineering documents. And you had the option to pay the $537,000 instead of going out and hiring any other third parties to perform engineering drawings; correct?

A.      This is I believe -- if I recall correctly, this is one where we requested for -- we requested the documents before we would pay the bill, but we never got the manuals, the engineering drawings. We wanted the product and we would pay for it, but we did not ever see the engineering product.

Q.      Because you hadn't paid for it. You had not paid for the documents; correct?  That's your testimony?

A.      Providing the engineering documents was a condition of payment that was … Give us the product, we'll give you the money.

…

Q.      So if the invoice wasn't paid, it was because you chose not to pay it?

A.      I chose not to pay it because we did not receive the work product. We did not receive the work.

Q.      Because you hadn't paid for it; correct?

A.      Mr. Guerino, I don't know if the chicken goes before the egg. Typically you get a product, then you pay the bill.

2/28/24 AM Tr. at 45-48.

Mr. Sullivan's insistence on delivery before payment directly contradicts paragraph

22 of the OSBL Engineering Agreement, which provides:

OWNERSHIP: *Upon payments of all amounts due and owing hereunder*, Company [TXIT] shall own and hold all right, title and interest in and to all work product generated hereunder . . . .

PX3, ¶ 22 (emphasis added).

TXIT thus had no excuse for its non-payment of Progress Payment 5. There is no

doubt the work was performed and that TXIT received the benefit of the work—the design

drawings were used to build the OSBL Facility. Polaris never would have agreed to provide

the engineering drawings to TXIT before final payment, because TXIT could have shared

those drawings with Polaris's competitors to undercut Polaris's pricing. This Court should modify its judgment and rule that TXIT breached the OSBL Engineering Agreement as a matter of law, and increase the actual damages awarded by $537,000.

**II.     Regardless of the outcome of any challenge to the jury's prior material breach finding, TXIT's claim for breach of the ISBL Agreement fails as a matter of law for many other reasons.**

This Court correctly applied the jury's finding that TXIT committed the first material breach of the ISBL Agreement and, thus, declined to award TXIT any damages on this claim. As a result, *this Court need not reach the arguments in this Part of the Motion.* However, in an abundance of caution, Polaris continues to assert the following challenges to the jury's answers to Questions 4-6 and 12, which constitute separate and independent grounds to support the take-nothing judgment on TXIT's ISBL breach of contract claim.

**A.     The evidence conclusively established that TXIT accepted the ISBL Facility and, thus, its exclusive remedy was a warranty claim (Question 4).**

TXIT's breach of contract claim fails as a matter of law because the evidence conclusively established that TXIT accepted the facility.

"Breach of contract and warranty claims are distinct causes of action under Texas law and provide for different remedies, and Texas law forbids conflating breach of warranty and breach of contract." *Baker Hughes Process & Pipeline Servs., L.L.C. v. UE Compression, L.L.C.*, 938 F.3d 661, 666 (5th Cir. 2019). Whether a contract is one for goods governed by the UCC or for services governed by the common law, the rule is same: If a party finally

accepts goods or services, its exclusive remedy is for breach of warranty. *Id.*; *accord Southwestern Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572 (Tex. 1991).

Because the evidence conclusively establishes that TXIT accepted the ISBL Facility, its breach of contract claim fails as a matter of law. *See Golden Spread Coop. v. Emerson Process Mgmt. Power & Water Solutions, Inc.*, 360 F. Supp. 3d 494, 507 (N.D. Tex. 2019), *aff'd* 954 F.3d 804 (5th Cir. 2020) (holding that "[b]ecause GSEC accepted the DCS, it cannot maintain a breach of contract action and is limited to only a warranty claim" and remanding for district court to enter summary judgment for defendant); *Orthoflex, Inc. v. ThermoTek, Inc.*, Nos. 3:11-CV-0870-D, 3:10-CV-2618-D, 2013 WL 4045206, at *8 (N.D. Tex. Aug. 9, 2013) ("Because plaintiffs accepted the products, they cannot maintain a breach of contract action, and this claim is dismissed.").

As the Court correctly instructed, acceptance occurred if:

1) after a reasonable opportunity to inspect the Facility, TXIT took or retained ownership of the Facility in spite of any non-conformity, OR

2) TXIT failed to notify Polaris, within a reasonable time after Mechanical Completion and after TXIT had a reasonable opportunity to inspect the Facility, that it was rejecting the Facility, OR

3) TXIT took any act inconsistent with Polaris's ownership of the Facility, such as altering or changing the Facility.

Dkt. 714 at p. 10; *see also* Tex. Bus. Com. Code § 2.606(a). While any one of these criteria is sufficient, here all three have been established as a matter of law.

### 1. TXIT took and retained the Facility.

It is undisputed that after Mechanical Completion, TXIT took over custody and control of the Facility *and has retained and operated (and handsomely profited from) the Facility to this day*—with full knowledge of all of its alleged "nonconformities."[5] Thus, TXIT's remedy for any alleged defect in the Facility was to assert a warranty claim under the ISBL Agreement's exclusive warranty provision (which it failed or refused to do); TXIT's breach of contract claim is barred as a matter of law. *See, e.g.*, *Golden Spread Elec. Coop.*, 360 F. Supp. 3d at 507; *Orthoflex, Inc.* 2013 WL 4045206, at *8.

### 2. TXIT never rejected the Facility.

The evidence also conclusively established that TXIT failed to reject the Facility within a reasonable time after Mechanical Completion. "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." Tex. Bus. & Com. Code Ann. § 2.602(a). "[A]fter rejection any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller." *Id*. § 2.602(b).

---

[5] 2/20/24 AM Tr. at 12-15 (Harrison testifying that TXIT produced naphtha and MFO product that was sold in 2020), at 25 (Harrison testifying that TXIT had contracts to sell naphtha and MFO in 2020, which it fulfilled); 2/27/24 PM Tr. at 68 (Sullivan testifying that TXIT operated Facility throughout summer of 2020 and reached stable operations); at 79-80 (Sullivan admitting TXIT ran 804,000 barrels through Facility in 2020 and sold products produced, including naphtha and MFO), at 99-101 (Sullivan testifying that TXIT hired "multiple engineers" other than Polaris and retrofitted Facility to the tune of $64M), at 104-05 (Sullivan testifying that TXIT retrofitted Facility in 2021 and has been making product since); 2/8/24 Tr. at 129-31 (Polaris expert referencing PX558_0015 and testifying as to TXIT actual crude runs and portions of its profits in 2022 and beyond).

Under section 10.1(c) of the ISBL Agreement, titled "Owner Approval or Rejection," TXIT was afforded twenty-four hours to inspect the Facility after notice of Mechanical Completion to identify any potential defects warranting correction or rejection. PX1 § 10.1(c). After that point, TXIT's available remedy was a warranty claim—not rejection. PX1 § 13.4. It is undisputed that within this twenty-four hour period, TXIT did not reject the Facility. Indeed, *ten days* after Polaris notified TXIT that the Facility was mechanically complete, TXIT gave Polaris a signed Certificate of Mechanical Completion. 2/6/24 PM Tr. at 69. TXIT did not timely reject the Facility, and therefore TXIT's breach of contract claim is barred as a matter of law. *See Golden Spread*, 360 F. Supp. 3d at 507.

### 3. TXIT exercised control over the Facility in a manner inconsistent with Polaris's ownership of the Facility.

Finally, the evidence conclusively establishes that TXIT exercised control over the Facility in a manner inconsistent with Polaris's ownership. "If a buyer retains and uses, alters, or changes the goods, it will be found to have accepted them." *Baker Hughes*, 938 F.3d at 667; *see also SB Int'l, Inc. v. Mike Jordan Co., Inc.*, No. 3:08-CV-1091-P, 2009 WL 10704364, at *2 (N.D. Tex. June 3, 2009) ("There is no shortage of cases in Texas finding that a buyer's post-rejection repair, modification, or use of non-conforming goods constitutes acceptance as a matter of law."). TXIT sought more than $64 million in "Retrofit Costs" for alleged modifications that it made to the Facility. *See* 2/26/24 AM Tr. at 5. By choosing to make those modifications, TXIT accepted the ISBL Facility as a matter of law and its breach of contract claim is barred.

### 4. TXIT did not plead, prove, or obtain a jury finding that it revoked acceptance of the ISBL Facility.

TXIT argued that it "justifiably revoked any acceptance" because upon discovering alleged "latent defects" in the Facility, "TXIT promptly informed Polaris and asked Polaris to fix its errors" through its September 14, 2020 Notice of Default. Dkt. 656 at 7-9. But it was TXIT's burden to plead, prove, and submit a jury question on revocation of acceptance, which TXIT did not do. *See Transoil (Jersey) Ltd. v. Belcher Oil Co.*, 950 F.2d 1115, 1120 (5th Cir. 1992); *Coastal Javelina, Inc. v. Caldwell Mktg., Inc.*, No. 13-98-117-CV, 1999 WL 34973403, at *10 (Tex. App.—Corpus Christi Aug. 26, 1999, no pet.). Accordingly, this issue is waived.

Even if TXIT could introduce a revocation theory at this late stage (which it cannot), TXIT's rejection could only remain effective if it abstained from using the Facility after it discovered it was non-conforming. Under Texas law, "[a]cceptance may still occur even after a proper rejection has occurred." *Bacchus Indus. Inc. v. Frontier Mech. Contractors*, 36 S.W.3d 579, 586 (Tex. App.—El Paso 2000, no pet.). When a party, after properly revoking its acceptance, goes on to extensively use and perform "acts of ownership" following revocation, the revocation is ineffective and the party's remedy lies in warranty, not breach of contract. *Id.*; *see also Bowen v. Young*, 507 S.W.2d 600, 604–05 (Tex. App.—El Paso 1974, no writ). And while some lower court cases suggest that temporary "reasonable use" of an asset may not defeat an attempt to revoke acceptance, there is nothing reasonable or limited about TXIT's $64 million retrofit. *See Toshiba Mach. Co., Am. v. SPM Flow Ctrl., Inc.*, 180

S.W.3d 761, 774-75 (Tex. App.—Fort Worth 2005, pet. granted, judg. vacated w.r.m).

Additionally, these cases state that reasonable use must occur while "the seller is promising

or trying unsuccessfully to cure the nonconformity"—which TXIT itself barred Polaris

from attempting. *Id.* TXIT plainly cannot keep, retrofit, and profit from the Facility, refuse

to allow Polaris an opportunity to correct any purported defect, and nonetheless claim that

it should get its money back.

* * *

For all the foregoing reasons, the evidence conclusively establishes that TXIT

accepted the ISBL Facility and never justifiably revoked its acceptance. Accordingly, its

claim for breach of the ISBL Agreement is barred is barred as a matter of law.

### B.   TXIT's claim for breach of an alleged performance guarantee relating to naphtha fails as a matter of law (Question 5).

TXIT's claim that Polaris breached the ISBL Agreement by failing to construct a

Facility that could meet Table 2's performance guarantee rests on a patently unreasonable

interpretation of the contract. Therefore, this theory of breach fails as a matter of law.

Throughout this litigation, the parties pressed competing interpretations of the

ISBL Agreement's performance guarantee, listed in Table 2 of Appendix F:

**Table 2**
**Performance Guarantee**

| Criteria | Minimum | Maximum | Method | Tolerance |
|---|---|---|---|---|
| Crude Feed Rate, BPD | 50,000[5] | | Orifice Plate | +/- 5% |
| MFO Yield, LV% on Crude | 42.6[6] | | Orifice Plate | +/-10% |
| MFO Product Flash Point, °F | 140 | NA | D93 | -0% |
| MGO Yield, LV% on Crude | 35.4[6] | | Orifice Plate | +/-10% |
| MGO Product Flash Point, °F | 140 | NA | D93 | -0% |
| Naphtha Yield, LV% on Crude | | 18.8[6] | Orifice Plate | +/-10% |
| Naphtha Product Reid Vapor Pressure, psi | NA | 9.0 | ASTM D323 | -0% |
| Naphtha Product Color | +20 | | Saybolt ASTM 156 | -0% |

Polaris contends that Table 2 guaranteed that if the Facility were running at its full capacity of 50,000 barrels per day, its naptha circuit could process up to 18.8% of that crude—or 9,400 barrels per day—of naptha. TXIT claims that Table 2 guaranteed that any barrel of crude run through the Facility—no matter its makeup—would never yield more than 18.8% naphtha. Dkt. 317 at 22. Considering the commercial context on the contract, TXIT's interpretation is unreasonable and fails as matter of law.

Texas courts "read contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served and avoiding unreasonable constructions when possible and proper." *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020). In this case, the parties contracted for the construction of a "simple crude processing unit." *See* PX1, Appendix A (scope of work); 2/8/24 PM Tr. at 58-59 (Polaris expert explaining that TXIT Facility is a "simple distillation facility" that "can only separate what is in the existing crude."). As industry professionals on both sides of this litigation have testified, it is impossible for a "simple crude processing unit" to

overcome the laws of nature and reduce the amount of naphtha in a barrel of crude. *See* 2/6/24 PM Tr. at 80–81; 2/27/24 AM Tr. at 126–27; 2/27/24 PM Tr. at 126.

Texas courts will not adopt an interpretation that (1) leads to absurd or impossible results, *see, e.g.*, *Kourosh Hemyari v. Stephens*, 355 S.W.3d 623, 626 (Tex. 2011) (per curiam), (2) is inequitable and oppressive, s*ee Brazos Contractors Dev., Inc. v. Jefferson*, 596 S.W.3d 291, 302 (Tex. App.—Houston [14th Dist.] 2019, pet. denied), or (3) renders portions of the contract superfluous, *Ill. Tool Works, Inc. v. Harris*, 194 S.W.3d 529, 537 (Tex. App.—Houston [14th Dist.] 2006, no pet.).[6] Adopting an interpretation that assumes that Polaris contracted to undertake an impossible task violates all three of these principles.

Because TXIT's claim that Polaris breached the performance guarantees in Table 2 is predicated on its erroneous interpretation of Table 2, it fails as a matter of law.

### C.   TXIT's claim for breach of a performance guarantee relating to non-Table 1 crude fails as a matter of law (Question 6).

Mid-trial, TXIT attempted to assert a new and unpled theory under the ISBL Agreement for breach of alleged performance guarantees related to non-Table 1 crude. This theory fails as a matter of law on numerous independent grounds.

---

[6] This conclusion is bolstered by Footnote 6, which would be rendered meaningless under TXIT's interpretation. Footnote 6 states that the "Yield[s] LV% on Crude" are "predicated" on "full design firing rates of the crude charge" (that is, 50,000 barrels per day). If, as TXIT asserts, the completed Facility could convert one product into another, it would be irrelevant what the firing rates were, and Footnote 6 would be mere surplusage. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("[C]ourts should examine and consider the *entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." (emphasis in original)).

To begin, the ISBL Agreement does not contain any performance guarantees related to non-Table 1 crude. To the contrary, it expressly states that: "The Green Marine Fuels Project performance guarantee is *limited* to the processing of crude oil conforming to the properties cited in Table 1 below." *See* PX1, Appendix F. On summary judgment, this Court concluded that: "Appendix F unambiguously states that the crude must either have the properties in Table 1 or have distillation curves not materially different from the curve in Table 1 for the Table 2 performance guarantee to apply." Dkt. 490 at 21.

In an attempt to circumvent the express language of the contract, TXIT claimed that the FEL-2 Report, which TXIT alleges makes performance guarantees related to non-Table 1 crude, was incorporated by reference into the ISBL Agreement. But TXIT failed to plead or even raise the theory of breach of a "promise" in the FEL-2 Report until halfway through trial. *See* 2/21/24 PM Tr. at 59–60. Accordingly, it is waived. *See Jimenez v. Tuna Vessel Granada*, 652 F.2d 415, 420–22 (5th Cir. Unit A July 1981) (holding party could not recover on unpled claim when party did not have notice issue was being tried).

Moreover, TXIT judicially admitted that the ISBL Agreement *does not* make any guarantees as to non-Table 1 crudes. "A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them." *Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476 (5th Cir. 2001). "It has the effect of withdrawing a fact from contention" and is binding absent leave to withdraw it. *Id.* at 476-77. TXIT explicitly argued to this Court that any promises relating to non-Table 1 crude were "entirely outside of the [ISBL Agreement's] scope." Dkt. 327 at 9. TXIT's statement

was "clear, unambiguous, and intentional" and TXIT "has made no attempt to seek leave of the Court to withdraw it." *See Johnson v. Idexx Labs., Inc.*, No. 3:06-cv-381-m, 2007 WL 1650416, at *1 (N.D. Tex. June 4, 2007). Therefore, TXIT is barred from now arguing that the ISBL Agreement contains promises related to non-Table 1 crude.

TXIT is also judicially estopped from asserting this contradictory position. A party is judicially estopped from pressing an argument when (1) it "has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (en banc). Here, TXIT not only intentionally asserted an inconsistent position (as set forth above), but this Court *agreed* with that prior position. In its order partially denying Polaris's motion for summary judgment, the Court held that TXIT could assert GCC's promissory estoppel claim based on "promises about crude that has distillation curves materially different from those outlined in Table 1 of the ISBL Agreement" because these were promises "outside of the contract's scope." Dkt. 491 at 18-19. Because TXIT induced this Court to rely on its position in ruling on the merits of its promissory estoppel claim, TXIT is estopped from now taking the opposite position. *Reed*, 650 F.3d at 574. TXIT cannot have it both ways.

And even putting judicial admissions and estoppel aside, TXIT is wrong that the ISBL Agreement expressly incorporates a performance guarantee relating to non-Table 1 crudes. TXIT's radical shift in position during trial came as the result of its reliance on the FEL-2 Report, which mentions certain non-Table 1 crudes. *See* DX90. As discussed, at trial

TXIT erroneously claimed that the FEL-2 Report is explicitly incorporated by reference into the ISBL Agreement. It relied solely on the following cursory reference in Appendix A of the agreement: "The Work is based on preliminary engineering and design performed by Contractor and transmitted in the FEL-2 Report by Contractor to Owner on December 27, 2018 and is subject to change with the subsequent development of detailed engineering and design." PX1 at p. 67. This statement is insufficient, as a matter of law, to explicitly incorporate all the terms of the FEL-2 Report into the ISBL Agreement.

For one document to incorporate another by reference, it must do so "plainly" and unambiguously. *Trico Marine Servs., Inc. v. Stewart & Stevenson Tech. Servs., Inc.*, 73 S.W.3d 545, 550 (Tex. App.—Houston [1st Dist.] 2002, no pet.). "The language in the signed document must show the parties intended for the other document to become part of the agreement." *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.). "A mere reference to another document is insufficient to establish a wholesale incorporation of the referenced document." *Tribble & Stephens Co. v. RGM Constructors, L.P.*, 154 S.W.3d 639, 665 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); *see also Bob Montgomery Chevrolet*, 409 S.W.3d at 189 ("Plainly referring to a document requires more than merely mentioning the document."). The ISBL Agreement's "mere reference" to the FEL-2 Report in an appendix, which does not plainly state that the parties intended to be bound by all the terms of the FEL-2 Report, is insufficient, as a matter of law, to establish incorporation by reference.

Moreover, the contract itself excludes the FEL-2 Report from the scope of work. The very first paragraph of Appendix A makes clear that "Sections 1, 2, 3 and 4 [of the ISBL Agreement] comprise the Work." *See* PX1, App. A - Definition of the Work. And as Mr. Sullivan acknowledged, none of these sections included any promises about non-Table 1 crude. 2/27/24 PM Tr. at 113-14. Therefore, the FEL-2 Report was not incorporated into the ISBL Agreement as a matter of law.

Finally, even assuming for the sake of argument that the FEL-2 Report were incorporated by reference into the ISBL Agreement (which it is not), TXIT still has presented no legally sufficient evidence of any enforceable promise or performance guarantee relating to non-Table 1 crudes. The FEL-2 Report is an *informational study*, it does not contain any enforceable promises or performance guarantees. *See* DX90.

For all the foregoing reasons, TXIT's claim under the ISBL Agreement for breach of a performance guarantee relating to non-Table 1 crudes fails as a matter of law.

### D.    TXIT's ISBL damage claims fail as a matter of law (Question 12).

The purported damages TXIT seeks for breach of the ISBL Agreement are barred by either Texas law or the Agreement itself.

#### 1.    TXIT's claim for liquidated damages under Article XI of the ISBL Agreement fails as a matter of law.

TXIT's claim for liquidated delay damages fails as a matter of law because there is undisputed evidence that any delay in the "Guaranteed Readiness for Commercial Operation Date" was caused in whole or in part by TXIT's conduct.

"An owner may not recover damages for the contractor's delay where the delay resulted from acts or omissions of both the contractor and the owner even if the contract expressly so provides." 10 TEX. JUR. 3D BUILDING CONTRACTS § 22; *accord Cobb Mech. Contrs., Inc. v. Morganti Grp., Inc.*, No. 4:06-CV-00183, 2007 WL 9736077, at *5 (S.D. Tex. Aug. 24, 2007) ("Unless all of the events causing a critical path delay are within the exclusive control of one party, then such a delay is described as a 'concurrent' delay. Concurrent delays are treated as excusable but non-compensable, so neither party can recover monetarily."); *see also Herron v. Lackey*, 554 S.W.2d 708, 711 (Tex. App.— Beaumont 1977), *aff'd as reformed*, 556 S.W.2d 246 (Tex. 1977) (holding that an owner could not recover for concurrent delay).

Here, the evidence conclusively establishes that any delay in the "Guaranteed Readiness for Commercial Operation Date" was caused in whole—or at the very least in part—by TXIT, including but not limited to delay in the construction of helical piles for the pipe-racks and provision of permanent electricity (on top of delays outside Polaris's control due to Hurricanes Laura and Delta, Tropical Storms Beta and Imelda, COVID, and a gas leak). *See, e.g.*, PX197, 199, 436, 593A; 2/7/24 AM Tr. at 23-48; *see also* PX568; 2/12/24 PM Tr. at 33–34 (discussing "bureaucratic shuffle" to get change orders approved); 2/13/24 PM Tr. at 21, 31–36; 2/29/24 PM Tr. at 48 (discussing delays caused by provision of permanent electricity were caused by TXIT.).

Accordingly, the Court should enter judgment as a matter of law against TXIT on its claim for liquidated delay damages under the ISBL Agreement. *See Cobb Mech. Contrs., Inc.,* 2007 WL 9736077, at *5; *Herron,* 554 S.W.2d at 711.

### 2.      TXIT's claim for retrofit costs fails as a matter of law.

TXIT's claim for "costs to complete the Facility" (i.e., retrofit costs) fails as a matter of law on numerous independent grounds.

*First*, retrofit costs are a legally erroneous measure of damages. Where, as here, an owner claims that a contractor has not substantially complied with the contract terms— i.e., that the contractor committed a material breach of contract—the correct measure of damages is the "difference between the value of the building as constructed and its value had it been constructed in accordance with the contract." *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 164 (Tex. 1982). Remedial damages, such as retrofit costs, are not recoverable. *Id.*; *Hutson v. Chambless*, 300 S.W.2d 943, 945 (Tex. 1957) (holding that the trial court erred in submitting cost of repair damages).

TXIT claims that section 16.2 of the ISBL Agreement overrides this Texas Supreme Court authority because, upon a contractor default, it permits TXIT to enter the Facility and "either itself or through others complete the Work." PX1 § 16.2. But TXIT did not complete unfinished work—it undertook a massive retrofit costing more than the original contract price. Nothing in the terms of section 16.2 permitted TXIT to do so. To the contrary, the ISBL Agreement makes a distinction between the completion of work unfinished and the "correction of work" already performed. *See* PX1 §§ 13.3, 16.2. The

correction of work is addressed by the exclusive warranty in Article XIII of the agreement. *See* PX1 §§ 13.3. But TXIT has never asserted a claim for breach of warranty.

*Second*, there is no evidence of the proper measure of damages. To recover difference-in-value damages, TXIT needed to provide "proof of the difference in market value of what was received and what was contracted for." *Harrison v. Dall. Ct. Rep. Coll., Inc.*, 589 S.W.2d 813, 816 (Tex. App.—Dallas 1979, no writ). TXIT did not offer evidence of either. And since TXIT has completely rebuilt the ISBL beyond recognition, there is no way for it to now prove the original value of the structure Polaris built. The Texas Supreme Court has held that this error is fatal to a party's claim for damages for breach of a construction contract. In *McGinty*, a homeowner similarly erred by solely seeking unreasonable repair costs for a contractor's defective construction. 372 S.W.3d at 628. The Court rejected the contention "that the jury could have reasonably inferred that the difference-in-value damages . . . were close to the cost of repair." *Id.* at 628. It concluded that because the owner "offered no evidence of the value of his house at the time of closing," he was barred from recovering any damages, regardless of the contractor's breach. *Id.* at 629. Here too, TXIT's defective damage theory precludes its recovery.

*Third*, TXIT's retrofit costs are barred by the doctrine of unreasonable economic waste. Under Texas law, an owner can only recover remedial damages "[w]here the correction of defects and deviations would not impair the structure as a whole, or require great expense or unreasonable economic waste." *Fid. & Deposit Co. of Md. v. Stool*, 607 S.W.2d 17, 21 (Tex. App.—Tyler 1980, no writ). When the expense of completing or

repairing a structure "is almost as much as the original contract price," those expenses constitute "unreasonable economic waste" as a matter of law. *See Hutson v. Chambless*, 300 S.W.2d 943, 945 (Tex. 1957) (quotation omitted). At trial, TXIT requested $64,446,217 in retrofitting costs, more than $5 million above the ISBL Agreement's contract price of $$59.2 million. *See* PX1, § 7.1. This evidence alone establishes that TXIT's purported attempt to "repair" the Facility constituted economic waste as a matter of law.

And although the jury did not award the full amount requested by TXIT, its award of more than $17.8 million (roughly one third of the contract price) remains a "great expense" that independently constitutes economic waste. *See Hutson*, 300 S.W.2d at 944-45. In *Huston*, the parties contracted to build a house for $16,750. *Id.* at 944. The jury found that the contractor deviated from specifications and the judgment awarded him $6,000 (roughly one third of the contract price) to repair the home. *Id.* The Texas Supreme Court reversed the award of damages, noting that: "It is manifest that to measure the owner's damage by the cost necessary to make the building conform to the contract would often be an injustice, because in many instances such cost would amount to almost as much as the original contract price." *Id.* at 945. It held that the proper measure of damages was "the difference between the value of the building as constructed and its value had it been constructed in accordance with the contract"—a measure that again TXIT neither pled, proved, nor obtained a jury finding on. *Id.*

*Fourth*, for the same reasons just stated, there is legally insufficient evidence that any of the retrofit costs that TXIT incurred were "reasonable and necessary." *See McGinty*

*v. Hennen*, 372 S.W.3d 625, 626 (Tex. 2012) ("A party seeking to recover remedial damages must prove that the damages sought are reasonable and necessary.").

*Fifth*, a substantial portion of the retrofits costs that TXIT sought are barred by the terms of the ISBL Agreement itself, including section 12.3 of the ISBL Agreement, which bars any recovery of "special, *indirect*, punitive or *consequential damages* of any nature whatsoever, including loses or damages caused by reason of unavailability of the Facility, shutdowns or service interruptions, loss of use, loss of profits or revenues, inventory or use charges, cost of purchased or replacement power, interest charges or cost of capital or claims of Owner's customers." PX1 § 12.3 (emphasis added). The following categories of retrofit costs are barred:

- **Payments to subcontractors and vendors**. TXIT sought damages for costs attributable to settlement payments to Polaris's subcontractors and vendors for amounts owed. *See* DX1046, 1087, 1095; 2/22/24 PM Tr. at 159–62. These damages are barred because:

  - ➤ They stem from contracts with third-parties and, therefore, are unrecoverable consequential damages. *See Hoppenstein Props., Inc. v. McLennan Cnty. Appraisal Dist.*, 341 S.W.3d 16, 21 (Tex. App.—Waco 2010, pet. denied) (holding that profits lost on third-party contracts are consequential damages); *Cherokee Cnty. Cogeneration Partners, L.P. v. Dynegy Mktg. & Trade*, 305 S.W.3d 309, 314 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (same).

  - ➤ They are "indirect" damages because they are several "link[s] in the causal chain" away from any breach by Polaris. *See Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 119 (Tex. App.—Houston [1st Dist.] 2011, no pet). For TXIT to incur these losses from any breach by Polaris, (1) Polaris would have needed to have intentionally declined to pay its vendors and subcontractors, (2) these third parties would have needed to execute liens on the Facility, and (3) TXIT would have needed to take it upon itself to settle these claims.

- **Start-up purchases of crude.** The retrofit damages also include start-up purchases of crude, which are barred because:

  ➢ They are "costs of capital" and "loss of use" damages that are explicitly barred by section 12.3.

  ➢ The Agreement explicitly allocates the responsibility for providing start-up crude to TXIT—not Polaris. *See* PX1, Appx G (listing under "Owner's Responsibilities": "Provide Crude in compliance with Table 1 of Appendix F at a sustainable rate of 50,000 BPD" for performance test).

  ➢ TXIT failed to plead for damages due to failed startups and lost property value of crude in connection with its breach of contract claims. TXIT pled for these damages solely in connection with its negligence claims. Dkt. 199 at 36; *see Boat Superstore, Inc. v. Haner*, 877 S.W.2d 376, 379 (Tex. App.—Houston [1st Dist.] 1994, no writ).

  ➢ The evidence conclusively established that these damages were incurred by GCC, not TXIT. *See* 2/26/24 AM Tr. at 5. Alternatively, to the extent these damages were incurred by TXIT (and there is no evidence they were) awarding TXIT these damages would provide it with a double recovery because TXIT conceded GCC already reimbursed it for damages pursuant to an oral agreement. *See* 2/26/24 AM Tr. at 37–42; *see also* Dkt. 528-3 at 6, 11-13. (Second Supplemental Report of Phillip Innes).

  ➢ TXIT cannot establish that these damages resulted from Polaris's breach. These damages purportedly occurred when the Facility was in TXIT's custody and control and while TXIT was actively in breach of the ISBL Agreement's notification of stable operations and performance testing requirements. Dkt. 490 at 21.

  ➢ TXIT cannot establish that these categories of damages were "foreseeable and directly traceable to [Polaris's] wrongful act." *See Basic Cap. Mgmt. v. Dynes Comm., Inc.*, 348 S.W.3d 894, 901 (Tex. 2011) (quotation omitted); *see also Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016) (superseding cause cuts off liability). This Court ruled that (1) the Table 2 Performance Guarantee only applied to Table 1-conforming crude, Dkt. 490 at 22–23, and (2) TXIT's experts

are precluded from presenting testimony resting on assumptions to the contrary, Dkt. 564 at 5. But the record is clear that at least some of the crude TXIT used during startup in the summer of 2020, and for which it is now seeking damages, did not conform to Table 1.

- **Security costs.** Finally, the retrofit damages include security costs, which are barred because:

  ➢ They are explicitly excluded by Appendix A of the ISBL Agreement, which states that "security costs" are "not part of the Work and are not included in the Contract Price." *See* PX1 Appx A.

  ➢ Moreover, because these damages are excluded from the scope of work, as a matter of law, they are not foreseeable and, thus, are also barred by section 12.3 as consequential damages.

*Sixth*, TXIT sought $685,000 in retrofit costs allegedly attributable to a failed heat exchanger, but TXIT's expert conceded that any such failure occurred in late 2023. *See* 2/22/24 PM Tr. at 147 (testifying that the failure occurred "very late last year, middle of the year"). The ISBL Agreement defines the "Warranty Period" as "commencing upon Mechanical Completion and ending twenty-four (24) months thereafter." PX1 Art. 1. As this Court found on summary judgment, Mechanical Completion occurred on May 21, 2020, when Polaris submitted a notice of mechanical completion that TXIT later countersigned. Dkt. 490 at 8-14. Accordingly, any failure in the heat exchanger in late 2023 would have fallen outside the ISBL's 2-year warranty period and, therefore, would not have been Polaris's responsibility to repair or replace. *See* 2/26/24 AM Tr. at 63-65; PX1 Art. XIII.

*Finally*, TXIT sought $16,756,017 in retrofit costs related to processing "heavy crudes." *See* 2/26/24 AM Tr. at 5. But as discussed in Part II.C, the ISBL Agreement does

not contain any promises related to crudes with a distillation curve materially different than Table 1. To the extent TXIT argues that the FEL-2 Report somehow makes guarantees related to these crudes, it is wrong because this report is not incorporated into the ISBL Agreement. *See supra* Part II.C. And *even if* the FEL-2 Report was incorporated into the ISBL Agreement, TXIT cannot establish that retrofitting was required to meet its requirements. The FEL-2 Report *at most* provided that the Facility could process heavy crudes, period (i.e., *some* heavy crudes). It did not promise that the Facility could produce a certain quantity of heavy crudes per day. Accordingly, since the trial evidence established that the Facility could process some heavy crudes, then even *if* the FEL-2 Report was incorporated by reference, there is no evidence of breach, and therefore TXIT was not entitled to any retrofitting damages. Therefore, any costs associated with modifying the Facility to better process non-Table 1 "heavy crudes" are unrecoverable as a matter of law.

### 3.    TXIT's damages are capped at 10% of the contract price.

Section 12.2 of the ISBL Agreement states that: "Contractor's maximum aggregate liability to Owner . . . shall not exceed Ten Percent (10%) of the Contract Price." PX1 § 12.2. The Contract Price was defined to be $59,221,784, subject to adjustment by change order. *Id*. § 7.1. Any judgment against Polaris—inclusive of all damages, attorneys' fees and other costs—cannot exceed 10% of that price.

## CONDITIONAL MOTION FOR NEW TRIAL

**III.** ***If*** **the Court were to grant TXIT's motion for new trial (which it should not do), Polaris is entitled to a new trial on the issue of its lost profits damages.**

Polaris intends to vigorously defend recovery of its damages for breach of the ISBL Agreement on appeal and does not affirmatively seek a new trial on this claim. However, in the unlikely event that this Court or the Fifth Circuit were to grant TXIT's anticipated request for a new trial, then Polaris also requests that its claim for lost profits under the ISBL Agreement be included in the scope of any new trial.

### A.     The court erred in concluding that the *Zachry* bad faith exception did not apply to the ISBL Agreement's consequential damages bar.

Under Texas law, contractual bars on consequential damages are not enforceable when a party breaches the contract in bad faith. *See Zachry*, 449 S.W.3d at 116. The "purpose of the [ ] exception is to preclude a party from insulating himself from liability for his own deliberate, wrongful conduct." *Id.*

This Court erred in limiting *Zachry* to its facts. Numerous Texas courts have extended *Zachry* beyond the delay-damages context. *See, e.g., Brennan v. Kaufman*, No. 14-19-00513-CV, 2021 WL 3729257, at *5–6 (Tex. App.—Houston [14th Dist.] Aug. 24, 2021, pet. denied) (applying *Zachry* to invalidate a broad-form release of tort liability); *see also Armstrong v. Curves Int'l, Inc.*, No. 6:15-cv-294-RP, 2017 WL 894437, at *12 (W.D. Tex. Mar. 6, 2017) (construing *Zachry* as holding broadly that "pre-injury waivers of future contract liability for harm caused intentionally or recklessly [are] unenforceable on grounds of public policy"); *see also e.g., Hill v. Fitness Int'l, LLC*, No. 02-22-00142-cv, 2023 WL

2607646, at *8 (Tex. App.—Fort Worth Mar. 23, 2023, no pet.) (mem. op.); *Bachtell Enters., LLC v. Ankor E&P Holdings Corp.*, 651 S.W.3d 514, 522 (Tex. App.—Houston [14th Dist.] 2022, pet. denied); *McCloskey v. Clubs of Cordillera Ranch, LP*, No. 04-17-00234-CV, 2017 WL 6502444, at *3 (Tex. App.—San Antonio Dec. 20, 2017, no pet.) (mem. op.).

Moreover, the Fifth Circuit has repeatedly instructed that the policy rationales of state supreme court decisions—as opposed to their factual specificities—must guide an *Erie* guess. *See Harris Cnty. Water Control & Improvement Dist. No. 89 v. Phila . Indem. Ins. Co.*, 31 F.4th 305, 309 (5th Cir. 2022). When a state supreme court has articulated a legal rule in "categorical language," the Fifth Circuit deems it to have clearly spoken. *See Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008). In *Zachry*, the Texas Supreme Court articulated a general, categorical rule. It stated:

> Generally, a contractual provision 'exempting a party from tort liability for harm caused intentionally or reckless is unenforceable on grounds of public policy.' ***We think the same may be said of contract liability***.

*Zachry*, 449 S.W.3d at 116 (emphasis added). Based on this categorical, unambiguous language, the Fifth Circuit would be unlikely to limit *Zachry* to its specific facts.

Finally, even supposing the Texas Supreme Court intended for *Zachry* to apply only on its facts, it is difficult to imagine a more factually analogous situation than the one presented here. Like *Zachry*, this case involves a dispute about whether a limitation of consequential damages bars a contractor from recovering from an owner's intentional misconduct. While the specific categories of damages limited by the relevant provisions

differ, the underlying logic for allowing the contractor to recover is exactly the same. Like the no-delay-damages provision in *Zachry*, the consequential-damages limitation in the ISBL Agreement aims to allocate risk for foreseeable losses—not to permit TXIT to "intentionally injure [Polaris] with impunity." *Id.* at 117; *see also Fiorito Bros., Inc. v. Fruehauf Corp.*, 747 F.2d 1309, 1315 (9th Cir. 1984). Accordingly, enforcing the ISBL Agreement's consequential damages limitation against Polaris here would run afoul of the same public policy concerns animating *Zachry* by "incentiviz[ing] wrongful conduct and damag[ing] contractual relations." 449 S.W.3d at 116.

For all these reasons, the Court erred in limiting *Zachry* to its facts and entering judgment as a matter of law against Polaris on its claim for lost profits.

**B.    Polaris presented sufficient evidence of bad faith and lost profits to be entitled to the submission of these issues to the jury.**

Polaris presented sufficient evidence of bad faith and lost profits to warrant the submission of this issue to the jury.

**1.    There is sufficient evidence of bad faith.**

With respect to bad faith, the evidence at trial established that TXIT's decision to shut down the ISBL Facility in the summer of 2020 was motivated by the downturn in the MEH market following the pandemic—not Polaris's purportedly deficient work. TXIT knowingly and intentionally blamed Polaris for its breach to avoid paying for the Facility when it was already facing financial strain.

There was testimony at trial that Todd Sullivan, Chairman and Managing Principal of TXIT, boasted on repeated occasions that he does not "pay full price" for anything, including his legally binding contracts. 2/7/24 PM Tr. at 16, 23-25. TXIT followed that strategy here by repeatedly and intentionally attempting to evade its contractual obligations. For example, TXIT:

- voluntarily signed a certificate of mechanical completion, but then attempted to revoke it despite the lack of any contractual provision allowing it to do so, 2/8/24 AM Tr. at 97-98; Dkt. 490 at 12 ("The contract provides no method for revoking mechanical completion.");

- admitted internally that the Facility "had definitely reached stable operations," while at the very same time telling Polaris that the facility was not achieving stable operations, 2/8/24 AM Tr. at 103-06;

- refused to supply Polaris with Table 1 crude for performance testing, as it was obligated to do under the contract, even though the crude was in its possession, and instead sold the crude to a third-party, 2/7/24 AM Tr. at 59-61;

- told Polaris that the Facility could not meet performance guarantees during performance testing, while at the same time making an economic decision internally to run the facility only at 30,000 barrels per day due to low crude oil prices, 2/8/24 PM Tr. at 106-18.

The evidence at trial also established that TXIT's decision to walk away from its contractual obligations to Polaris was motivated by a post-pandemic market downturn, not Polaris's performance under the parties' agreements. *See, e.g.*, PX326 (Sullivan admitting the economic conditions presented the "worst-worst case scenario" for TXIT); PX141 (GCC's Bormaster admitting that running MEH contract crude through the ISBL Facility "drastically hurts" GCC and TXIT's economics); PX294 (GCC's Smith admitting the

market for crude is was "dismal"); PX328 (Sullivan characterizing the economic backdrop

as a "generational refining market disaster"); 2/14/24 AM Tr. at 51 (Bill Sullivan testifying

that he and his operations team "wasn't trying to get up to 50,000 barrels a day. We were

running 30,000 barrels a day in 2-cut mode. We were told [by management] to stay there"),

at 54 (Sullivan testifying that "economic and planning group" told him to "maintain

30,000 barrels in 2-cut operations" even though "there was nothing unsafe about the

unit"); 2/12/24 PM Tr. at 63-64 (Crouthamel testifying that on August 19, 2020,  after

receiving test results that MGO was on spec at 30,000bpd, he got a call from John Mafrige

"to take the unit back to 2-cut mode . . . for commercial reasons.").[7]

This evidence demonstrates TXIT breached the ISBL Agreement in bad faith.

Instead of either honoring its contractual obligations or choosing to terminate the

agreement for convenience under section 16.7 (and paying the resulting termination

payment under section 16.8), TXIT chose to violate its agreement with Polaris while

---

[7] *See also, e.g.*, 5/8/24 PM Tr. at 99-101 (Waguespack testifying re PX141 that TXIT concluded internally that MEH "hurts our economics" and "must avoid running [it] at all costs"), at 103 ("So in the first quarter of 2020 they start moving away from MEH…. It's economically driven to move away from MEH, but yet the contract is MEH."), at 105 ("[The pandemic] was happening right when the facility is complete. And [TXIT is] in the—they're in this sort of worse—almost unprecedented worse refining margin environment"), at 107 ("And then you see for a string of months, it's like – it's $1 per barrel [margin]. So there is no incentive whatsoever to run barrels through"), at 114 ("Q: So is it fair to say there is a potential plan being discussed on August 7th [2020] to shut the refinery down for economic reasons for the next six months. Is that correct?  A: I think it's pretty clear by [Harrison's] email here. Q: And is that consistent with your view of the market at that time, looking back at futures predictions and historical data?  A: Yeah. I mean, it's certainly consistent with that environment and not surprising."), at 116 ("[Crudes] were all bad. There were no good crudes to try to run [in late summer 2020]. They were all sinking to the bottom along with the rest of the industry at this point."), at 117 ("As I mentioned, [TXIT is] going to transition the unit to two-cut mode kind of going the opposite direction of where they performance test needed to get to."), at 120 (testifying that TXIT never asked Polaris to performance test using the eight days of MEH supply TXIT had on hand in fall 2020 and instead TXIT sold off the MEH and idled the unit).

simultaneously blaming Polaris for TXIT's own intentional misconduct. *See Zachry*, 449 S.W.3d. at 104, n.7 (defining "bad faith" as the "conscious doing of a wrong for a dishonest purpose"). Making matters worse, TXIT repeated these known falsehoods to third parties (namely, Polaris's bond broker, Scott Chapman), which, as shown below, prevented Polaris from obtaining bonds on future work. *See* PX388.

### 2. There is sufficient evidence of lost profits.

Polaris also presented sufficient evidence of its lost profits. Lost profits must be demonstrated with "reasonable certainty" using competent evidence. *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1098 (Tex. 1938); *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). "[O]pinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Holt Atherton*, 835 S.W.2d at 84. But the loss alleged does not need to be susceptible to exact calculation. *See Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994). If a party has proven "the fact of legal of damages," any "uncertainty as to the amount will not defeat recovery." *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 280 (Tex. 2015). "A party who breaks his contract cannot escape liability because it is impossible to state or prove a perfect measure of damages." *Id.*

Mr. Nodier, co-owner and President of Polaris, testified that Polaris lost $185 million in profits on bids and contracts that Polaris *won*, but ultimately was unable to work on because TXIT's misconduct prevented Polaris from obtaining necessary bonds. 2/7/24 AM Tr. at 72-76, 79-83, 90-104. In support of this testimony, Polaris introduced evidence

of the prices of the specific lost contracts, the expected overhead, the percentage used to calculate the profit margin, and the percentage used to determine the risk that the project would cost more than expected. *See* PX613; PX162.[8] Mr. Nodier testified that he "was directly involved with developing all of these numbers," drawing on his thirty years of experience working on dozens of similar projects. 2/7/24 AM Tr. at 93.

Texas law is clear that this evidence suffices to establish lost profits with reasonable certainty. *See, e.g., Anthony Equip. Corp. v. Irwin Steel Erectors, Inc.*, 115 S.W.3d 191, 204 (Tex. App.—Dallas 2003, pet. dism'd); *Toshiba Mach. Co., Am. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 778–79 (Tex. App.—Fort Worth 2005, pet. granted, judgm't vacated w.r.m.). For example, in *Anthony*, the Dallas Court of Appeals affirmed a jury verdict awarding an established construction company lost profits supported by very similar evidence. *Id*. The company's owner testified about the circumstances surrounding the lost contract. *Id*. He then introduced an exhibit into evidence that listed "the profit margin on [the company's] construction projects" as a percentage and the contract price of the lost project. *Id*. The owner testified that he determined the lost profits caused by the lost bid by multiplying the two together. *Id*. The court held the owner's testimony was legally sufficient evidence of lost profits. *Id*. at 204–05; *see also Toshiba*, 180 S.W.3d at 777–79 (affirming an award of lost profits where the company's president testified about the

---

[8] PX613 details $182 million of Polaris's $185 million in lost profits. The remaining $3 million is reflected in PX162, which pertains to a substantial pool project Polaris was awarded, but was unable to complete, due to diminished bonding capacity. *See* PX609 (the underlying contract), PX610 (notice to proceed); PX611 (change order); 2/7/24 AM Tr. at 90-92.

circumstances of the lost sales, and multiplied the gross sales lost by a profit margin derived from the company's past financial information); *Meaux*, 607 F.3d at 170-72 (holding that a corporate officer's testimony as to lost profits, combined with the company's history of past profitability, was legally sufficient to establish lost profits).

Polaris also presented sufficient evidence linking TXIT's bad faith misconduct with the profits Polaris lost. *See, e.g.*, 2/16/24 AM Tr. at 87-88 (Nodier testifying that after TXIT made a claim on the ISBL bond, he met with five bond companies regarding a new project and Polaris was unable to get a bond from any of them, despite never having trouble getting bonds previously); PX388; *Meaux*, 607 F.3d at 169–70 (Juries "may infer proximate causation from circumstantial evidence" and common sense). Thus, if this Court or the Fifth Circuit grants a new trial, Polaris should be able to press its claim for lost profits.

## CONCLUSION AND PRAYER

For the foregoing reasons, Polaris requests that the Court render judgment that TXIT take nothing on its conversion and promissory estoppel claims (and thus remove the $2,050,000 offset), render judgment that Polaris prevailed on its claim for breach of the OSBL Engineering Agreement (and thereby increase the awarded actual damages by $537,000), and grant all the other relief to which it is entitled. In the event this Court grants a new trial for any reason (and it should not), Polaris requests that it be permitted to pursue its claim for lost profits arising out of TXIT's bad faith breach of the ISBL Agreement.

Dated: June 7, 2024

Respectfully submitted,

**HAYNES AND BOONE, LLP**

*/s/ Mark Trachtenberg*
Mark Trachtenberg, State Bar No. 24008169
Polly Fohn, State Bar No. 24065318
Kaylen Strench, State Bar No. 24126549
1221 McKinney, Suite 4000
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
*mark.trachtenberg@haynesboone.com*
*polly.fohn@haynesboone.com*
*kaylen.strench@haynesboone.com*

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Tony Guerino*
Tony Guerino, Bar No. 00792552
Elizabeth E. Klingensmith, Bar No. 24046496
Jonathan T. Sink, Bar No. 24099968
Ryan Steinbrunner, Bar No. 24093201
R. Yona Starosta, Bar No. 24120668
909 Fannin St., Suite 2000
Houston, Texas 77010
Telephone: 713-276-7695
Facsimile: 713-276-7673
*tony.guerino@pillsburylaw.com*
*liz.klingensmith@pillsburylaw.com*
*jonathan.sink@pillsburylaw.com*
*ryan.steinbrunner@pillsburylaw.com*
*yona.starosta@pillsburylaw.com*

***Attorneys for Plaintiff Polaris Engineering, Inc. and Third-Party Defendants Polaris Construction, Inc., Gerry Obluda, and Michael Nodier***

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been served on counsel of record for all parties via the Court's CM/ECF system on June 7, 2024.

*/s/ Mark Trachtenberg*
Mark Trachtenberg